**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| DAN FRANKENSTEIN, individually, and on behalf of all others similarly situated, and on behalf of the HMSHOST 401(k) RETIREMENT SAVINGS PLAN AND TRUST,<br><br>     *Plaintiff*,<br><br>    v.<br><br>HOST INTERNATIONAL, INC.; HMSHOST 401(k) RETIREMENT SAVINGS PLAN AND TRUST RETIREMENT COMMITTEE; COLEMAN LAUERBACH; and DOES NO. 1-10, Whose Names Are Currently Unknown,<br><br>    *Defendants*. | Case No.: 8:20-cv-01100-PJM |

**SUR-REPLY IN OPPOSITION TO PLAINTIFF'S REPLY**
**IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

## I. Introduction

Plaintiff's Reply offers new evidence and a new argument in support of his Motion for Class Certification to which Defendants have had no opportunity to respond. *See* ECF No. 88. First, Plaintiff offers the June 9, 2022 Initial Expert Report of James E. Turpin ("Turpin Report"), which Plaintiff describes as providing "two methodologies for calculating the Plan's losses overall." Such new evidence is improper in a Reply, and in any event, the Turpin Report addresses remedies that are unavailable in this Action and is therefore irrelevant. Second, to avoid evident conflicts arising from Plaintiff's legal claim that should preclude class certification, Plaintiff asserts a new argument—that each Plan participant should have the *option* to decide whether 401(k) withholdings will be taken from their credit card tips, or whether they will receive such tips in cash. This argument misconstrues the true issue before the Court—the

interpretation of the Plan language—and ignores the necessary results of Plaintiff's proposed interpretation, which would preclude Plan participants from receiving credit card tips in cash at the end of their shifts. Finally, Plaintiff wholly misrepresents the position of the NLRB regarding the unfair labor practice claim asserted by Plaintiff's own union by mischaracterizing the deposition testimony of Brian Donohoe. In so doing, Plaintiff attempts to sweep under the table the critical impediment to any class-wide relief in this case.

## II.    Plaintiff's Submission Of Mr. Turpin's Expert Report Is Both Improper For Reply, And Irrelevant As It Addresses Remedies Not Within This Court's Purview

Plaintiff offers for the first time with his Reply the Turpin Report. That report purports to reflect how Plaintiff will demonstrate that class members suffered an injury and how that injury would be remedied on a class-wide basis. *See* ECF No. 88 at 7-8, 14; *see also* ECF No. 88-10. The Turpin Report, however, at best, offers a legal conclusion regarding how certain errors might be addressed by the Internal Revenue Service ("IRS") and the Department of Labor ("DOL")—not remedies that are available to Plaintiff in this Action. As such, the Turpin Report and related testimony is irrelevant to this Action, and in any event should be excluded as improper legal opinion.[1]

Mr. Turpin opines that "[n]ot following the specific terms of the Plan represents an operational failure," which could "result in adverse tax consequences." Turpin Report at 4. He then notes that the IRS and DOL "provide guidance on correcting plan failures," including through the IRS' Employee Plan Compliance Resolution System (EPCRS), and the DOL's

---

[1] Mr. Turpin's testimony also appears to fall far short of any standard for expert testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). But, as Defendants have not yet had an opportunity to depose Mr. Turpin, Defendants reserve their right to move to exclude that expert report on *Daubert* grounds at the appropriate time.

Voluntary Fiduciary Correction Program (VFCP). He then describes the ways to correct operational failures under EPCRS and VFCP, quoting extensively from the regulations.

In the first instance, Mr. Turpin's opinion is simply improper legal opinion. *See*, *e.g.*, *Sun Yung Lee v. Clarendon*, 453 F. App'x 270, 278 (4th Cir.2011) ("While expert witnesses may testify as to the ultimate matter at issue, Fed.R.Evid. 704(a), this refers to testimony on ultimate facts; testimony on ultimate questions of law, i.e., legal opinions or conclusions, is not favored.") (quoting *Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir.2007)); *Safeway, Inc. v. Sugarloaf P'ship*, 423 F. Supp. 2d 531, 539 (D. Md. 2006) ("Evidence supplied by experts as to legal conclusions is not admissible, nor indeed evidence at all.") (internal quotation marks and citation omitted). Mr. Turpin offers no more than (i) an opinion that the purported conduct constitutes an "operational failure," (a legal conclusion), and (ii) a summary of how the IRS and the DOL permit companies to resolve operational failures to avoid disqualification of the plan (another legal conclusion). Mr. Turpin spends pages describing the 140-page long EPCRS revenue procedure, the IRS 401(i) Fix-It Manual, and the guidelines for the DOL's VFCP. That entire discussion is simply Mr. Turpin's attempt to interpret the regulations and guidelines that might apply if this were a proceeding before the IRS or the DOL. Even if that procedure was relevant (which it is not), the interpretation of those procedures would be a question for the Court; not the proper subject of expert testimony. *United States v. McIver*, 470 F.3d 550, 562 (4th Cir.2006) ("[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible."); *Peters v. Baltimore City Bd. of School Com'rs*, 2014 WL 4187307, at *7-8 (D. Md. Aug. 21, 2014) (striking portions of expert's report that were legal conclusions that invaded the province of both the judge and jury).

Aside from being an improper legal opinion, the Turpin Report is also irrelevant to this matter because the correction methodologies Mr. Turpin describes apply (if at all) only to proceedings before the IRS and DOL. Those methodologies are not proper ways to measure losses in a breach of fiduciary duty claim. Both the Fourth Circuit and the District of Maryland have found that IRS determinations have no impact on ERISA actions brought in federal court. For example, in *Cross v. Bragg*, 329 Fed. Appx. 443, 455-56 (4th Cir. July 24, 2009), the Fourth Circuit explained that "the IRS [EPCRS] determination is neither helpful nor controlling in this appeal." *Id.* Rather, the "primary purpose of the IRS's EPCRS program "is to authorize an ERISA plan to amend its provisions without losing the tax exemption provided for by 26 U.S.C. § 501(a)." *Id.* Such proceedings are "*ex parte*," "predicated only on the submissions of the ERISA plan seeking relief," and "only resolve[] issues between the IRS and the ERISA plan." *Id.* As such, "[a]lthough [courts] accord great deference to the IRS with respect to tax policy and regulation, the judiciary retains its dominion in ERISA civil actions." *Id.*

Similarly, in *Chavis v. Plumbers and Steamfitters Local 486 Pension Plan*, --- F.Supp.3d ----, 2020 WL 1503679, at *34 (D. Md. Mar. 27, 2020), Judge Hollander explained that the IRS's EPCRS program is a "voluntary process" that is "designed to encourage self-correction by limiting fees, sanctions, and overall liability for plans that choose to take advantage of it." *Id.*

Mr. Turpin's opinion that either the IRS or the DOL's voluntary programs outline "an acceptable method" to remedy Plaintiff's claims in this lawsuit is contrary to binding Fourth Circuit precedent and should be disregarded. Losses, if any, would be measured by comparing what would have happened "but for" the alleged conduct with what actually occurred.  *See, e.g., Plasterers' Local Union No. 96 Pension Plan v. Pepper,* 663 F.3d 210, 221 (4th Cir. 2011) (proper measure of losses compares what Plan actually earned with what plan would have earned

if assets properly invested); *Peters v. Aetna Inc.*, 2 F.4th 199, 224 (4th Cir. 2021) ("the measure of loss requires a comparison of what [plaintiff] and the Plan would have paid [but for the alleged conduct], and what they actually paid. . ."). Mr. Turpin's methodology makes no effort to estimate losses in that manner.  In fact, Mr. Turpin's methodology—under which participants would retain the tips they were already paid, and would be credited with an additional 50% or 100% of the amount of those tips in their retirement accounts—would result in a windfall to Plaintiff. *See* Exhibit A, attaching Expert Report of Greg Eastman ("Eastman Report") at ¶ 54. ERISA does not permit windfall remedies. *See Walsh v. Vinosky*, 19 F.4th 672, 683 (4th Cir. 2021) ("The aim of ERISA is 'to make the plaintiffs whole, but not to give them a windfall.'") (quoting *Henry v. Champlain Enters.*, 445 F.3d 610, 624 (2d Cir. 2006) (Sotomayor, J.)); *see also Harms v. Cavenham Forest Indus.*, 984 F.2d 686, 693 (5th Cir. 1993) (discussing how "a double-recovery windfall" is "a result abhorred by ERISA").

As demonstrated in the Eastman Report, had Mr. Turpin attempted to calculate losses properly, it would become apparent that individualized factual issues would have to be considered to determine if each, or any, Plan participant suffered any injury (let alone to calculate the amount of that injury). For example, for each Plan participant, one would have to consider whether the participant's reduced withholding level resulted from the alleged wrongful conduct of the Plan fiduciaries or from the participant's own decision about where to spend or invest his or her compensation. Further, any tax consequence arising from the alleged conduct would have to be evaluated participant by participant, considering both their existing and projected future tax rates. Eastman Report at ¶¶ 37-51. By adopting an improper measurement for losses, Mr. Turpin ignores the individualized inquiries that would necessarily have to be resolved even to determine if liability exists.

**III.    Plaintiff's New Argument—That He Only Asks For The *Opportunity* For Tipped Associates To Defer Their Credit Card Tips—Is Inconsistent With His Claims and ERISA**

This lawsuit is based entirely on Plaintiff's theory that "gratuities" (including credit card tips) constitute "Compensation," as defined by the Plan, and therefore the Plan must include those gratuities in calculating the amount deferred from each participants' Compensation. *See* ECF No. 1 at ¶¶ 1, 12-13, 23. Plaintiff asserts that Defendants breached their fiduciary duties by not deferring payment of his (and other tipped associates') tipped income, because the Plan's language *required* Defendants to defer payment of those tips. *See id.* at ¶ 31 (asserting a common questions of fact and/or law common to Plaintiff and purported class members include: (1) "Whether the Plan Document *requires* Defendants to apply the deferral elections of Plaintiff and the Class to the reported tips they receive"; and (2) "Whether Defendants breached their fiduciary duties under ERISA when they *failed to apply the deferral elections* of Plaintiff and members of the Class to their reported tips as alleged herein") (emphasis added); *id.* ¶ 41 ("Defendants acted contrary to the Plan Document by preventing Plaintiff and the Class from contributing a portion of their reported tips based on their deferral elections"); *id.* ¶ 57 ("Defendants refused, and continue to refuse, to comply with the terms of the Plan with respect to Plaintiff's and the Class's rights to contribute a portion of their reported tips to the Plan based on their deferral elections, and receive benefits based on those contributions"). In other words, Plaintiff argues that gratuities must be included in the definition of compensation, and that the Plan *requires* that a participant's full deferral election be effectuated from that compensation, regardless of whether the compensation is paid through tips or salary.

It is axiomatic that for credit card tips to be deferred into the Plan on a pre-tax basis, those credit card tips cannot be paid out at the end of each shift. Once the tips have been paid

out, that payment is a taxable transaction that cannot be retroactively reversed. Eastman Report ¶ 22. Indeed, Plaintiff acknowledges this concept as he has clarified that he only seeks to represent Plan participants who received *credit card* tips—not *cash* tips—and is amenable to modifying his proposed class definition accordingly. ECF No. 88 at 1, n2. For the Plan to defer taxes on credit card tips that participants receive from customers, those tips would have to remain with Host and be placed into the Host payroll system to be paid on a bi-weekly basis.

Under Plaintiff's theory of his claims, there is no basis for some participants to "opt in" to having credit card tips available for purposes of their pre-tax deferral elections and some participants to "opt out" of having credit card tips available for purposes of their pre-tax deferral elections. There can be only one interpretation of the Plan document—either credit card tips are not "effectively available compensation" under the Plan or they are. To paraphrase Plaintiff (Reply at 1), the answer must be either *yes* (the Plan considers tips as effectively available) or *no* (the Plan does not consider tips as effectively available). *See* ECF No. 88 at 1.

If that determination is made in Plaintiff's favor, Plan fiduciaries (under Plaintiff's theory) would have to ensure that the Plan had access to *all* compensation, including both credit card and cash tips.[2] To do that, Plan fiduciaries would have to cause the Company to withhold tips from all plan participants until the biweekly pay period, when it can determine whether the participant's salary will be sufficient for that period to meet the withholding obligations.  Thus, any tipped employee participating in the Plan would be required to forego payment of credit card tips in cash.

---

[2] Note, as Defendants have argued elsewhere, the means of paying compensation and payroll is a function of Host as a company, and is not an administrative or fiduciary function controlled by the Plan or the Plan administrator. Thus, Defendants dispute that Plan fiduciaries have any authority to change the way in which the Company makes those payments. The above discussion assumes, only for purposes of this submission, that Plan fiduciaries did somehow have control over how the company pays compensation and payroll.

In short, Plaintiff has framed the question improperly. Plaintiff argues that the case is about whether class members have a "right"— rather than an obligation—to defer a portion of their reported credit card tips on a pretax basis. ECF No. 88 at 1. That is not the question the Court must resolve. The Court must resolve how the Plan should be interpreted (giving proper deference to the administrator's interpretation), and whether tips must be deemed "effectively available compensation." If credit card tips are deemed "effectively available compensation," then the Plan Administrator would have to withhold income from both credit card and cash tips for all participants, and no participants could receive their credit card or cash tips at the end of their shift. Because many participants actually prefer to receive their credit card tips in cash at the end of each shift, this question presents precisely the conflict identified in Defendants' Opposition to Plaintiff's Motion for Class Certification. *See* ECF No. 85 at 22-26. Plaintiff offers no other meaningful rebuttal to this critical argument.

## IV.    Plaintiff's Blatant Mischaracterization Of Mr. Donohoe's Deposition Testimony Impacts Defendants' Argument That Substantial Conflicts Exist Across The Proposed Class

In their Opposition, Defendants argue that class certification is inappropriate because, among other reasons, Plaintiff is susceptible to individualized labor defenses as he and his fellow colleagues are subject to a unique CBA that governs the terms and conditions of their employment, which arguably includes the Tips Policy at the core of Plaintiff's complaint. ECF No. 85 at 30. Specifically, Defendants assert that whether Plaintiff's CBA precludes Host from unilaterally changing the Tips Policy—and precludes Host from acting the way Plaintiff demands—requires an individualized analysis of all CBA terms. *Id.*

To counter this argument, Plaintiff argues that "the NLRA is not an obstacle" and that "[t]he [NLRB] agreed with Host International's position [that changes to the Tips Policy did not

violate the NLRA] . . . ." ECF No. 88 at 3-4. In support of this incorrect argument, Plaintiffs cite to deposition testimony from Brian Donohoe, Host's Senior Director of Labor Relations. *Id. (*citing Donohoe Dep. Tr. 76:7-77:15). But Mr. Donohoe *did not* testify that the NLRB agreed with Host's position and *there is no evidence* to support such a finding. Rather, in response to questioning whether Mr. Donohoe had an understanding of why Local 11's unfair labor practice charges had been withdrawn, he stated, "I don't know why they've been withdrawn, but they were withdrawn shortly after the company submitted its position statement to the board agent investigating it." *See* ECF No. 89-1, Donohoe Dep. Tr. at 76:3-77:6.[3]

Therefore, the Court should disregard Plaintiff's argument that the NLRA "is not an obstacle" that would preclude Host from acting the way Plaintiff demands.

## V.    Conclusion

For the foregoing reasons, Plaintiff's Motion for Class Certification should be denied.

---

[3] Defendants also strongly dispute Plaintiff's characterization of Mr. Lauterbach's testimony. *See* ECF No. 88 at 6-7. But because Mr. Lauterbach's testimony is not material to the Court's consideration of Plaintiff's Motion for Class Certification, Defendants do not address these mischaracterizations at this time.

Dated: August 4, 2022

/s/ Reginald Goeke
**MAYER BROWN LLP**
Reginald Goeke
Katherine Monks
Michelle Webster (admitted *pro hac vice*)
1999 K Street NW
Washington, DC 20006
Telephone: (202) 263-3241
Facsimile: (202) 263-5241

**MAYER BROWN LLP**
Nancy G. Ross (admitted *pro hac vice*)
Andrew Rosenman (admitted *pro hac vice*)
Megan E. Troy (admitted *pro hac vice*)
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I certify that, on August 4, 2022, a true and accurate copy of the foregoing was

electronically filed with the Clerk's Office using this Court's electronic filing system, which will

then send a notice of electronic filing to all attorneys of record:


*/s/ Reginald Goeke*
Attorney for Defendants