**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)**

| | |
|---|---|
| DAN FRANKENSTEIN, individually, and on behalf of all others similarly situated, and on behalf of the HMSHOST 401(k) RETIREMENT SAVINGS PLAN AND TRUST,<br><br>    Plaintiff,<br><br>  v.<br><br>HOST INTERNATIONAL, INC.; HMSHOST 401(k) RETIREMENT SAVINGS PLAN AND TRUST RETIREMENT COMMITTEE; COLEMAN LAUERBACH; and DOES NO. 1-10, Whose Names Are Currently Unknown,<br><br>    Defendants. | Case No.: 8:20-cv-01100-PJM |

**HOST DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S PROPOSED SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW ON CLASS <u>CERTIFICATION</u>**

  Plaintiff stands alone. After two class hearings, two rounds of discovery, multiple depositions, and extensive briefing, that much is clear. Plaintiff conceded in his deposition that he knew of no one who sought the relief he sought, and after over two years he could not find even a single person to support his position, even when directly asked to do so by the Court. This alone dooms Plaintiff's Motion for Class Certification. Yet Plaintiff's Post-Hearing Findings of Fact and Conclusions of Law ("Plaintiff's Findings") further undermine his own Motion.

  Plaintiff's Findings suffer from numerous fatal deficiencies: First, Plaintiff erroneously attempts to shift the burden on class certification to the Defendants, arguing that it is Defendants' obligation to demonstrate the existence of a conflict, rather than Plaintiff's burden to show the lack

of any conflict. Plaintiff takes this position out of necessity, because Plaintiff made no attempt at all to show the lack of any conflict. Yet, the Fourth Circuit is clear that Plaintiff bears the burden on all elements of class certification. In any event, even if there had been a burden on Defendants to show the existence of a conflict, the evidence at the hearing was overwhelming, and Plaintiff failed to provide any evidence at all to rebut the point.

Second, Plaintiff's argument is predicated on ignoring the thrust of his own claim. Plaintiff focuses on the interpretation of the Plan document as if that is the only issue to be litigated. But, the thrust of Plaintiff's claim lies not in the Plan document itself, but in the manner in which tips are paid to tipped employees. This is a process that is not governed by the Plan document and that differs based on the location and the union negotiations. It is only by ignoring that central fact that Plaintiff can pretend that his claim is amenable to class wide treatment.

Third, Plaintiff mischaracterizes the role of the unions. He argues that they are not class members or participants so have no standing in the action. But, this is premised on the prior error – Plaintiff is trying to sweep under the rug that the thrust of his claim is ***not*** about how the Plan withholds deferrals, but rather it is about how tips are paid to tipped employees. On that second issue, the unions play an important and dispositive role. The payment of wages is a mandatory subject of bargaining, and the unions have consistently argued that the way tips are paid is also a mandatory subject of bargaining. As noted in Defendants' Findings of Fact and Conclusions of Law (Dkt. 149) ("Defendants' Findings"), the union is uniquely positioned to negotiate regarding the method of payment of tips, and it would be improper to use the class mechanism to remove that bargaining right from the unions.

## PLAINTIFF'S BACKGROUND AND FINDINGS OF FACT

Plaintiff's Supplemental Proposed Findings of Fact (Dkt. 148) suffer from several fundamental misconceptions.

**Definition of "Missed Deferral Opportunities" and failure to Separate Plan and Corporate Functions.** The most fundamental failure of Plaintiff's argument in favor of class certification is the failure to define what constitutes a "missed deferral opportunity," and the role of the Plan and the corporate payroll function. By glossing over the specific elements Plaintiff must prove, Plaintiff obfuscates the conflict that exists.

Plaintiff's Findings posit that the "gravamen" of his complaint is that Defendants caused a "missed deferral opportunity." (Plaintiff's Findings at 2). Plaintiff offers two definitions for that term: (1) it is when "an employee who is supposed to have the opportunity to defer, for whatever reason, is not allowed to do so," and (2) that a missed deferral opportunity indicates that "the Plan Administrator has failed to oversee the point of sale activities to make sure that all credit card tipped income is properly categorized and coded for inclusion in the Plan. Plaintiff's Findings ¶ 23. The second statement is simply incorrect: First the Plan Administrator does not oversee point of sale activities; that is done by Host outside of the Plan. Second, Plaintiff glosses over that the *Plan* does not require that credit card tipped income be coded for inclusion in the Plan unless that income is processed through the payroll function and appropriate deductions are taken.

Plaintiff concedes that the Plan limits a participant's contribution to his "effectively available Compensation," and that the Plan defines that term to mean "Compensation remaining after all applicable amounts have been withheld." Plaintiff's Findings ¶ 17. Plaintiff concedes that the "withholding of applicable amounts" is done through the payroll system, using a "stacking order," to ensure that taxes, garnishments, and other withholdings are made prior to

pre-tax 401(k) deferrals. Plaintiff's Findings ¶¶ 21, 26. Thus, for any Compensation to be "effectively available" it must be processed through the Payroll system and have applicable amounts withheld. If the Compensation is not processed through the payroll system, then it is not eligible under the Plan, and would not constitute a "missed deferral opportunity." Contrary to Plaintiff's assertion, none of this has to do with "overseeing the point of sale activities to make sure credit card tips are properly categorized." Plaintiff's Findings ¶ 23.

This is where the conflict in this case arises. For credit card tips, Host and its unions (both under the CBAs *and* by operation of law[1]) consider those tips to be property of the employee, and Host's tips policy provides that the tips will be paid out in cash at the end of the employee's shift. If the tips are paid in cash at the end of a shift, they do not go through payroll, do not have applicable withholdings taken out, and therefore cannot become effectively available compensation. Those tips would not be eligible for pre-tax deferral, and thus cannot constitute a missed deferral opportunity.

The only way to make those tips eligible for pre-tax deferral under the Plan is to have the tips paid through the payroll system. This means that the tips cannot be paid out in cash at the end of the night. As noted repeatedly in Defendants' Findings, the evidence is overwhelming that Host's tipped employees prefer to have their tips paid in cash at the end of the night. Dkt. 149 ¶¶ 49-56. And Host's unions—who are the elected representatives of the tipped employees who would be swept up into Plaintiff's class—have fought vigorously to have tips paid in cash, or to receive concessions or control over the process of tip payment if a different mechanism is chosen. *See id*. ¶¶ 54-56.

---

[1] *See* Defs.' Proposed Findings of Fact, Dkt. 149 ¶ 38 (discussing California and federal law stating that tips are property of the employee, not the company).

Plaintiff correctly identifies two methods for deductions to be made from credit card tips. (Plaintiff's Findings ¶ 27). The first is processing the credit card tips through the payroll system – in other words, not paying them out in cash at the end of the shift. The second is using a paycard system – which also means not paying out tips in cash at the end of the shift. Plaintiff posits a third option – withholding the pre-tax deferral at the point of sale and distributing the remaining credit card tips in cash at the end of the shift. *Id.* But, as explained in Defendants' Findings (Dkt. 149 ¶¶ 42-43), this would result in withholding of pre-tax deferral *without* the withholding of other applicable amounts from tipped income. By definition, this would not constitute "effectively available compensation." Nor has Plaintiff identified any evidence to suggest that such a solution is practicable. Defs.' Findings ¶¶ 42-43, 51 n.4. Ultimately, the only way for credit card tips to become effectively available compensation is for those tips to be processed through the payroll system, which means they cannot be paid out in cash at the end of the night.

**Role of the Union.** This leads to the role of the unions. Plaintiff's factual findings repeatedly assert that the unions "waived any rights to bargain with regard to the administration and operation of the Plan," and are not members of the putative Class or participants of the Plan. Plaintiff's Findings ¶¶ 6, 7, 12, 14. Those findings are red herrings. The unions are not asserting rights regarding the operation of the Plan. They are asserting rights regarding the manner in which wages are paid. *See* Defs'. Findings ¶¶ 53-58 (Dkt. 149). As noted in Defendants' Findings, negotiation over the payment of wages is typically a mandatory subject of negotiation with the unions, and Host does not have the authority to unilaterally change that policy. *See* Defs.' Findings ¶ 48.

Plaintiff contends that Host would have the authority to change how tips are paid without negotiating with the union based on the various "Management Rights" provision in the CBAs. Plaintiff's Findings ¶ 13. As an initial matter, it is clear the unions disagree with this position and are willing to take legal action to protect their right to bargain on this issue. *See* Defs.' Findings ¶ 52 (explaining that Plaintiff's own union filed a ULP Charge against Host "following the mere *announcement* of the [paycard] program" at a *different* location). Second, whether any of the "Management Rights" provisions in any of the CBAs actually provide Host with the authority to change how tips are paid without negotiation with the union is a question that has not been adjudicated. As Host labor negotiator Mr. Donohoe explained at the Hearing, Host made this argument in a letter to the NLRB in response Local 11's ULP Charge to avoid waiving a potential argument in future proceedings. *See* Mar. 27, 2024 Hrg. Tr. 127:17-128:8. No legal determination on this question has ever been made for Local 11's CBA (or for any other CBA), and Mr. Donohoe went on to state that the unions "absolutely did not agree" with the position Host took in its letter. *Id.* 128:9-11. If the issue were to be resolved, it would fall within the jurisdiction of the NLRB to make that determination. *See* Defs.' Findings ¶ 94 (citing 29 U.S.C. § 160) (NLRB has jurisdiction over bargaining orders; *See also Kirkwood Fabricators, Inc. v. NLRB*, 862 F.2d 1303, 1305-6 (8th Cir. 1988) ("Construing and applying the duty to bargain and the language of §8(d) are tasks lying at the heart of the Board's function. This is so because Congress made a conscious decision to delegate to the Board the primary responsibility of marking out the scope of the statutory language and of the statutory duty to bargain."); *United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Industry, Steamfitters & Refrigeration Union, Local 342 v. Valley Engineers*, 975 F.2d 611, 614 (9th Cir. 1992) (noting the "congressional intent to have matters of national labor policy decided in the first instance by the National Labor Relations Board" and that courts should "tread

6

lightly" on matters reserved for the NLRB's consideration). In any event, Host has, in practice, always bargained with the unions over how tips are paid, as evidenced by the fact that Host has spent *years* in difficult negotiations with the unions over this exact question. *See* Defs.' Findings ¶¶ 53-56.

Plaintiff incorrectly contends that Defendants operate the Plan inconsistently by implementing deferral elections of credit card tips only in non-union and select union locations. Plaintiff's Findings ¶ 6. Yet this is premised on a failure to appreciate the two steps in the deferral process discussed above. In the first step, the tips payment (a form of wages) must be paid through the payroll process. That payment is a corporate action totally separate from the Plan. In the second step, the Plan will then apply 401(k) plan deferrals after other applicable withholdings have been made. For all Plan participants—union and non-union alike—if their compensation is paid through the payroll system, and other applicable withholdings have been made (Step one), then appropriate amounts will be deferred into the Plan (Step two). There is no inconsistent application of the terms of the Plan, which govern the second step in that process. The differences that exist lie in the first step of that process, which is not governed by the Plan.

**Class Members**. Plaintiff contends that because 2,291 directly tipped Plan participants had deferral elections in place, those participants should be considered for purposes of evaluating the numerosity of the class. Plaintiff's Findings ¶ 5. But, there is no indication that those participants were unable to defer the full amount of elected compensation into the plan on a pretax basis. In fact, because most of those participants did not receive an arrears notice, the evidence shows that most participants did not miss any deferral opportunity.

The Plaintiff next contends that over 500 participants per year were sent arrears notices (suggesting that the income available for their deferral elections was not sufficient to defer the

7

full amount of the deferral they elected). Plaintiff's Findings ¶ 85. Yet, that number does not suggest that those participants *wanted* to defer more income. Indeed, when given the opportunity to do so, only up to 18%, in any year, made the arrears contribution. *See* Defs.' Findings ¶¶ 104-107. This confirms the evidence that tipped employees preferred to have cash today than to defer income into a retirement program. And, even among those who did make arrears contributions, there is no evidence that they would prefer to have their cash tips withheld so it could be paid into the Plan. If that were the case, Plaintiff might have been able to find one or two other employees to testify on his behalf. He did not. In other words, Plaintiff has presented no evidence that any participant other than himself wants the relief he is seeking.

## ARGUMENT

### I. Plaintiff Fails to Meet His Burden of Showing a Lack of Intra-Class Conflict.

The burden is on the Plaintiff to show the lack of any intra-class conflict. Plaintiff presented no evidence to address the conflict. Plaintiff produced no other participant who wanted the same relief as Plaintiff. Plaintiff did not produce testimony of any union representatives to rebut the testimony of those union representatives who testified that their members opposed Plaintiff's proposed relief. Plaintiff failed to produce any evidence to support his argument that tips could both be paid out in cash to those who prefer it, and also paid through payroll for other participants. In short, Plaintiff has failed to carry his burden to show a lack of intra-class conflict.[2]

Rather than try to meet that burden, Plaintiff seeks to shift the burden. Plaintiff argues that

---

[2] Plaintiff apparently "explains" (without explanation) that the conflicts discussed through Defendants Findings are "manufactured conflicts." Plaintiff's Findings ¶ 121. As Defendants have repeatedly noted, *Host actually wants to move to electronic payment of tips*, and has engaged in years of negotiations to try to reach that result. Host cannot do so because of the unions' objections. Rather than being "manufactured," the evidence reflects an actual conflict that is premised on employee and union preference for payment of tips in cash.

"[i]t is Defendants' burden to prove that an *actual* conflict exists between Plaintiff and the proposed Class members." Plaintiff's Findings, ¶ 120 (emphasis in original). But Plaintiff's only support is a single, decades-old, unpublished, out-of-circuit district court case (*Gutierrez v. Kovacevich "5" Farms*, 2004 WL 3745224 (E.D. Cal. Dec. 2, 2004))[3]. In contrast, the Fourth Circuit is very clear that it is the moving party, Plaintiff here, that bears the burden to prove all elements of Rule 23. *E.g.*, *Gregory v. Finova Capital Corp.,* 442 F.3d 188, 190 (4th Cir. 2006) ("The plaintiff bears the burden of proving all the requirements of Rule 23); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 458–59 (4th Cir. 2003) (quoting *Lienhart v. Dryvit Sys., Inc.,* 255 F.3d 138, 146 (4th Cir.2001)) (same); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321 (4th Cir. 2006) ("[W]e have stressed in case after case that it is *not the defendant* who bears the burden of showing that the proposed class *does not comply* with Rule 23, but that it *is the plaintiff* who bears the burden of showing that the class *does comply* with Rule 23.") (emphases in original).

There are no circumstances in which the burden shifts to the non-moving party in this Circuit, and the Fourth Circuit has rejected any attempt to do so. *See Thorn*, 445 F.3d at 322 (rejecting attempt to shift burden to defendants on issue of individualized determinations of statute of limitations, even though it was defendant's burden on the merits, and stating the Fourth Circuit would "continue, as [it] must, to allocate to the plaintiff the burden of proving compliance with Rule 23.").

Moreover, the Fourth Circuit and courts herein are clear that the Plaintiff bears the burden under Rule 23 specifically to demonstrate the lack of conflicts. For example, in *Broussard v. Meineke Disc. Muffler Shops, Inc.*, the Fourth Circuit held that *plaintiff* had not been able to

---

[3] It should be noted that the *Gutierrez* Court engaged in no analysis related to that conclusion, citing only to cases that that did not squarely address that issue.

9

mitigate its intra-class conflict issues and denied class certification on that threshold question. 155 F. 3d 331, 338 (4th Cir. 1998); *see also Gunnels v. Healthplan Servs., Inc.*, 348 F.3d 417, 431-32 (4th Cir. 2003) (plaintiff met burden to show that intra-class conflicts did not preclude certification); *Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 295 (S.D. W. Va. 2015) (plaintiff met burden of showing class conflicts did not preclude certification). The law in this Circuit is clear: Plaintiff bears the burden on all elements of Rule 23. There is no burden shifting whatsoever, despite Plaintiff's barely supported claim to the contrary. Plaintiff's effort to sidestep his burden only underscores his failure to present evidence to demonstrate a lack of conflict.[4]

Even if there was any burden on Defendants to show the existence of a conflict (which there is not), Defendants more than demonstrated the conflict. Plaintiff's arguments to the contrary simply ignore the overwhelming evidence. As set forth in Defendants' Findings (Dkt. 149) that evidence includes substantial testimony from Baumann, Martin, and Donohoe that employees preferred to receive their tips in cash. Defs.' Findings ¶¶ 53-58. It includes expert testimony that employees in the hospitality industry typically received their tips in cash. Defs.' Findings ¶ 34 (citing Expert Report of David Sherwyn, ECF No. 136-2). It includes the many emails where employees complained about a pilot project that would have resulted in tips not being paid in cash. Defs.' Findings ¶ 89 (listing exhibits). It includes evidence that union negotiators, on behalf of

---

[4] Apparently relying on the supposed burden-shifting argument, Plaintiff argues that Defendants should be faulted for failing to produce a witness from Unite Here Local 11. Plaintiff's Findings, ¶ 64. This is absurd. First, Unite Here Local 11 is *Plaintiff's* Local Union. He used to serve on its negotiating committee. If Plaintiff thought their testimony would support his claim, he would have obtained it. He did not. Further, Plaintiff fails to acknowledge that Local 11 is in active negotiations with Host about precisely the issue of how tips are paid. *See* Dkt. 149 ¶ 52 (testimony of B. Donohoe on ongoing negotiations). That Local 11 opposes the use of the paycard in those negotiations is strong evidence of their opposition to Plaintiff's requested relief. *Id.* Indeed, it was Local 11 that filed a grievance against Host when it announced the start of pilot programs for the Paycard program. *Id.* ¶ 52. Further, Host produced as a witness the company representative, Brian Donohoe, leading those negotiations with Local 11. *Id.* ¶ 23.

10

their members, have opposed any form of change in payment of tips other than in cash. Defs.' Findings ¶¶ 52-58.

Plaintiff's responses are non-sequiturs. Plaintiff argues that the complaints do not pertain to compensating participants for missed deferral opportunities. Plaintiff's Findings ¶ 124. This is not the point. For Plaintiff's claim to succeed, Plaintiff will have to demonstrate that Host is legally obligated to process all tips through the payroll system so that those tips can be deferred under the terms of the Plan. By definition, this means those tips cannot be paid out in cash. In other words, if Plaintiff was to succeed in his claims, all the other employees would have to forego receiving tips in cash or be forced out of the Plan.

Plaintiff contends that the evidence only showed opposition to the way the pilot program was implemented. Plaintiff's Findings ¶ 123. Not so. The evidence reflected that the negotiating team for Unite Here International (comprised of many union locals) opposed any change that would result in tips not being paid in cash; regardless of whether that was done through the paycard program or using the payroll system. Defs.' Findings ¶¶ 52, 54-56. Multiple unions threatened to strike if there was any change from cash payment of tips. *Id.* ¶ 56. Moreover, Mr. Baumann noted that even if they would agree to payment of tips through a paycard program, the unions insisted that they be given the opportunity to negotiate for how those tips would be paid. *Id.* ¶¶ 12, 56. If Plaintiff were to succeed on his claim, the interests of all those union members would be overridden.

Plaintiff contends that the union opposition has no bearing on the interests of the class, notwithstanding that the unions are the entities elected by the unionized employees to negotiate with Host regarding the payment of wages, including tips. Indeed, this Court specifically sought the testimony of the unions to understand the basis of the opposition to Plaintiff's claim. *See* Defs.'

11

Findings ¶ 20 (citing, ECF No. 109, Sept. 7, 2022 Hrg. Tr. at 35:1-8, 38:1-9).

Plaintiff cites to *Becher v. Long Island Lighting* Co., 164 F.R.D. 144, 152 (E.D.N.Y. 1996) for the proposition that a conflict between union and management employees is not sufficient to preclude class certification. That case is inapposite. In that case, the Court noted that class certification should not be founded on a "speculative suggestion of potential conflict," and wanted to see if the conflict "[became] clear." *Id.* at 152. In this case, there has been extensive testimony and evidence showing an actual conflict. Further, in *Becher,* the Court found that conflicts between management and union employees could be addressed with subclasses. Here, there is only one plaintiff—Frankenstein—and he is a unionized employee. There is no ability to create subclasses to address the conflict.

## II. Plaintiff is in a Class by Himself

Plaintiff produced no evidence that anyone else wants the same relief he seeks. Indeed, he testified at his deposition that he knows no one who wants the same relief. Defs.' Findings ¶¶ 76, 116. If the class is not certified, Plaintiff can continue with his individual claim. There is no need or reason to impose Plaintiff's preferred relief on the absent putative class members who oppose it.

Plaintiff attempts to downplay this fundamental deficiency in two ways. First, Plaintiff contends that it is sufficient to have only one named representative of the putative class. Plaintiff's Findings ¶ 81. No one disputes that fact. The issue is whether there are any other participants who want the same relief. The cases cited by Plaintiff are also inapposite. In *Kohl v. Association of Trial Lawyers of Am.*, 183 F.R.D. 475, 483, the plaintiff identified at least 35 putative class members. In *Call v. Ameritech Mgmt. Pension* Plan, 2003 WL 27384268, at *4 (S.D. Ill. Aug. 26, 2003), the plaintiff identified 725 members. In this case, Plaintiff has admitted that he does not

12

know a single other person who shares his interest. Defs.' Findings ¶¶ 76, 116.

Plaintiff relies on a preliminary approval order for a class settlement for a claim brought by Plaintiff's law firm against Hyatt. Plaintiff's Findings ¶ 82. Yet, in that settlement, the Court found that there were 1048 class members. Plaintiff fails to make any proof of a similar number here. In any event, that was a settlement class, where defendants did not contest class certification.

Finally, as noted above, Plaintiff attempts to conflate tipped participants with deferral elections in place, or participants who were sent an arrears notice, with those who share Plaintiff's interest in this class action. Plaintiff presented no evidence to support the contention that any of those participants share plaintiffs' interest. Indeed, as stated in Defendants' Findings of Fact, if anything the evidence suggests that even among those who received arrears notices, only 18% even made an after tax contribution, confirming the testimony that most employees (including Plaintiff) preferred to use their pay to meet immediate expenses; not to save for retirement. *See* Dkt. 149 ¶ 105 (only 18% of employees made after tax contributions); *id.* ¶ 59, 126 (Plaintiff never made an arrears payment and chose not to do so because "[h]e had other things [he] was working on."). *id.* ¶ 57 (citing Mar. 27, 2024 Hrg. Tr. 63:11-25) (Baumann: "personally, I wish workers could care more about the 401(k) and pensions; right? But it's something that people, unfortunately, have bills they have to pay today and that's what really drives the discussion. So, we talked about it, but it wasn't a high priority among the workers, yeah."); *id.* ¶ 57(citing Mar 27, 2024 Hrg. Tr. 99:10-15) (Martin noting employees "don't care about [the] 401(k)")..

### III.    Plaintiff Has Failed to Show the Existence of Commonality

In his attempt to demonstrate the existence of commonality, Plaintiff identifies a list of seven supposedly common questions. But, as the Supreme Court stated in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), "What matters to class certification . . . is not the raising of

13

common 'questions'—even in droves—but, rather, the capacity of a classwide proceedings to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."

As explained in Defendants' Findings, there are critical dissimilarities across Plaintiff's proposed class. A significant portion of the class has suffered no conceivable injury because the income processed through payroll was sufficient to cover their elected deferrals. Defs.' Findings ¶ 113. Differences among the positions taken by the unions may impact both the question of whether Compensation is "effectively available" under the Plan terms, and whether Host could be found to have discriminated against those union members. *Id.* ¶¶ 115, 118. Further, individualized differences in participants' interest in deferring income to retirement, and in their tax rates, will impact whether liability can be determined on a class wide basis. *See id.* ¶¶ 120-129.

Those dissimilarities will preclude the generation of answers common even to Plaintiff's proposed questions across the class. For example, in Plaintiff's Findings, Plaintiff contends that it is a common question whether Defendants breached their duty to implement deferral elections (Plaintiff's Findings ¶ 90 at c). But, the answer to that question will depend on whether Compensation can be deemed "effectively available Compensation," which in turn may depend on whether the union would have permitted the Compensation to be paid through the payroll system. Similarly, Plaintiff contends that the question of whether Defendants "discriminated against tipped employees" is also a common question. (Plaintiff's Findings ¶ 90 at f). Yet, that question too may turn on the relevant union position with respect to how tips are paid. It would be hard to find that Host discriminated against union employees by paying them their tips in cash when it was the union local that insisted on such payment of tips.

Finally, Plaintiff contends that an individualized loss analysis is not required at the class

certification stage. Plaintiff's Findings ¶ 93. While the Court may not need to address the quantum of damages at the class certification stage, the Court does need to address whether there is a fact of injury for any of the class members. *See* Defs.' Findings ¶ 109. Such injury is necessary for those members to have a valid claim or even have standing. *Bond v. Marriott Int'l, Inc.*, 296 F.R.D. 403, 407–08 (D. Md. 2014).

## IV. Plaintiff has Failed to Show that His Claims are Typical.

Plaintiff argues that his claims are typical of the class because there is a "unified practice or course of conduct." Plaintiff's Findings ¶ 97. But, as noted above, Plaintiff can only make that argument by ignoring the multiple steps involved in the deferral process. It is true that the Plan treats all participants the same: For all participants (salaried, union and non-union employees), their deferrals are made based on their effectively available Compensation, which is compensation available after deductions (for taxes and health benefits among others) are made in the payroll process. Defs.' Findings ¶¶ 27-33. But that is not the issue Plaintiff is litigating. Plaintiff is litigating whether the tips get put into the payroll process in the first place. On that issue, there are meaningful differences within the class as to whether the tips are paid through payroll (which is true for non-union locations), and whether the unions would permit the tips to be paid through payroll or require them to be paid in cash.

The Fourth Circuit has stated that "[t]he essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Dieter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (*quoting Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 340 (4th Cir. 1998). Plaintiff's claim will not resolve the claims of the class. For example, given that Plaintiff's union (Unite Here Local 11) would not agree to permit payment of tips other than in cash at the end of a shift, even on Plaintiff's theory, those tips

would not have been "effectively available Compensation" because they would not go through the payroll system. *See* Defs.' Findings ¶¶ 52, 54, 62. Participants in Tampa (which agreed to the Paycard program), or in Chicago (which agreed to deductions through the payroll system) would be differently situated. *See id.* ¶ 56. Similarly, it would be hard for Plaintiff to demonstrate that Host discriminated against Plaintiff by failing to implement an electronic payment method for tips when that issue had to be negotiated with the union, and it was Plaintiff's own union that opposed that option. But participants in other locations also might be differently situated. In short, on the central elements of Plaintiff's claim, resolution of his individual claim will not resolve the claims of other putative class members.

Plaintiff also contends that individualized issues regarding whether his claim is barred by the statute of limitations does not preclude class certification. Plaintiff's Findings ¶¶ 102-103. But Plaintiff misses the point. First, Plaintiff claims that he could not have known of his claim until he read the Plan document, which he did not do until 2019. *Id.* ¶ 104. But Defendants are entitled to prove through inference that Plaintiff—a former actuary—had actual knowledge regarding the deferral obligations in the Plan prior to 2019. Further, it is not apparent that Plaintiff's knowledge requires a review of the Plan document. Plaintiff knew that he had missed deferrals at least by 2014. Dkt. 85 at 29. Plaintiff knew that this was the result of tips being paid in cash. *Id.*; *see also* Defs.' Findings ¶ 137 n.12. The language in the Plan document did not give rise to Plaintiff's claim. Indeed, Plaintiff scarcely addresses the purported plan language governing his claim—that deferrals under the Plan are made only up to the limit of effectively available compensation. This is because Plaintiff's claim is not dependent on that language, but on his theory that Host discriminated against tipped employees.

Second, Plaintiff also fails to note that even if he did not review the Plan document prior

16

to 2019, other participants may have done so, and their claims may be time barred. Because of that, resolving Plaintiff's claim will not resolve the claim of other participants.

Third, Plaintiff fails entirely to address the statute of limitations for his ERISA Section 510 claim, which is the lynchpin to his case. As noted in Defendants Findings of Fact (Defs.' Findings ¶¶ 136-137), the statute of limitations for that claim is three years, and would have started to run from the moment that Defendant took the challenged action (here, the payment of tips in cash that precluded deferral through the 401(k) Plan). Plaintiff plainly had knowledge of that policy; indeed, he tried to alter it through his union and the Company years before. Defs.' Findings ¶ 62. Because the statute of limitations bars Plaintiff's claim under ERISA section 510, but might not block a claim of more recently hired employees, Plaintiff's claim is not typical of all members of the class.

## V. Plaintiff has Failed to Show that He is an Adequate Class Representative.

As set forth in Defendants' Findings, Plaintiff is an inadequate representative for at least two reasons. Defs.' Findings ¶ 139. First, he cannot represent absent members of non-unionized locations, or of those locations where the paycard was rolled out, because he is not a member of those groups, and has little incentive to advance the unique and different arguments those groups would have. *Id.* ¶¶ 140-143. Second, Plaintiff's claim is plainly one brought in spite, after trying multiple avenues to change the Host Tips policy. *Id.* ¶ 144. Where Plaintiff evinces such motivation—particularly given that relief is opposed by most other tipped employees and his own union—it would be difficult for Plaintiff to adequately represent such a class. As the Court noted, Plaintiff is off on his own "toot," seeking to override even the views of the union that represents him. Sept. 7, 2022 Hrg. Tr. 36:7-11 (Dkt. 109).

Plaintiff's Findings do not address either of those arguments. Instead, Plaintiff addresses the extent to which Plaintiff is an adequate representative of those class members whose paychecks

17

were sufficient to meet their deferral elections. Plaintiff contends that those participants will equally benefit from Plaintiff's advocacy because they will gain the "opportunity" to have their tips count as part of their overall deferral calculation. Plaintiff's Findings ¶ 118. But, this is wholly illusory. For participants whose paycheck already is sufficient to meet their deferral opportunities, the ability to defer also from their tipped income would add nothing. Moreover, it would deprive those participants of the opportunity to receive their tipped income in cash at the end of the shift. Indeed, it is those participants who would most suffer from Plaintiff's proposed relief. They are already deferring into the Plan precisely the amount elected, *and* they also receive their tips paid out to them in cash at the end of the shift. If Plaintiff gets the relief sought in this case, those participants will still be deferring the exact same amount, but now will no longer be able to receive their tips in cash at the end of the shift. This highlights why Plaintiff—with his own agenda, and who places a greater emphasis on retirement savings than his peers—would be such an inadequate representative of that class.

## VI. Certification Under Rule 23(b)(1) is Improper

Plaintiff contends that certification under Civil Procedure Rule 23(b)(1)(A) is appropriate where the defendant "is obligated by law to treat the members of the class alike." Plaintiff's Findings ¶ 132. But this is not such a case. There is no obligation to pay tips in the same manner to every employee. Indeed, the testimony at the hearing made clear that some unions insist on tips being paid in cash. Others are willing to negotiate for payment through a paycard. Still others are willing to negotiate for payment through the payroll process. And different solutions to those issues are put in place at each of Host's locations.

Plaintiff contends that certification under Civil Procedure Rule 23(b)(1)(B) is appropriate because individual adjudications as a practical matter would be dispositive of the interests of the

other members not party to the individual actions. Plaintiff's Findings ¶ 135. This is also incorrect. For example, it is likely that Plaintiff's claim could fail here because it would be impossible to show that Host discriminated against Plaintiff by not paying tips electronically when it was Plaintiff's own union that vigorously opposed such payment. Yet, it is plausible that some other participant whose union had not taken a similar position, may have an alternative argument that is unavailable to Plaintiff. In other words, whether compensation is "effectively available" and whether Host could be deemed to have discriminated against employees, will likely turn on whether a third party (like a union) influenced or dictated Host's conduct. Because those factors will differ across the class, certification under Rule 23(b)(1)(B) is inappropriate.

And it is critically important to emphasize here that Plaintiff seeks to certify a non-opt-out class—a class where none of the Plan participants can opt out of Plaintiff's requested relief and say that they would rather just receive their tips in cash. Because the record at class certification was clear that most participants actually prefer to receive their tips in cash, class certification is not appropriate; particularly not for a mandatory class that will bind many class members to a judgment they do not want.

## **CONCLUSION**

For the foregoing reasons and for the reasons set forth in Defendants' Revised Post-Hearing Findings of Fact and Conclusions of Law, and in Defendants' briefing in Opposition to Plaintiff's Motion for Class Certification, Plaintiff's Motion for Class Certification should be DENIED in its entirety.

Dated: May 28, 2024   */s/ Reginald R. Goeke*
**MAYER BROWN LLP**
Reginald R. Goeke
Michelle N. Webster (admitted *pro hac vice*)
1999 K Street NW
Washington, DC 20006

Telephone: (202) 263-3241
Facsimile: (202) 263-5241

**MAYER BROWN LLP**
Nancy G. Ross (admitted *pro hac vice*)
Andrew Rosenman (admitted *pro hac vice*)
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

*Attorneys for Defendants*