**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Southern Division)**

| | |
|---|---|
| DAN FRANKENSTEIN, individually, and on behalf of all others similarly situated, and on behalf of the HMSHOST 401(k) RETIREMENT SAVINGS PLAN AND TRUST, | **Case No.:** 8:20-cv-01100-PJM |
| *Plaintiff*, | |
| v. | |
| HOST INTERNATIONAL, INC.; HMSHOST 401(k) RETIREMENT SAVINGS PLAN AND TRUST RETIREMENT COMMITTEE; COLEMAN LAUTERBACH; and DOES NO. 1–10, Whose Names Are Currently Unknown, | |
| *Defendants*. | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' PROPOSED**
**POST-HEARING FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to this Court's Memorandum Order (ECF No. 144) entered on March 29, 2024, Plaintiff Dan Frankenstein ("Plaintiff") hereby submits this Response to Defendants' Post-Hearing Proposed Findings of Fact and Conclusions of Law (ECF No. 149), which was submitted following the secondary class certification hearing commenced before this Court on March 27, 2024.  ECF No. 147-2.

## INTRODUCTION

The lengthy proceedings surrounding class certification in this matter have only further proven the futility of Defendants' attempt to manufacture conflicts between Plaintiff and

proposed Class members.  It remains clear that Plaintiff has established the requisite facts to support his motion to certify the following class:

> "All current and former participants of the HMSHOST 401(k) Retirement Savings Plan and Trust who (i) received reported credit card tips as compensation outside a regular paycheck or paycard, and (ii) had a deferral election in place at the time he or she received the reported tips within six years of the date this action was filed to the present."

Dkt. 145.

"[I]n considering class certification motions, it is important to bear in mind the Fourth Circuit's direction to 'give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and ... promote judicial efficiency.'" *DiFelice v. U.S. Airways, Inc.*, 235 F.R.D. 70, 77 (E.D. Va. 2006) (quoting *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 424 (4th Cir. 2003), *cert. denied* 542 U.S. 915 (2004) (internal quotation marks omitted). Nonetheless, Defendants urge the Court to forgo the Fourth Circuit's guidance and impose a highly restrictive standard based on blatant mischaracterizations of Plaintiff's allegations and requested relief.

While the Court should conduct a "rigorous analysis" to determine whether the elements of Federal Rule of Civil Procedure 23 have been satisfied, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011), "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the class certification stage." *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Id*.  Defendants' frequent segues into the merits of Plaintiff's claims are little more than an attempt to distract the Court from the facts relevant to class certification.

The reality is that courts routinely certify ERISA cases involving claims for benefits and breaches of fiduciary duty. *See Tatum v. R.J. Reynolds Tobacco Co.*, 254 F.R.D. 59, 67 (M.D.N.C. 2008); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 453 (S.D.N.Y. 2004); *Knight v. Lavine*, No. 1:12-CV-611, 2013 WL 427880, at *4 (E.D. Va. 2013); *DiFelice v. U.S. Airways, Inc.*, 235 F.R.D. 70, 80 (E.D. Va. 2006); *see also In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 604 (3d Cir. 2009) (collecting cases); *Schuman v. Microchip Technology, Inc.*, 2020 WL 887944 (N.D. Cal. Feb. 24, 2020); *Woznicki v. Raydon Corp.*, 2020 WL 1270223 (M.D. Fla. Mar. 16, 2020); *Karg v. Transamerica Corp.*, 2020 WL 3400199 (N.D. Iowa Mar. 25, 2020).

Regarding defined contribution retirement plans in particular, ERISA plaintiffs have largely succeeded in obtaining class certification because their central claims allege fiduciary breaches relating the overall administration of the plan and courts have found that the implicated ERISA fiduciary duties are owed to all participants. *See Karg*, 2020 WL 3400199, at *3–4 (emphasizing that "fundamental questions involving defendants' alleged fiduciary breaches [with respect to the company's 401(k) plan] are common to proposed class members" and that "the fiduciary underpinnings of the ERISA claim protect the participants and beneficiaries collectively."). The same is true of Plaintiff's claims here.

For the reasons outlined below, and in all other briefings and arguments before this Court, Plaintiff has satisfied the Rule 23 requirements.

**Numerosity.** As long as "the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist." *See O'Connor v. Boeing North American, Inc.*, 180 F.R.D. 359, 366 (CD Cal. 1997). Plaintiff has met the burden of showing that a certain number of other participants with pre-tax deferral elections received

credit card tip income outside of payroll or the Pilot Program, which resulted in missed deferral opportunities.

Indeed, Defendants' own discovery responses confirm numerosity: over 500 Plan participants elected pre-tax deferrals and received credit card tip income outside payroll or paycard program from 2014 through 2021. As a result of Defendants' failure to follow Plan participants' pre-tax deferral elections, there have been over $23 million worth of missed deferral opportunities impacting hundreds of Plan participants. ECF No. 80-9.

**Commonality.** Courts have routinely recognized that the commonality requirement is not high. *Morris v. Transouth Fin. Corp.*, 175 F.R.D. 694, 697 (M.D. Ala 1997); *see also Shipes v. Trinity Industries*, 987 F.2d 311, 316 (5th Cir. 1993) ("The threshold requirements of commonality and typicality are not high[.]"). If a benefit may be achieved through class disposition, "[Rule 23] requires only that the resolution of common questions affect all or most of the class members." *Jenkins v Raymark Indus.*, 782 F.2d 468, 472 (5th Cir. 1986).

The commonality test is "qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class." *See In re American Medical Systems, Inc.*, 75 F 3d 1069 (6th Cir. 1996); *see also Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982) (The commonality test of Rule 23(a)(2) is met when there is "at least one issue whose resolution will affect all or a significant number of the putative class members[.]"). Plaintiff does not bring just *one* common issue and question—he brings several, including:

a. Whether the Basic Plan Document and other governing Plan documents require Defendants to implement the deferral elections of Plaintiff and members of the Class to their reported credit card tip compensation on a pre-tax basis;

b. Whether Defendants acted as fiduciaries to the Plan under ERISA when they failed to implement the deferral elections of Plaintiff and members of the Class to their reported credit card tip compensation on a pre-tax basis;

c. Whether Defendants breached their fiduciary duties under ERISA when they (i) failed to implement the deferral elections of Plaintiff and members of the Class to their reported credit card tip compensation on a pre-tax basis; and/or (ii) failed to deposit the deferred compensation in a timely manner;

d. Whether Defendants breached their fiduciary duties under ERISA by their failure and refusal to correct the operational errors resulting from Defendants' failure and refusal to comply with the terms of the Plan and to implement the deferral elections of Plaintiff and members of the Class to their credit card tipped compensation on a pre-tax basis;

e. Whether Defendants can implement the participant's pre-tax deferral election at the point of sale and before paying the remainder of the credit card tips in cash.

f. Whether Defendants' application of the Host tip policy to interfere with the ability of Plaintiff and members of the Class to receive the benefit of deferring their reported credit card tips on a pre-tax basis discriminated against tipped employees, in violation of ERISA section 510; and

g. Whether and what form of relief should be afforded to Plaintiff and the Class.

*See* ECF No. 79-1.  These types of common questions, which mirror those presented in successful class certifications in other ERISA matters, "may be sufficient to meet the commonality requirement, as they may 'generate common answers apt to drive the resolution' of the [defendant's] liability."  *Peters v. Aetna Inc.*, 2 F.4th 199, 593 (4th Cir. 2021) (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350)); *see Berry v. Wells Fargo & Co.*, 2018 WL 9989754, at *6–7 (D.S.C. Oct. 9, 2018) ("Rule 23(a)'s commonality requirement is often satisfied in ERISA cases" since a "'question of defendants' liability for ERISA violations is common to all class members because a breach of a fiduciary duty affects all participants and beneficiaries'").

Defendants cannot overcome or refute these common issues by focusing on premature loss calculations or hypothetical individualized defenses.  Not only are such arguments unfounded, as varying damage levels rarely prohibit a class action if the class claims possess factual and legal commonality, *see Mayer v. Mylod*, 988 F.2d 635, 640 (6th Cir. 1993) (in securities fraud action, commonality and typicality requirements are met even where some

investors made money and some lost money because the questions of liability are common to all class members regardless of their level of damages); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) (in mass tort action, even though damages may be disparate, where liability can be determined on a class-wide basis because it arises from a single course of conduct that is identical for each plaintiff, class action is suitable for adjudication), but the Court declined to consider damages at the class certification stage. *See* ECF No. 109 at 6:18–20.

What is necessary for certification are common issues the resolution of which will advance the litigation. *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998). In cases involving the question of whether a defendant has acted through an illegal policy or procedure, commonality is readily shown because the common question becomes whether the defendant in fact acted through the illegal policy or procedure. *See Day v. NLO, Inc.*, 144 F.R.D. 330, 333 (S.D. Ohio 1992) ("This [commonality] requirement is satisfied 'as long as the members of the class have been affected by a general policy of the defendant, and the general policy is the focus of the litigation.'") (citation omitted); *see also Haywood v Barnes*, 109 F.R.D. 568, 577 (E.D.N.C. 1986).

Plaintiff's common questions all arise from Host's general policy of denying tipped employees the opportunity to defer credit card tip income in line with the Plan's terms. The resolution of these issues would be applicable to the Plan as a whole, and thereby to the proposed Class as a whole, which is more than sufficient for commonality.

**Typicality.** Typicality requires that the representative party's claims be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality element of Rule 23 does not require that members of the class have "*identical* factual or legal claims in all respects." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 344 (4th Cir. 1998) (emphasis

added); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466–67 (4th Cir. 2006).  Rather, Plaintiff needs

only demonstrate that he is "a part of the class and 'possess[es] the same interest and suffer[s] the

same injury as the class members.'"  *Broussard*, 155 F.3d at 338 (citation omitted); *Lienhart v.*

*Dryvit Systems*, Inc., 255 F.3d 138, 146 (4th Cir. 2001); *see Brown v. Nucor Corp.*, 576 F.3d 149,

153 (4th Cir. 2009) ("The threshold requirements of commonality and typicality are not high;

Rule 23(a) requires only that resolution of the common questions affect all or a substantial

number of the class members.") (citation omitted).  Courts tend to find the typicality requirement

satisfied when class members suffer a similar injury as a result of "a unified practice or course of

conduct by Defendants."  *Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 458–59 (D. Md.

2014).  Plaintiff readily meets the typicality requirement.

 Contrary to Defendants' assertions otherwise, factual variations between claims—even if

they were to exist—will not defeat typicality.  *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d

912, 923 (3d Cir. 1992); *Meredith v. Mid-Atlantic Coca Cola Bottling Co.*, 129 F.R.D. 130, 133

(E.D. Va. 1989).  Moreover, "even relatively pronounced factual differences will generally not

preclude a finding of typicality where there is a strong similarity of legal theories."  *Baby Neal v.*

*Casey*, 43 F.3d 48, 58 (3d Cir. 1994); *see Dameron v. Sinai Hosp. of Baltimore, Inc.*, 595 F. Supp.

1404, 1408 (D. Md. 1984) (typicality satisfied where one plaintiff's interests are aligned with the

class members and where the representative's claims arise from the same event, practice, or

course of conduct and if plaintiff prevails all class members will benefit).

 Plaintiff's claims are typical of the proposed Class because Plaintiff, like all other

employee-participants who receive credit card tips, including those whose paychecks always

covered their deferral elections, was foreclosed from exercising his right to defer his credit card

tips on a pretax basis as required under the terms of the Plan.  Plaintiff seeks to recover the losses

relating to the missed deferral opportunities, correct the operational failures resulting from the failure to administer the Plan in accordance with its terms, and enjoin Defendants from discriminating against employees by reducing those who received credit card tipped compensation eligible for deferral by mandating that the tips be cashed out prior to implementing the appropriate deferral election. Plaintiff's claim is consistent with that of the putative class. If he prevails, all class members will benefit by correcting the operational failure resulting from the missed deferral opportunity.

**Adequacy.** A plaintiff establishes adequacy of representation by showing that he or she will "fairly and adequately protect the interests of this class." Fed. R. Civ. P. 23(a)(4). It is an essential prerequisite to the right to maintain a class action under Rule 23 that the court be certain the representatives will fairly and adequately protect the interests of the class. *Hill v Western Electric Co.*, 672 F.2d 381, 388 (4th Cir. 1982), *cert. denied*, 459 U.S. 981 (1982).

The adequacy analysis asks the Court to consider two requirements: (1) "the named representative must not have antagonistic or conflicting interests with the unnamed members of the class"; and (2) "the representatives must appear able to vigorously prosecute the interests of the class through qualified counsel." *Valerino v. Holder*, 283 F.R.D. 302, 318 (E.D. Va. 2012) (citation omitted); *see Pruitt v Allied Chemical Corp.*, 85 F.R.D. 100, 105 (E.D. Va. 1974). Here, Plaintiff does not have positions that would be antagonistic to those of unnamed proposed Class members.

For retrospective relief, the Plaintiff and the proposed Class members seek compensation for the missed deferral opportunities that impacted all of Class members in the same manner. For prospective relief, Plaintiff and the proposed Class members whose pre-tax deferral elections are not being followed by the Plan have identical interests—requiring Defendants to follow the

terms of the Plan by honoring their pre-tax deferral elections and making the contributions of the compensation required by the Plan. Plaintiff adequately represents the interests of proposed Class members with missed deferral opportunities resulting from Defendants' actions, as the claims revolve around one federal law (ERISA), one contract (the Plan), and the same course of conduct (failure to comply with pre-tax deferral elections). *See Kohl v. Ass'n of Trial Laws. of Am.*, 183 F.R.D. 475, 485 (D. Md. 1998) (one plaintiff representative adequate to represent interests of ERISA class where claim involved the same Plan and course of conduct); *see also Riggs v. Dayco Prod., LLC*, No. CIV. 1:05CV91, 2006 WL 680520, at *6 (W.D.N.C. Mar. 16, 2006) (court rejected defendants' claim their individual interests were antagonistic to class members because the action essentially seeks to re-negotiate the contract between the parties as the case not factually or legally distinct from the normal litigation brought by employees against employers for breaches of ERISA and/or LMRA).

Defendants' argument that the alleged actual and potential conflicts is a matter of particular concern in a Rule 23(b) class because absent class members are not permitted to opt out of such litigation is without merit. Here, Plaintiff can satisfy either of the requirements of Rule 23(b)(1) and 23(b)(2). Under Rule 23(b)(1)(A), a class action may be brought if the prosecution of separate actions by or against individual members of the class would create a risk of "inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." *Amchem*, 521 U.S. at 613–14. The adjudication of this case as a class action will result in one interpretation of the Plan's prescribed benefits and provide a uniform calculation of pre-tax deferrals for all plan participants. *See Kohl*, 183 F.R.D. at 485–86 (D. Md. 1998) (rejecting

claim of inadequate representation based on alleged conflict where issue involved calculation of lump sum payments under the plan).

At least one federal court has certified a class of plan participants alleging claims almost identical to those alleged by Plaintiff Frankenstein.  The Central District of California recently approved the settlement of a class action against Hyatt Corporation involving a claim by one class participant for missed deferral opportunities resulting from Hyatt's mandatory cash out of credit card tipped income.  *See* Request for Judicial Notice, Exhibit 1.  The district court concluded that the one named plaintiff who filed the action (and was in a position similar to Plaintiff's) was an adequate class representative.  *Id.*

Likewise, Plaintiff has satisfactorily carried the burden of proving his adequacy as a representative for the proposed Class.

**Evidentiary Hearing.**  The evidence set forth in the motion for class certification and the evidentiary hearing demonstrate that from 2014 through the present, Defendants have failed to follow the terms of the Plan and interfered with participants' ability to defer their compensation on a pre-tax basis as permitted under the Plan, resulting in thousands of dollars' worth of missed deferral opportunities.

The primary purpose of the evidentiary hearing was to allow Defendants to provide evidence that Plaintiff's union opposed the relief requested by Plaintiff.  *See* Plaintiff's Resp. to Finding No. 1, *infra*.  Despite the Court's clear request to hear from Plaintiff's union on the matter, Defendants failed to provide any representative of Plaintiff's union to support Defendants' contentions (presumably because there is no one who could do so) and instead presented more of the same: testimony from principals of Host ("interested parties," as the Court rightly identified, *id.* at 34:6–9) who routinely negotiate against the unions—not on behalf of or

in the best interests of Plan participants—and one union representative who testified that certain employees (not proposed Class members) opposed the paycard program because of fees or inconvenience (and, in fact, who recently negotiated an agreement that provides for participants to have the ability to defer their pre-tax credit card tips through the paycard Pilot Program). Importantly, when asked about the employees who complained about the paycard program, Defendants made no effort to find out if any of the employees were participants in the Plan with pre-tax deferral elections.

Indeed, the witnesses presented by Defendants at the evidentiary hearing produced additional evidence that supports class certification, including the acknowledgement that the unions waived all rights and responsibilities with regard to the Plan and have no standing to object to class certification, *see* ECF No. 147-2 at 35:10–15, 69:7–12, 95:1–16, and that the unions concur that all Plan participants must be treated the same. *Id.* at 19:13–16. Their testimony helps establish that established unequivocally that Defendants (i) failed and continue to fail to comply with the terms of the Plan with respect to complying with the participants pre-tax deferral elections; (ii) treat participants differently based on whether the participants work at a union location, whether Defendants have implemented a paycard program or pay credit card tips through payroll; and (iii) discriminate against participants who are non-highly compensated employees who derive the majority of their income through tips. *See* ECF No. 147-2 at 19:13–16, 29:3–5. This is precisely the uniform misconduct that Plaintiff alleges implicated *all* Plan participants and presents several common questions of issue and fact that should be addressed on a Class-wide basis.

For the reasons set forth in detail below and based on the overwhelming preponderance of the evidence before the Court, the Court should determine that class certification is

appropriate in this action and grant Plaintiff's motion for class certification. Should the Court determine that certification of the proposed Class in not warranted, then Plaintiff requests that the Court narrow the Class definition accordingly or deny the motion without prejudice to grant Plaintiff the opportunity to amend.

**INDEX**

I. RESPONSE TO DEFENDANTS' PROPOSED FINDINGS OF FACT .................................... 1

II. RESPONSE TO DEFENDANTS' PROPOSED CONCLUSIONS OF LAW ......................... 32

## I.      RESPONSE TO DEFENDANTS' PROPOSED FINDINGS OF FACT

**Defendants' Proposed Finding of Fact No. 1 (¶ 20)**

The Court indicated at the September 7, 2022 conference that it wished to hear from class proponents and opponents, including the unions (or typical unions) and any individuals who support the relief Plaintiff is seeking. *See* ECF No. 109 at 35:1-8; 38:1-9.

**Plaintiff's Response:**  While Plaintiff does not dispute that the Court wished to hear testimony regarding the existence of an actual conflict, the record indicates that the Court was particularly interested in the opponents to class certification after Defendants asked the Court "to buy the parade of horribles that [they were] marching through."  *See* ECF No. 109 at 29:5–6.  The secondary hearing was primarily meant to address the fact that it was "hard for [the Court] to be entirely clear as to why the unions might be opposed to [Plaintiff's requested relief]."  *Id.* at 29:8–11.

Defendants cite to the only instance in which the Court specifically asked to hear from *proponents* of class certification:

> But I do think that prior to that, it may be useful […] to have something like a class action hearing or evidence or however you would do it so we can see who potentially the class proponents and opponents are, including the unions, or some typically [*sic*] unions, and see what the problems are because that would refine, define what the class ought to be.

*Id.* at 35:2–8.  However, shortly thereafter the Court emphasized that the potential opposition to the class was its primary concern. See:

> But I need a better feel for what the class is exactly and ***what the opposition to the class*** is before I am even prepared to conditionally certify.

*Id.* at 35:20–22 (emphasis added).  And:

> Well, ***let's get his union in here*** and find out then if they are – if they really think that this guy is going off on a – on a toot on his own direction, I'd like to hear that. You say it's so, but I am not prepared to accept that as established.

*Id.* at 36:7–11 (emphasis added).  Notably, Defendants did *not* bring in Plaintiff's union, Local 11, to testify that they were opposed to Plaintiff's requested relief or class certification.  *See generally id.*

**Defendants' Proposed Finding of Fact No. 2 (¶ 22)**

The Court notes that Plaintiff, despite having the burden on class certification, failed to produce a single witness or affidavit to support his claim. Mar. 27, 2024 Hrg. Tr. 15:25-16:7; 16:15-16. Thus, the Court concludes that Plaintiff has been unable to identify any other individual who seeks the relief that Plaintiff seeks in this case. *Id*. at 16:17-22.

**Plaintiff's Response:**  Defendants draw a legal conclusion from their version of the facts.

Further, contrary to Defendants' claims here and elsewhere, Plaintiff has already shown that he does not stand alone in his requested relief.  During the negotiations in 2018, Unite Here Local 11 requested the relief that Plaintiff seeks on behalf of its members' locations, which includes Plaintiff's airport.  In fact, on April 16, 2024, Plaintiff's union and Defendants reached an agreement to implement the paycard program the Santa Ana Airport beginning January 1, 2025. *See* Declaration of Dan Frankenstein, Exhibit A.  Curiously, Defendants have not disclosed the agreement to the Court and instead insist that the issue is still being negotiated.

Similarly, testimony from Defendants' witnesses at the secondary class certification hearing established that the unions, like Plaintiff, want the Plan to follow the law and want Defendants to administer the Plan uniformly for all participants, with no distinction in the treatment of union and non-union participants.  *See* ECF No. 147-2 at 19:13–16.

As a final note, Plaintiff made discovery requests regarding the identities of Plan participants and potential Class members in an effort to clarify the Class and the Class's wishes—requests that were denied by Defendants.  For example, in response to Plaintiff's Second Set of Interrogatories requesting the identity of each Plan participant with an elective pre-tax deferral during the Class period, Defendants objected and refused to answer, stating that: "[P]roviding the identity of each participant with a pre-tax elective deferral has no bearing to the merits of Plaintiff's claims or Defendants' defenses. Nor is this Interrogatory relevant to class certification because identity of plan participants has no bearing on the Rule 23 standards."  ECF No. 147-3 at 5 (Interrog. 3).

At the initial class certification hearing, this same issue was raised with the Court:

> MR. KRAVITZ: […] One impediment I think that has come up a bit in our discovery is that certain discovery was -- a request -- were met with objections because we did not have a class that was certified yet so we were not entitled --
> THE COURT: No. You are entitled -- I am trying to define a class right now. Right now, I am telling you tentatively, tentatively, I am not even quite there yet, there appears to be a likely class here. There appears to be. But I am not confident that I can say right now that it is.
> So I think there should be discovery that goes toward trying to define the contours or what the class would be and also any objections, what objections there would be to the class.

*See* ECF No. 109 at 37:4–18.  Despite the Court's indication that such discovery requests should be answered, Defendants failed to disclose the identities of potential Class members and has hampered Plaintiff's ability to bring forth additional witnesses.

**Defendants' Proposed Finding of Fact No. 3 (¶ 23)**

Defendants, on the other hands, offered substantial evidence, including documentary evidence, and deposition and hearing testimony, which reflected substantial opposition, particularly among unionized employees, to Plaintiff's preferred form of relief.

2

**Plaintiff's Response:** Defendants fail to clarify what, exactly, they mean by Plaintiff's "preferred form of relief." At most, Defendants have possibly presented evidence that some potential Class members would object to being forced to cash-out at the end of every shift without variance, which would be in line with Defendants' (false) assertion that Plaintiff's "preferred relief" is to overthrow the Pilot Program and impose mandatory tip-outs. However, Defendants argue past Plaintiff's *actual* requested relief, which is that Defendants should be required to follow the terms of the Plan and the law and allowed Plan participants to defer pre-tax contributions from their credit card tip income, *by whichever means Defendants arrange to be compliant*. Notably, Defendants have not presented *any* evidence of *any* proposed Class members who object to the opportunity to defer their credit card tips pre-tax.

Further, Defendants did not offer any evidence from any participants who elected to defer credit card tipped income. *See generally* ECF No. 147-2. None of the testimony, documentary evidence, deposition testimony, or hearing testimony included any of the participants who had MDOs. *Id.* In fact, Defendants' former Vice President, Doug Crosswhite, testified that the paycard system that allows participants to defer credit card tipped income was generally well received by employees. *See* Mr. Crosswhite's testimony:

> Q. Do you have any understanding as to how the Pilot Program was received in those locations where it was implemented, whether it was favorable or people were upset about it, like that?
> […]
> A. And, yes, it was favorable.

ECF No. 147-5 at 47:23–48:5.

Additionally, Defendants ignore the ample documentary evidence that Plaintiff has previously proffered in support of class certification, including 39 individual Exhibits covering, *inter alia*, Plan documents, email and letter communications, Pilot Program policies, deposition testimony, and union grievances (or lack thereof). *See* ECF Nos. 80-1 *through* 80-22 (Ex. A–AA); ECF Nos. 88-2 *through* 88-13 (Ex. AB–AM).

Much of the remaining evidence that might be relevant to class certification—such as the identities of any purposed Class members who may have objected to or supported the Pilot Program, which is just one way in which Defendants might be able to provide Plaintiff's preferred relief—is exclusively within Defendants' possession, who have refused to produce it in discovery. For instance, not only did Defendants refuse to provide the identities of Plan participants with deferral elections in place, *see* ECF No. 147-3 at 5, but they also refused to provide the identities of Plan participants with deferral elections in place who participated in the Pilot Program and chose to cash out instead of deferring their tips. *See* No. 147-3 at 6 (Interrog. 4) ("Providing the identity of each participant who 'participated in the Pilot Program' and 'cashed out credit card tips instead of receiving the tips through payroll' has no bearing to the merits of Plaintiff's claims or Defendants' defenses. Nor is this Interrogatory relevant to class certification because identity of plan participants has no bearing on the Rule 23 standards.").

3

**Defendants' Proposed Finding of Fact No. 4 (¶ 27)**

Pre-Tax and After-Tax Contributions Permitted. The Plan allows participants to make both pre-tax and after-tax contributions. *See* AA §§ 1.07, 1.08, ECF No. 1-3; 2017 SPD 4, ECF No. 1-4.

**Plaintiff's Response:**  Notably, the Plan is *supposed* to allow participants to make pre-tax contributions. As is the subject of this dispute, however, Defendants do not allow participants to make pre-tax contributions from their credit card tip compensation, which significantly limits participants' ability to make contributions as promised by the Plan.

**Defendants' Proposed Finding of Fact No. 5 (¶ 28)**

Basic Plan Document ("BPD") § 5.03 provides Host "shall make a Deferral Contribution on behalf of the Participant corresponding to the amount of said reduction." BPD § 5.03, ECF No. 1-2. The critical language in section 5.03 at issue in this case provides that "in no event shall a Participant be permitted to make Deferral Contributions in excess of his 'effectively available Compensation.'" *Id*. The Plan explains that a "Participant's 'effectively available Compensation' is his Compensation remaining after all applicable amounts have been withheld (e.g., tax-withholding and withholding of contributions to a cafeteria plan)." *Id*.[1] Notably, those tax and other withholdings are all made within the Host Payroll system. Crosswhite Dep. Tr. 29:8-30:10. Thus, for Compensation to be included in "effectively available Compensation," it must pass through the payroll system.

**Plaintiff's Response:**  As Defendants go on to explain in footnote one, addressed below, the definition of "effectively available Compensation" has thus far been subject to Defendants' whims in violation of ERISA and related regulations regarding definitely determinable benefits.  *See Chavis v. Plumbers & Steamfitters Loc. 486 Pension Plan*, 612 F. Supp. 3d 516, 541 (D. Md. 2020) (pension plan within the meaning of Section 401(a) is a plan established and maintained by an employer primarily to provide systematically for the payment of definitely determinable benefits).

The definition put forth by the Plan—"Compensation remaining after all applicable amounts have been withheld"—does not exclude credit card tip compensation.  In fact, the Plan specifically provides that Compensation includes credit card tips, ECF No. 147 ¶ 16–17, which is consistent with statutory definitions under ERISA.  *See* 26 U.S. § 3401(a) (defining "wages" as "all remuneration … for services preformed by an employee for their employer"); § 3401(f) (specifying that "wages" include tips received by an employee during their employment).

Further, the fact that one stage of the deferral process currently occurs within the Host payroll system does not mean that credit card tips *must* be excluded from "effectively available Compensation."  Appropriate deferral elections and other withholdings could be taken at the point-of-sale, for example, which would allow Defendants to hold back a percentage of an employee's credit card tips while cashing out the remainder at the end of each shift.

**Defendants' Proposed Finding of Fact No. 6 (¶ 28 fn. 1)**

Although not relevant to class certification, the Plan Administrator has been delegated authority to interpret the Plan's terms. Plan Document for the HMSHost Corp. 401(k) Retirement Savings Plan

and Trust § 19.01(adopted Jan. 1, 2016), ECF No. 1-2. The Administrator, in response to Plaintiff's claim, has interpreted the term "effectively available compensation" to refer to that compensation that is effectively available to the Plan for purposes of withholding and deferral, that tips that are paid out to participants in cash at the end of the night are not included in "effectively available compensation." Letter from Carol Russell 1 (April 10, 2019), HOST0003385 at 3385, ECF No. 84-13 (referencing Section 5.03 of the Plan and denying claim); Letter from Coleman Lauterbach 3 (June 7, 2019), HOST0002745 at 2749, ECF No. 84-15 (affirming denial of claim). At the merits stage of litigation, such an interpretation is subject to review only for abuse of discretion. *Brown v. Nucor Corp.*, 576 F.3d 149, 152 (4th Cir. 2009).

**Plaintiff's Response:**  The Plan does not provide that Compensation must go through the payroll system to be included as "effectively available Compensation."  Defendants manufactured this requirement and cited no Plan language to support it.  *See* ECF No. 80 at 4–5.  In reality, prior to the moment that credit card tips are cashed out at the end of a shift or, where the Pilot Program has been implemented, prior to the moment an employee withdraws the credit card tips from their paycard, those credit card tips are available for deferral.  *See* ECF No. 79-16 at 54:20–55:3 (explaining that if an employee does not withdraw their tips, they roll over into their paycheck).

Further, Defendants seem to confuse the applicable standard in question.  Their citation to *Brown* points to the abuse of discretion standard for review of a district court's class certification decision, *not* for review of an administrator's interpretation of plan language or for contractual interpretations.  *See Brown v. Nucor Corp.*, 576 F.3d 149, 152 (4th Cir. 2009) ("We review the district court's certification decision for abuse of discretion.").

## Defendants' Proposed Finding of Fact No. 7 (¶ 29)

A participant also may make after-tax contributions up to 75% of "Compensation," up to the annual limit. Those after-tax contributions are made pursuant to Basic Plan Document § 5.04, which provides that a participant "may elect to make non-deductible Employee Contributions to the Plan in accordance with the rules and procedures established by the Employer and subject to the limits provided through Subsection 1.08(a) of the Adoption Agreement." After tax contributions can either be elected by a participant, or a participant can make an after tax contribution as a result of an "arrears" notice. Arrears occur when the participants' effectively available Compensation is not sufficient to meet the deferral percentage selected by the participant.

**Plaintiff's Response:**  The arrears occur, in part, due to and as a function of Defendants' interference with the participants' ability to defer pre-tax compensation.  If not for Defendants refusing to defer credit card tipped income in accordance with Plan participants' elections, there would be no need to make arrears contributions to make up the difference and MDO.

## Defendants' Proposed Finding of Fact No. 8 (¶ 34)

Tipped Unionized Employees Are Paid Tips in Cash. In the food and beverage service industry, there is a long tradition that employees receive cash for their tips at the end of each shift. Expert Report of David Sherwyn 7-8 (May 2023) ("Sherwyn Report"), ECF No. 136-2; Baumann Dep. Tr. 25:5-10, ECF No. 136-4.

**Plaintiff's Response:**  Defendants rely on the Sherwyn Report frequently to bolster otherwise unsupported assertions and conclusions.  Plaintiff has not yet had the opportunity to challenge or verify the credibility of this expert or the Sherwyn Report, as the Court explicitly stated that it is not interested in expert testimony at this stage of proceedings.  *See* ECF No. 109 at 39:12–13 ("***The reports of experts, that's not really of concern to me at this point.***") (emphasis added); *id.* at 6:18–20 ("[A]nd I am not too interested in what one expert said or another and I am not sure we are at the damages stage either.").  Thus, to the extent that Defendants rely exclusively on the Sherwyn Report for certain claims herein, Plaintiff contends that these "facts" are not supported by the record and any conclusions reached by Sherwyn are inadmissible conclusions of law.

## Defendants' Proposed Finding of Fact No. 9 (¶ 36)

Cashing out credit card tips at the end of the shift is an effective way to ensure timely pay – something that almost all state governments see as relevant and necessary. Sherwyn Report 10, ECF No. 136-2; Baumann Dep. Tr. 20:16-21:3, ECF No. 136-4.

**Plaintiff's Response:**  Plaintiff renews his objection to the use of the Sherwyn Report as "evidence."  Notably, Sherwyn explains that the vast majority of states "have laws requiring that employees be paid *either weekly, bi-weekly, semi-monthly, or monthly*."  ECF No. 136-2 at 10 (emphasis added).  What state governments see as "relevant and necessary" is timely payment within these timeframes—*not* cashing out credit card tips at the end of each shift specifically.  *See id*.

Regardless, Defendants themselves are not in compliance with this imaginary cash-out priority. Currently, Defendants employ several means of timely paying employes, including (i) through payroll; (ii) through a pay card pilot program; or through a policy of calculating the credit card tips at the end of a shift and paying employees the amount of the credit card tips that they will later receive once the credit card companies process the credit card payments.  *See* ECF No. 147 at ¶ 27, 52.

## Defendants' Proposed Finding of Fact No. 10 (¶ 38)

Tips Are the Property of Employees. U.S. law, as well as laws in various states, such as California, require that tips be treated as the property of the employee, and that no employer may keep tips received by its employees for any purposes. *See., e.g.*, 29 U.S.C. § 203(m)(2)(B) ("An employer may not keep tips received by its employees for any purposes, . . . regardless of whether or not the employer takes a tip credit."); Cal. Labor Code § 351 ("No employer or agent shall collect, take, or receive any gratuity or a part thereof that is paid, given to, or left for an employee by a patron."). *See also* Cal. Dep't of Industrial Relations, Payroll Deductions and Offsets Against Wages (Jan. 2011), www.dir.ca.gov/dlse/PayrollDeductions.pdf ("An employer cannot collect, take, or receive any gratuity given or left for an employee, or deduct any amount from wages due an employee on account of a gratuity given or left for an employee."). As discussed further below, many unions have also negotiated CBAs that similarly make clear that tips are the property of the employee.

**Plaintiff's Response:**  Defendants mistakenly equate tips being the "property of the employee" with credit card tips being ineligible for deferral according to an employee's explicit deferral

elections and wishes. If anything, complying with Plan participants' decisions to defer their credit card tips is more in line with tips being treated as their property.

## Defendants' Proposed Finding of Fact No. 11 (¶ 39)

<u>The Court finds that Plaintiff's Preferred Remedy Would Eliminate Payment of Cash to Employees Tipped with a Credit Card</u>. In order to effectuate Plaintiff's preference for credit card tips to be deferred to the Plan pre-tax, Host would need to forego paying those credit card tips in cash to the employee, and instead allow those credit card tips to become part of company payroll system, from which deferrals to the 401(k) Plan are made. Under this arrangement, employees would no longer receive their tips in cash at the end of each shift. They would instead be paid their tip income when they received their paychecks. Depending on when the tips are received within the payroll process, employees may have to wait up to two weeks (i.e., whenever they receive their paycheck) to receive their credit card tips – money that they would otherwise have in hand at the end of each shift. This process would place a significant burden on many tipped workers; workers who may be more concerned with covering daily expenses than maximizing retirement benefits. *See* Sherwyn Report 9-13, ECF No. 136-2; Martin Dep. Tr. 54:21:55:16, ECF No. 136-7.[2]

**Plaintiff's Response:** First, Defendants mistake their legal obligations for mere "preference." ERISA mandates that Defendants follow the terms of the Plan and act in the best interest of the Plan participants, which includes implementing any deferral elections taken by Plan participants. *Band v. Paul Revere Life Ins. Co.*, 14 F. App'x 210, 212 (4th Cir. 2001) (quoting *White v. Provident Life Accident Ins. Co.*, 114 F.3d 26, 28 (4th Cir. 1997) ("ERISA demands adherence to the clear language of the employee benefit plan."), and *HealthSouth Rehabilitation Hosp. v. American Nat'l Red Cross*, 101 F.3d 1005, 1009–10 (4th Cir. 1996) ("The express terms of the Plan must be followed.")).

Second, implementing the pre-tax deferral elections would only place a significant burden on Plaintiff and the putative Class if Defendants made it so. In reality, Defendants have provided little justification for why they would be forced to deny all Plan participants the flexibility of an early cash out if they chose to cash out rather than deferral their credit card tip income. Plaintiff's requested relief only requires Defendants to ensure that any chosen deferral elections are followed—by *whatever* means. ECF No. 1 at 16–17 (containing no requested relief that requires Defendants to adopt a forced cash out system). How Defendants chooses to go about complying with the Plan and making those deferrals is entirely at Defendants' discretion.

## Defendants' Proposed Finding of Fact No. 12 (¶ 39 fn. 2)

According to Defense Expert, Professor David Sherwyn, The Cornell University John and Melissa Ceriale Professor of Hospitality Human Resources at the School of Hotel Administration, there is another reason tipped employees prefer to receive their tips in cash, at the end of the shift: to allow a practice known as "tip outs" which is the sharing of tips between servers, bartenders, etc. and the total split between all co-workers for a given shift. Tipped employees, especially in states like California, often earn more money than their co-workers, such as kitchen staff and even managers. This dynamic can create resentment, and tip outs, according to Professor Sherwyn, mitigate this resentment. Support employees, such as barbacks, bussers, and hosts, can contribute to the success or failure of a server or bartender's shift. Accordingly, many restaurants and bars require, or allow,

tipped employees to "tip out" their support co-workers. In sum, tipped employees, managers, and owners see tip outs as a way to reduce conflict and create a more efficient and congenial work environment for higher paid tipped employees and lower paid support employees. Sherwyn Report 11, ECF No. 136-2. Receipt of tips in cash is necessary to share tips between workers. *See* Mar. 27, 2024 Hrg. Tr. 42:9-43:17 (Baumann).

**Plaintiff's Response:**  Sherwyn's speculation on tip outs and tipped-nontipped employee relations is not only untested and therefore unreliable at this stage, but irrelevant to the question of class certification.  Defendants also provide no explanation for why it is *necessary* to cash out credit card tips at the end of each shift for tip sharing.  Employees could, for example, use their cash tips to tip out coworkers—or they could make other arrangements to tip out coworkers according to the parameters of whatever solution Defendants impose.  An employee under the Pilot Program, for example, could choose to tip out coworkers at a later date by withdrawing funds from their paycards.  While potentially less convenient, such an option nonetheless demonstrates that it is not *impossible* to tip out without cashing out at the end of each shift.

## Defendants' Proposed Finding of Fact No. 13 (¶ 40)

During the hearing, counsel for Plaintiff argued that Host could defer tipped income from tipped employees at the point of sale. Mar. 24, 2024 Hrg. Tr. at 17:13-18:4. Although counsel did not provide specifics on how he envisioned this process to work, presumably, for each employee, counsel imagines that the employee's manager knows the percentage of income that the employee would seek to defer. Counsel argued that if an employee made $100 in credit card tips and elected to defer 20 percent of their compensation, the manager at the end of each shift would pay the employee $80. *Id. See also id.* at Tr. 36:8-13 (arguing that deferrals could be implemented at the point of sale) Presumably, Host would somehow credit the employee for the remaining $20 to be paid into the 401(k) plan.

**Plaintiff's Response:**  While counsel for Plaintiff provided only a simplified explanation for how deferral elections and withholdings could be implemented at the point-of-sale, it should be noted that it is not Plaintiff's obligation to develop a solution for Defendants' breaches of their fiduciary duties and violations of the Plan terms.

Plaintiff never intimated that an employee's manager must run calculations or personally know the percentage of income each employee has chosen to defer, or the percentage that must be withheld for taxes and other withholdings.  A more thorough explanation of this example is provided in Plaintiff's response to Proposed Finding No. 15.

## Defendants' Proposed Finding of Fact No. 14 (¶ 41)

But Counsel provided no evidence to support the viability of his simplified methodology, and there is good reason to believe it would not work. In the first instance, Counsel's proposal would require managers at every location to know and maintain data on the withholding rates for every employee, and then to apply those rates to the credit card tipped income at the end of each shift for each employee, which would pose a significant administrative challenge. Further, testimony at the hearing confirmed that Host does not have accounting control systems to track such payments, and

8

has not been able to acquire such systems despite considering it for several years. Mar. 27, 2024 Hrg. Tr. 91:20-93:13; 111:5-112:6; 29:17-30:19.

**Plaintiff's Response:** It bears repeating that Plaintiff is not obligated to solve Defendants' logistical concerns to meet the class certification standard. Plaintiff alleges only that Defendants are violating the terms of the Plan by denying employees the opportunity to defer their credit card tipped income. How Defendants go about remedying that breach is beyond the scope of Plaintiff's burden; suggestions made by way of example to establish that what Plaintiff requests isn't impossible are just that—*examples*.

## Defendants' Proposed Finding of Fact No. 15 (¶ 42–43)

Further, each tipped employee, in addition to also receiving credit card tips, also is paid a salary and cash tips. Currently, information about all those sources of compensation are provided to the Host payroll system, which makes deductions from that total compensation amount to account for various taxes (Federal, FICA, State,), for health benefits, and for retirement benefits. Crosswhite Tr. 29:8-30:10, ECF No. 136-6. The manager would not have the information about other compensation amounts, nor would the manager be able to withhold, as required, for taxes and health benefits prior to making a withholding for retirement benefits. *See*. Mar. 27, 2024 Hrg. Tr. 129:7-130:3 (Donohoe testimony that taxes would not be deducted prior to retirement withholdings if the withholdings were made at the point of sale).

Using counsel's example, if an employee worked a five-hour shift and made $100 in salary, $100 in credit card tips, and $100 in cash tips, the employee might be required to first withhold $60 in federal taxes, $20 in FICA, $20 in state taxes, and $15 for health benefits, before being eligible to defer $60 to the 401(k). The manager at the end of every shift would not have the data necessary to make any of those calculations to determine the amount to withhold from the credit card tips. Mar. 27, 2024 Hrg. Tr. 129:7-130:3. For purposes of evaluating class certification, however, I need not make a final determination on this issue, as Plaintiff provided no evidence that such a methodology is feasible or is used in any other business.

**Plaintiff's Response:** Defendants continue to overstate the burden that a point-of-sale deferral solution would place on managers (or those responsible for distributing cash at the end of each shift). Withholdings, whether in the form of percentage of compensation or flat amount, are *consistent*. All the determinations made in payroll are based on a formula that is consistent month to month for each employee. The difficulty of calculating each withholding for each employee's unique circumstances is not something that arises at the managerial level. Those calculations have already been made.

Using the same example, and assuming that the employee's tax withholdings in the given example are percentage-based (that is, $60 in federal taxes out of $200 total income is a 30% tax rate, and so on), the employee's total withholding obligation would be 57.5%. Or, if the health benefits withholding is a flat rate, it would be 50% of compensation *plus* $15. It stands to reason that this percentage or information could be loaded into the point-of-sale (where the employee typically reports their credit card tips at the end of a shift) or elsewhere to perform calculations based on each shift's tipped income. At the end of the shift, an employee with $350 in credit card tips, for example, would owe $201.25 in withholdings—an amount they can calculate based purely on their

tips for that shift and the total withholding obligation percentage. That would leave $148.75 to be tipped out in cash. If the employee has a deferral election in place for their 401k, that percentage could be included in the total and factored into what must be withheld. It would be a simple matter then for shift managers to cash out employees for what their remainder is, without having to do any individualized calculations or being required to somehow keep track of each employee's withholding information personally.

For more complicated scenarios, where there are flat rate withholdings included, those amounts could be withheld from the salaried portion of an employee's paycheck or withheld from the first shift of the month's tips (or divided across two shifts) or so on. The bottom line is that there are simple solutions to the problem that Defendants claim to be facing, and it is disingenuous to suggest that managers would be incapable of making the proper withholdings from credit card compensation at the point-of-sale.

## Defendants' Proposed Finding of Fact No. 16 (¶ 44)

Host's Policy and Practice with Respect to Tips. Host maintains a Tips Policy that is consistent with the law. HMS Associate Handbook 47 (2014), at HOST00009740, ECF No. 84-25; HMS Associate Handbook 52 (2016) at HOST0009394, ECF No. 84-26; Tip Reporting and Tip Jars Policy 1 (Apr. 17, 2014), HOST0003573 at 3583, ECF No. 84-7. Specifically, the Policy provides that "Tips are the Property of the Associate," and that "[g]ratuities/tips are considered the sole property of the associate(s) to whom they are given."

**Plaintiff's Response:** To the extent that the Tips Policy precludes employees from deferring their credit card tip income, it is not consistent with the applicable law that requires Defendants to administer the Plan according to its terms.

Further, if Defendants choose to interpret the HMS Associate Handbook's language as *requiring* credit card tips to be cashed out at the end of a shift, then Host has not been in compliance with that requirement nor the apparent "law" since 2020. *See* ECF No. 80-17 (introducing new Tips Policy in February 2020). Indeed, the introduction of the Pilot Program, which allows employees at non-union and some union locations to deferred credit card tipped income, would be in direct violation of both according to Defendants' view.

## Defendants' Proposed Finding of Fact No. 17 (¶ 45)

Defendants' witnesses stated that Host's practice, consistent with its policy, has been to distribute credit card tips to its employees in cash at the end of each shift. Baumann Dep. Tr. 20:16-19, ECF No. 136-4. As Mr. Baumann testified, the "overwhelming majority, if not all" of the workers he represents prefer their credit card tips to be paid in cash under this system. Mar. 27, 2024 Hrg. Tr. 46:2-8. Similar to cash tips, which go immediately to the employee, the distribution of credit card tips in cash to the employee is a taxable transaction. Once those payments are made, they are no longer eligible for a pre-tax contribution.[3] Because those tip payments do not proceed through the company's payroll system, they are not effectively available for a pre-tax withholding to the Plan, as the Plan terms prescribe.

**Plaintiff's Response:** Plaintiff does not dispute that credit card tips become unavailable once they are cashed out—only that it is at Defendants' discretion when they are cashed out, and therefore Defendants control whether those tips pass through payroll or are processed at the point-of-sale for withholdings prior to a cash out. Defendants choose to make credit card tips ineligible for pre-tax contributions in violation of the Plan documents.

## Defendants' Proposed Finding of Fact No. 18 (¶ 47)

Of the 34 unionized locations where employees participate in the Plan (which comprise less than half of Host's U.S. Airport locations), many of the CBAs include provisions that control the manner of payment of tips to employees. […] Defendants have shown, however, that the specific language governing tips often differs from one CBA to another. […] The different language governing tips payment in each CBA reflects the separate negotiations with each local union regarding the payment of tips for employees covered by those CBAs.

**Plaintiff's Response:** None of the CBAs cited by Defendants reflects the manner of payment of credit tips to employees who have a pre-tax deferral election under the Plan. In fact, each of the unions waived the right to bargain over the management and operation of the Plan and the requirements of Defendants to comply with the terms of the Plan and to treat all participants in the same manner.

For example, Local 11's CBA for John Wayne International Airport (February 1, 2013 through January 31, 2018) expressly waives all rights and responsibilities with regard to the Plan:

> **ARTICLE 15 – HMSHOST CORPORATION 401(k) RETIREMENT SAVINGS PLAN AND TRUST**
>
> Eligible Employees may elect to participate in the HMSHost Corporation 401(k) Retirement Savings Plan and Trust (the "Plan") pursuant to the requirements, terms and provisions of that Plan as amended from time to time. The Employer retains the exclusive right, in its sole discretion, to amend or terminate the Plan in whole or in part without bargaining with the Union. Should the Employer terminate the Plan, it will promptly notify the Union.

[ECF 84-29 at 15.] The same or substantively similar waiver language appears in the CBAs for every unionized location participating in the Plan presented by Defendants. *See* ECF No. 84-30, Art. 4 (Local 12, Cincinnati/Northern Kentucky Int'l Airport CBA); ECF No. 84-31, Art. 13 (Local 5, Honolulu Int'l Airport CBA); ECF No. 84-32, Art. 13.7 (Local 100, Newark Liberty Int'l Airport CBA); ECF No. 84-33, Art. 13.8 (Local 8, Spokane Int'l Airport CBA); ECF No. 84-34, Art. 13.8 (Local 23, Hartsfield-Jackson Int'l Airport, CBA); ECF No. 84-36, Art. 14.2 (Local 64/74, Kansas City Int'l Airport CBA); ECF No. 84-37, Art. 24 (Local 100, LaGuardia Airport CBA); ECF No. 84-38, Art. 13 (Local 5, Lihue Airport CBA); ECF No. 84-39, Art. 13.2 (Local 631, Sky Harbor Int'l Airport CBA); ECF No. 84-40, Art. 13.1 (Works United Southern Region, Tampa Int'l Airport CBA).

11

Additionally, Defendants neglected to acknowledge that when Local 11 originally brought its unfair labor practice charge against Defendants, Host asserted that it can modify the tips policy without having to bargain with the unions.

> The Union's allegations lack merit. Host denies the Union's allegations and submits it did not violate the [NLRA]. Specifically, Host asserts that it never unilaterally changed its tip payment methods and processes or modified any other terms and conditions of employment even though it has the authority to take such actions consistent with the negotiated terms of the [collective bargaining agreement]. . . Host asserts that even if a pilot program regarding a potential new tipping procedure was being considered at the [airport], it did not and does not owe Local 11 a duty to bargain over such a program.

> . . .

> Even if there was a bargaining obligation, which there is not, the Union contractually waived its right to bargain over the Company's decisions. Further, even if the [National Labor Relations] Board believes that the Union did not waive its bargaining right, the Company had a "sound arguable basis" to rely on the applicable Agreement to justify implementing its decisions without the Union's input and consent. The Board should not serve as an arbiter or what is, at best, an unmeritorious contractual interpretation dispute and the Charge should be dismissed in its entirety.

ECF No. 80-19 at 2; ECF No. 80-20 at 2; ECF No. 80-21 at 2.

Indeed, *many* CBAs contain an identical or substantially similar "Management Rights" provision that explicitly retains for Host the "full and exclusive authority to determine and direct the policies, procedures and methods of operating its business." *See* ECF No. 84-31, Art. 4 (Local 5, Honolulu Int'l Airport CBA); ECF No. 84-32, Art. 4.1 (Local 100, Newark Liberty Int'l Airport CBA); ECF No. 84-33, Art. 4.1 (Local 8, Spokane Int'l Airport CBA); ECF No. 84-34, Art. 13.8 (Local 23, Hartsfield-Jackson Int'l Airport CBA); ECF No. 84-35, Art. 4.1 (Local 100, JFK Int'l Airport CBA); ECF No. 84-36, Art. 13.1 (Local 64/74, Kansas City Int'l Airport CBA); ECF No. 84-37, Art. 3 (Local 100, LaGuardia Airport CBA); ECF No. 84-38, Art. 4 (Local 5, Lihue Airport CBA); ECF No. 84-39, Art. 4.1 (Local 631, Sky Harbor Int'l Airport CBA); ECF No. 84-40, Art. 4.1 (Works United Southern Region, Tampa Int'l Airport CBA).

### Defendants' Proposed Finding of Fact No. 19 (¶ 48)

Wages are benefits generally considered to be mandatory subjects of bargaining under the NLRA and, therefore, an employer must bargain before making any changes to employees' wages. Sherwyn Report 14, ECF No. 136-2. Union representatives have consistently taken the position that the method of payment of tips—whether in cash, payroll, or on a pay card—is likewise a mandatory subject of bargaining. Mar. 27, 2024 Hrg. Tr. 48:12-22 (Baumann) (any change to method of payment of tips a mandatory subject of bargaining); *see also* Baumann Dep. Tr. 22:13-25:18, ECF No. 136-4 (same). Indeed, when Plaintiff's own local union was informed that Host was going to initiate a pilot program to use a paycard program, which would result in employees

not being paid their tips in cash at the end of the night, the local union filed an unfair labor practice charge against Host with the National Labor Relations Board ("NLRB") alleging that Host's attempt to implement such a change without first negotiating with the union was a violation of Host's duty to bargain under Section 8(a)(5) of the NLRA. Mar. 27, 20204 Hrg. Tr. 112:19—113:1; ECF Nos. 85-15, 85-14, 80-20.

**Plaintiff's Response:**  Plaintiff reiterates that the credibility of Defendants' expert has not yet been addressed and that the Court explicitly stated that it was disinclined to hear what experts had to say at this stage.  *See* ECF No. 109 at 39:12–13, 6:18–20.  Defendants' reliance on their expert for statements of fact here is yet again unfounded.

As discussed above, regardless of the stance unions may or may not take regarding wages, the implementation of practices to comply with the pre-tax deferral elections of participants is not a mandatory subject of bargaining as the unions specifically waived the right to bargain over the terms of the Plan and the practices required to comply with the terms of the Plan.

### Defendants' Proposed Finding of Fact No. 20 (¶ 50)

Host planned to roll out the electronic paycard system at select locations in early 2020. In February 2020, it notified its local union representatives at all of its unionized locations about the program generally, and also proposed that two union-represented locations be part of a pilot program. The program's rollout was put on hold due to the COVID pandemic, but as of the end of 2021, Host had introduced the paycard system in all non-union airport locations and two union locations, Charlotte and Minneapolis. Donohoe Dep. Tr. 83:15-84:3, ECF No. 136-5. In Charlotte and Minneapolis, the paycard proposal was adopted by employees following extensive collective bargaining with the relevant unions. Crosswhite Dep. 2023 Tr. 23:21-24, ECF No. 136-6; Donohoe Dep. Tr. 26:16-19, ECF No. 136-5. In the select locations where it has been implemented, the electronic paycard system has eliminated Host's practice of cashing out credit card tips at the end of a shift and instead gives tipped employees access to their credit card tips through their paycard the following morning. If the tipped employee does not withdraw the credit card tips from the paycard by a certain deadline, the tips are then rolled into Host's payroll system and paid through the employee's regular payroll process. Crosswhite 2022 Tr. 54:18-55:3, ECF No. 136-6. This, in turn, provides an employee with increased payroll compensation to be used, among other purposes, for pre-tax deferrals into the Plan. It was not possible, however, to implement the electronic payment of tips on an individual-by-individual basis. Crosswhite 2023 Tr. 24:9-19, ECF No. 136-6. Rather, at each location all employees would either have to receive tips electronically, or all employees would receive tips in cash. Otherwise, it would create a very high risk of cash violations and cash theft, and would be difficult to reconcile the cash positions at each location at the end of the shift. Crosswhite 2023 Tr. 24:9-25:24, ECF No. 136-6.

**Plaintiff's Response:**  Host has demonstrated that it is feasible to implement a system to allow it to comply with participants' pre-tax deferral elections and to contribute credit card tip compensation to the Plan in accordance with the elections made by participants.  *See* ECF No. 136-6 at 24:9–19.  Host also concedes that it is in fact possible to implement an electronic payment of credit card tips on an individual-by-individual basis in accordance with each individual's pre-tax election to defer compensation and that the only reason it has failed to do was because it

concluded that there would be a high risk of cash violation and/or it would be difficult to reconcile cash positions at each location at the end of the shift. *See id.* at 24:9-25:24.

### Defendants' Proposed Finding of Fact No. 21 (¶ 51)

The Court finds Host's explanation for why it is not feasible to implement electronic payment of credit card tips to be credible. As Mr. Martin testified, Host investigated numerous options, including paycards, so-called "railroad" transfers, and other methods to try and create a workable system; and Host engaged third-party vendors to assist in this effort. See Mar. 27, 2024 Hrg. Tr. 104:19-108:3 (Martin) (Host "turned over every rock and looked around every corner to find a solution that was within [its] abilities"). Further, as shown above, Host's experts in their payroll systems and operations explained in detail why it would not be feasible. Plaintiff has not offered any evidence to contradict the testimony of Host's witnesses on this point.[4]

**Plaintiff's Response:**  Host agreed with the Court that the technology involved in processing point of sale transactions, and that it has not specifically engaged a consultant to implement a system to ensure compliance with the pre-tax deferral elections made by participants. *See* ECF No. 174-2 at 89:12-90:8.

### Defendants' Proposed Finding of Fact No. 22 (¶ 51 fn. 4)

Plaintiff's counsel has suggested that it would be easy for Host to do this at the point of sale system, but counsel's speculation is not evidence. While the Court notes that technology often improves, it also credits Mr. Martin's statement that he was informed Plaintiff's solution was not feasible "three years ago, and that's not changed." Mar. 27, 2024 Hrg. Tr. 90:7-93:13.

**Plaintiff's Response:**  The scope of the limited evidentiary hearing to determine class certification did not include whether current technology affords Host a point-of-sale alternative method to implement the pre-tax deferral elections made by participants in the Plan, and it is Host's obligation to develop a feasible method or amend the terms of the Plan to include only terms that it can implement and follow. *See Band*, 14 F. App'x at 212 (quoting *White*, 114 F.3d at 28 ("ERISA demands adherence to the clear language of the employee benefit plan."), and *HealthSouth*, 101 F.3d at 1009–10 ("The express terms of the Plan must be followed.")).  It is not Plaintiff's burden to show the feasibility of a point-of-sale system or any other system in order to certify a class based on Defendants' failure to comply with the terms of the Plan.

### Defendants' Proposed Finding of Fact No. 23 (¶ 52)

The announcement of the paycard system was not well-received at many, if not most, of Host's unionized locations. In fact, following the mere announcement of the program, some local unions, including Plaintiff's local union, filed an Unfair Labor Practice ("ULP") Charge and grievance against Host. *See* Donohoe Decl. ¶¶ 21, 22, ECF No. 85-08; Ex. R, ECF No. 85-14; Ex. S, ECF No. 85-15; *see also* Mar. 27, 2024 Hrg. Tr. 114:4-8 (Donohoe) (Local 11 "[a]bsolutely" would have pressed ULP charge "if Host had implemented the [pilot] program"). In addition to the ULP Charges, the paycard system has been the subject of collective bargaining negotiations between Host and Unite HERE International and Local 11 at John Wayne Airport (Plaintiff's union). Mar.

27, 2024 Hrg. Tr. 115:4-22 (discussing ongoing negotiations and noting Local 11 is "adamantly opposed" to "electronic payment of tips"); *see also* Donohoe Dep. Tr. 29:4-14, ECF No. 136-5.

**Plaintiff's Response:** Defendants have not provided even one potential Class member who has opposed the paycard system or the implementation of a system to comply with the pre-tax deferral election made by Plaintiff and proposed class members. *See generally* ECF No. 147-2.

Further, none of the unions referenced by Defendants is a member of the proposed class. *See United Food & Com. Workers Loc. 204 v. Harris-Teeter Super Markets, Inc.*, 716 F. Supp. 1551, 1561 (W.D.N.C. 1989) (collecting cases) ("This Court holds that the Union lacks standing as a plaintiff under Section 1132(a) of Title 29, United States Code, because it is neither a participant nor a beneficiary of the Plan.").

## Defendants' Proposed Finding of Fact No. 24 (¶ 53)

As discussed above, each of Host's unionized airport locations has a separate collective bargaining agreement, and the bargaining units are all distinct. Martin Dep. Tr. 30:19-22, ECF No. 136-7. Several of the local unions have agreed to coordinate labor negotiations with Host on topics including the electronic payment of tips under the terms of a Memorandum of Understanding ("MOU") between Host and the UNITE HERE International union. MOU (2021), ECF No. 85-09. That MOU provided that the parties would "create a subcommittee to discuss issues related to distribution and other issues related to tips at Airport Operations where workers do not traditionally receive tips." *Id.* at ¶ 10(c). That subcommittee was charged with addressing (among other topics) "the electronic payment of credit card tips program, and payroll debit cards." *Id.* The MOU reiterated that in locations in which workers traditionally received tips, the tips shall be the property of the workers performing the service. *Id.* Nonetheless, the MOU also provided that "the terms of any [CBA] between Company and [an MOU Signatory] Local" regarding tipping language that the local union deems preferable with respect to the terms of the MOU shall govern. *Id.* at HOST0008296.

**Plaintiff's Response:** All of the collective bargaining agreements of the unionized airport locations contain provisions waiving the rights of the unions to bargain with regard to the management and operation of the Plan. *See* ECF No. 147-2 at 35:10–15, 69:7–12, 95:1–16. While the union may bargain over the terms of the electronic payment of credit cards in each specific location, none of the unions had the authority to modify the Plan or exclude any of the employees from their rights under the terms of the Plan. *See id.* at 61:6–62:4; ECF No. 142, Ex. 6 at 19. To the extent Defendants continue to exclude credit card tip income from compensation by mandating the payment of the tips at the end of each shift, Defendants have allowed the unions to effectively amend the definition of Compensation under the Plan and to impede participants from receiving the benefit of making pre-tax deferral elections provided under the express terms of the Plan. *See* ECF No. 147 at 2.

## Defendants' Proposed Finding of Fact No. 25 (¶ 54)

When Host announced the paycard pilot program, several local unions challenged Host's ability to unilaterally implement such a program and filed ULPs and grievances. *See* Donohoe Decl. ¶¶18-21, ECF No. 85-08; Ex. P, ECF No. 85-12; Ex. Q, ECF No. 85-13; Ex. R, ECF No. 85-14; Baumann

Dep. Tr. 21:4 – 21:18, ECF No. 136-4. In addition to the ULPs filed by Plaintiff's own union local (UNITE HERE Local 11), a grievance was filed concerning the potential implementation of a new paycard procedure by UNITE HERE local 74, covering St. Louis and Kansas City. Donohoe Decl. ¶20, ECF No. 85-08; Ex. Q, ECF No. 85-13). UNITE HERE local 23, covering Atlanta, also filed a grievance. Donohoe Decl. ¶19, ECF No. 85-08; Ex. P, ECF No. 85-12. At other locations, union employees raised concerns about the paycard programs directly to management. Donohoe Decl. ¶ 21, ECF No. 85-08; Ex. T, ECF No. 85-16.

**Plaintiff's Response:**  Many of these ULPs and other grievances were withdrawn or had no further action.  Local 11, for example, withdrew its complaint.  *See* ECF No. 147-2 at 111:5–112:2.  In his testimony at the secondary class certification hearing, Mr. Donohoe claimed that the charges were withdrawn by Local 11 because "they said not all the members of the bargaining union were in favor of it."  *Id.*  Mr. Donohoe previously testified that he did not know why the charges were withdrawn but that when charges are withdrawn it typically is an indication that the board agent does not believe the charges have merit; the charging party is given the opportunity to withdraw through the NLRB procedures.  *See* ECF No. 88-2 at 75:21–77:15.

## Defendants' Proposed Finding of Fact No. 26 (¶ 55)

Even at those locations that adopted the paycard through bargaining, the system has not been popular with employees. For instance, in Charlotte, there were a number of complaints about the complications of the new system, and many employees indicated that they preferred the prior cash payout policy. Baumann Dep. Tr. 40:19-42:18, ECF No. 136-4. According to one of the labor negotiators, "if it was up to our members, they would have said no. … [I]t was part of the big bargaining process. So it was a good contract, but that was the poison pill we had to take." *Id.* at 25:19-26:2. In Tampa the adoption of the paycard system was referred to as a "big concession" by the negotiator working with the union. *Id.* at 24:3-7.

**Plaintiff's Response:**  Nevertheless, Defendants' former Vice President, Doug Crosswhite, testified that the paycard system that allows participants to defer credit card tipped income was generally well received by employees.  *See* ECF No. 147-5 at 47:23–48:5.

## Defendants' Proposed Finding of Fact No. 27 (¶ 56)

The Union response to proposals to pay tips electronically (as opposed to cash at the end of a shift) has varied from location to location. For the Chicago UNITE HERE bargaining unit, the Union opposed any use of the paycard or a third party payment source, but the bargaining unit was willing to agree to having tips paid through the payroll system as part of a compromise negotiation related to other issues. Mar. 27, 2024 Hrg. Tr. 78:7-20 (noting that it took 14 months and "very significant economic concessions by Host to get Local 1 in Chicago to abandon "threats of strikes" and agree to electronic payment of tips because "[t]hey absolutely hated the program."). In negotiations with the UNITE HERE International (which represents a number of locals pursuant to the MOU), the union negotiators strongly oppose the use of a paycard and resolution of that issue has stalled. In at least one location, the Union has threatened to strike in the event the Company insists on deploying a paycard. As noted above, in Tampa, the Union agreed to accept the paycard, but only in exchange for other concessions. Mar. 27, 2024 Hrg. Tr. 55:20-56:9 (Baumann) (noting union

negotiated a "great economic package" for employees in exchange for accepting the "poison pill" of the electronic payment of tips).

**Plaintiff's Response:**  In the union locations where Defendants identified union representatives who opposed the paycard system or a third-party payment source, Defendants have not identified any potential Class member who has pre-tax deferral elections and who opposed the paycard system or a third-party payment source that would allow Host to make the pre-tax deferral contributions in accordance with the terms of the Plan.

## Defendants' Proposed Finding of Fact No. 28 (¶ 57)

Plaintiff's argument for class certification relies upon the notion that Plan participants' deferral elections are more important to them than the cash payment of credit card tips. The evidence adduced at the March 27 Hearing strongly undermines this supposition. Mr. Baumann, the union representative, testified that during negotiations with union members in Tampa over the paycard program, the fact that electronic payment of tips would make contributing to the 401(k) Plan easier was raised with members. *See* Mar. 27, 2024 Hrg. Tr. 62:16-63:4 (Baumann); *see also* Mar. 27, 2024 Hrg. Ex. 2 (documenting benefits to 401(k) plan of electronic payment of tips); Mar. 27, 2024 Hrg. Ex. 8 (powerpoint presented to members explaining benefits to 401(k) participation of electronic tips program). As Mr. Baumann testified, the union members "certainly talked about the 401(k) aspects of [electronic payment of tips], [b] at the end, people care about the cash. That was the priority that folks had." Mar. 27, 2024 Hrg. Tr. 63:1-4 (Baumann); see also id. 63:11-25 (Baumann: "personally, I wish workers could care more about the 401(k) and pensions; right? But it's something that people, unfortunately, have bills they have to pay today and that's what really drives the discussion. So, we talked about it, but it wasn't a high priority among the workers, yeah."). Indeed, as Mr. Baumann noted, complaints that employees were not "able to participate in the 401(k) plan" "never came up in any of [the union's] preparations for negotiations." *Id.* 71:7-10 (Baumann).

**Plaintiff's Response:**  Plaintiff's argument for class certification relies upon the Plan, which requires Defendants to ensure that the participant's pre-tax deferral election be implemented properly and timely in accordance with the law.  *See* ECF No. 147-4 at 27:3–28:17, 30:2–31:11; 29 C.F.R. § 2510.3-102; DOL Regulation 2510.3-102.  Defendants did not present any evidence of proposed class members who opposed the relief requested by Plaintiff.  *See generally* ECF No. 147-2.

The unions are not proposed class members and have no standing to oppose the relief requested by Plaintiff.  *See United Food & Com. Workers Loc. 204 v. Harris-Teeter Super Markets, Inc.*, 716 F. Supp. 1551, 1561 (W.D.N.C. 1989) (collecting cases) ("This Court holds that the Union lacks standing as a plaintiff under Section 1132(a) of Title 29, United States Code, because it is neither a participant nor a beneficiary of the Plan.").  Further, any potential "conflict" arising from the unions does not bar class certification at this stage.  *See Becher*, 164 F.R.D. at 152–53 (it is "premature to deny class certification ... based on alleged conflict of interests between the union, non-union, and management employees.").

**Defendants' Proposed Finding of Fact No. 29 (¶ 59)**

Plaintiff is a former enrolled actuary who worked at KPMG International as a Principal in its Employee Benefits group from 1986 to 1999. Frankenstein Dep. Tr. 41:15-42:1, ECF No. 136-3. Since 1999, Plaintiff has worked in various bartending positions. Plaintiff has worked as a bartender at Host's John Wayne Airport location since July 2011, where his compensation includes a combination of regular wages and cash and credit card tips from customers. *Id*. at 27:9-25; 49:8-18. Since the start of his employment, he has always received his credit card tips in cash at the end of his shift. *Id*. at 61:8-16. He deposits his cashed-out tips into his checking account and he then pays his bills from his checking account. His tips generally cover his bills and he has extra money left after paying all of his bills. *Id*. at 128:13-16. According to Plaintiff, he does not set aside a certain portion of his tips to invest; rather, he contributes to his investment accounts when he has extra money and "when the mood strikes [him]." *Id*. at 128:10- 12; 129:12-14. Since the beginning of his employment at Host, Mr. Frankenstein has received dozens of arrears notices alerting him to the possibility of making arrears contributions to the Plan. He has never made an arrears contribution to the Plan. *Id*. at 72:13-73:5; 78:3-5.

**Plaintiff's Response:** Mr. Frankenstein elected to make pre-tax contributions of his compensation (including credit card tips compensation) to the Plan. ECF No. 88-4 at 66: 17–21, 68:21–69:7. Defendants prevented him from making the pre-tax contributions to the Plan by forcing him to take his credit card tips at the end of each shift, thereby creating the missed deferral opportunity and operational failure of the Plan. Mr. Frankenstein did not elect to make post-tax contributions to the Plan. Mr. Frankenstein has no obligation under ERISA to make post-tax contributions or mitigate any losses by making post-tax contributions. *See Maryland Elec. Indus. Health Fund v. MESCO, Inc.*, 2014 WL 853237, at *9–10 (D. Md. Feb. 28, 2014).

**Defendants' Proposed Finding of Fact No. 30 (¶ 61)**

In the year from November 2012 to November 2013, Plaintiff's paycheck covered his deferral elections. Falkenstein Decl. ¶10, ECF No. 84-16. However, since increasing his election to 25% in 2014 and then to 75% in 2019, his paychecks no longer covered his pre-tax elections. Id. at ¶12. As a result of the inability of his paycheck to cover his 25% election, starting at the end of March 2014, Plaintiff received, but yet disregarded, 33 quarterly arrears letters, all of which informed him of the arrears amount and offered him the opportunity to make after-tax contributions to cover the deficiency. See id. at ¶¶15, 16, 17; Frankenstein Dep. Tr. 76:19-22, ECF No. 136-3. While Plaintiff claims that Host did not honor his full election, due to the fact that he did not have the payroll funds, Plaintiff makes no claim that he did not receive his full match from the company. Falkenstein Decl. ¶19, ECF No. 85-05; Frankenstein Dep. Tr. 71:20-72:3, 78:13-19, ECF No. 136-3.

**Plaintiff's Response:** Starting at the end of March 2014, because Defendants failed comply with the terms of the Plan and include credit card tip compensation as a part of his compensation, Plaintiff's paycheck was insufficient to cover his pre-tax deferral election, resulting in a MDO. Plaintiff received 33 quarterly arrears letters offering him the opportunity to make after-tax contributions. ECF No. 79-1 at 6–10.

**Defendants' Proposed Finding of Fact No. 31 (¶ 62)**

Plaintiff has been unsuccessfully seeking to change Host's Tips Policy since at least 2018 through various means. Frankenstein Dep. Tr. 106:19-108:11, ECF No. 136-3. First, Plaintiff approached his HR Manager in November 2018 asking that Host change its Tips Policy. He was informed that it was "company policy" that could not be changed. *Id*. at 57:25-58:10. In November 2018, he approached his local union to put pressure on Host. During a November 28, 2018 bargaining session, Local 11 proposed that tipped employees be given the option of receiving credit card tips as part of their paycheck instead of receiving credit card tips in cash at the end of one's shift. Because some Host employees on Local 11's negotiating team disagreed with Plaintiff's request and did not want to have their credit card tips paid through their paycheck, this proposal was framed only as an option, not a uniform policy change. Due to the administrative difficulties of implementing that option, Host declined the proposal and the issue was tabled. *Id*. at 106:19-109:15. Plaintiff has acknowledged that Host is contractually bound to the terms of his Union's CBA, and Host cannot change the terms of the agreement without negotiating with the Union. *Id*. at 102:22-103:5.

**Plaintiff's Response:** Plaintiff has been unsuccessfully attempting to cause the Plan to implement his pre-tax deferral elections since 2018. *See* ECF No. 88-4 at 58:14–60:12. One way to ensure that Host consider all compensation as defined by the Plan would be to allow Host to implement the pre-tax deferral and contribution to the Plan and not force Plaintiff and the proposed Class to cash out credit card tips at the end of each shift, thereby precluding Host from making the contributions to the Plan.

**Defendants' Proposed Finding of Fact No. 32 (¶ 63)**

Plaintiff's Claim under ERISA Sections 502(a)(1), (a)(2) and (a)(3). In an effort to shoehorn his claim into ERISA, Plaintiff claims that because tips are Compensation as defined under the Plan, the Plan requires that pre-tax withholdings be taken from tips. Frankenstein Dep. Tr. 159:3-25, ECF No. 136-3. Notably, even though cash tips would fall within the definition of Compensation under the Plan, Plaintiff does not argue that pre-tax withholdings must be taken from cash tips. Class Cert Hrg. Tr. 5:7-14 (ECF No. 109) (explaining that Plaintiff's claims relate only to credit card tips and not cash tips because cash tips are no longer within the control of Host).

**Plaintiff's Response:** Plaintiff is not attempting to "shoehorn" his claim into ERISA claims. Cash tips cannot be subject to pre-tax deferrals because once the employee has the cash in hand, deferrals cannot be withheld from those amounts. However, with regard to credit card tip compensation, employers like Host have control of retaining tips to cover the deferral withholdings. *See* ECF No. 147-5 at 32:2–6.

Employers benefit by having credit card tips to be included in the definition of compensation under the Plan. IRC section 414(s) compensation ratio test is a test that ensures plans do not carve out certain types of compensation in a way that disproportionately benefits the highly compensated employees (HCEs). In most cases, the HCEs are owners or members of management that do not receive any tip income. Thus, excluding tip income from plan compensation is discriminatory to non-highly compensated employees (those receiving tips), and favoring the HCEs.

The accurate inclusion or exclusion of tip income in accordance with plan provisions is important when calculating employee deferrals, allocating employer contributions, and testing contributions for plan compliance purposes. *See* ECF No. 147-4 at 30:2–31:11.

Failing to include credit card tips as part of Plaintiff's compensation under the terms of the Plan results in (i) a clear violation of the terms of the Plan, (ii) a breach of fiduciary duty by the fiduciary defendants for failing to follow the terms of the Plan and inconsistently operating the Plan and subjecting the Plan to possible disqualification; (iii) illegal discrimination against Plaintiff and the proposed Class under the terms of the Plan, and (iv) the failure to pay benefits under the terms of the Plan.

**Defendants' Proposed Finding of Fact No. 33 (¶ 64)**

The Plan also limits pre-tax deferrals to "effectively available Compensation." As the Plan Administrator determined during Plaintiff's internal administrative appeal, once tips are paid out in cash, those tips are not "effectively available" for a pre-tax contribution. Thus, the Plan Administrator determined that "effectively available Compensation" must be compensation paid through the payroll system. This interpretation is buttressed by the fact that the Plan specifies that "effectively available compensation" is "Compensation remaining after applicable amounts have been withheld (e.g., tax-withholding and withholding of contributions to a cafeteria plan)." And those withholdings are only made through the payroll system.

**Plaintiff's Response:** First, Section 5.03 provides that "in no event shall a Participant be permitted to make Deferral Contributions in excess of his "effectively available Compensation." A Participant's "effectively available Compensation" is his Compensation remaining after all applicable amounts have been withheld (e.g., tax-withholding and withholding of contributions to a cafeteria plan.) *See* ECF No. 80-3.

Under the terms of the Plan (that includes credit card tips as Compensation), Section 5.03 does not "limit pre-tax deferrals to "effectively available Compensation." Section 5.03 only provides a cap on the amount of the Deferral Contribution by stating that a Participant cannot make Deferral Contributions "in excess" of his "effectively available Compensation."

Second, the Plan Administrator did not determine "that "effectively available Compensation" must be compensation paid through the payroll system." Instead, without any support from language in the Plan or applicable law, HMS only incorrectly determined that it could make Deferral Contributions from Compensation consisting of "regular w-ages paid through payroll" that remain after taking deductions for all required tax withholdings and other authorized deductions from pay. *See* ECF No. 80-10 at 12. Defendants now concede that Deferral Contributions are not limited to "wages" and in fact now include deferrals based on credit card tip income. *See id.*

Third, Host denied Plaintiff's initial demand that Host comply with the terms of the Plan by incorrectly stating that credit card tips were "unreported" and that deferrals of Compensation under the Plan cannot be made from a mere disbursement or payment of unreported tips but rather must be made on "effectively available Compensation" in your regular paycheck.:

You correctly point out that the Plan, at Section 5.03, states that a participant is not permitted to make Deferral Contributions in excess of his "effectively available Compensation" and that "effectively available Compensation" is a participant's Compensation remaining after all applicable amounts have been withheld (e.g., tax-withholding and withholding of contributions to a cafeteria plan). However, under the federal tax law and applicable IRS rules and guidance, the withholding of federal and state income tax, FICA taxes and Medicare taxes is (i) required on the amount of tips reported by employees, but not on the amount of unreported tips, and (ii) the applicable tax withholdings are required to be taken from regular wages (but not from tips) or from amounts that the employee pays to the employer to fund those withholdings. When these legal requirements for tax withholding are applied, together with the "effectively available Compensation" limitation on the making of deferrals in the Plan, it is clear that deferrals of Compensation under the Plan cannot be made from a mere disbursement or payment of unreported tips to you, but rather must be made on "effectively available Compensation" in your regular paycheck.

In other words, even though reported tips are included in Compensation for purposes of determining the overall amount of deferrals/contributions to the Plan, "counting" tips as Compensation does not mean the tip amounts are effectively available to withhold deferrals from. As such, to the extent that regular wages are insufficient to withhold elected deferrals from, the Plan allows for a participant's contribution of after-tax amounts."

*See* ECF No. 80-10 at 12.

Ms. Russell's letter then argued, without authority, that the credit card tips, which Host International requires its tipped employees to report before paying them back out and uses to determine their taxable earnings, are somehow not "employee-reported tips":

You also separately state that your credit card tips are collected by HMSHost and then paid to you as "Compensation," as defined under the Plan. From this statement you then conclude that the Company should be deferring and paying into your Plan account your elected deferral percentage from the credit card tips paid to you daily. However, as stated above, the IRS requires that we recognize as Compensation only tips reported to us by employees. The SPD, at section IV (as previously referenced and discussed in our March 11 letter to you) also states that Plan contributions based on tips include as "eligible compensation" only your "reported gratuities." Therefore, the mere payment or disbursement of credit card tips to you daily or at the end of a shift does not constitute the payment of employee-reported tips. In addition, such daily payments are not combined with the payment of regular wages. This is important because, as described above, we can only withhold income tax, FICA, and Medicare imposed on tips from available regular wages in order to satisfy those withholding obligations with respect to your tip amounts. And, further, only after satisfying those required withholding amounts can we determine if we have "effectively available Compensation" upon which deferrals can be taken for Plan purposes.

Ms. Russell's explanations in her letter were illogical because (i) credit card tips are clearly "reported tips," as Host International requires its employees to report them and then uses those reports to calculate the employees' taxable earnings; and (ii) the reported tips" are "eligible compensation" under the Plan and should be deferrable.

On behalf of Host, Mr. Lauerbach cited Ms. Russell's letter and upheld the denial, stating in pertinent part:

> As we have previously explained in [Ms. Russell's April 10, 2019 letter] and in prior correspondence, an Employer *cannot*, under the terms of the Plan and federal tax law, make your elected pre-tax deferrals of tip Compensation out of anything *other than* your regular wages paid through payroll that remain after taking deductions for all required tax withholdings and other authorized deductions from your pay.

As with Ms. Russell's April 10, 2019 letter, Mr. Lauerbach did not explain how federal and state withholding laws prohibit Defendants from using a separate mechanism to allow Plan participants to defer their reported credit card tips, nor did he refer to any provision in the Plan that prohibits such deferrals or carves out reported credit card tips from being included as "effectively available Compensation" qualifying for pre-tax deferrals.

Fourth, Host's interpretation of the Plan is not "buttressed by the fact that the Plan specifies that "effectively available compensation" is "Compensation remaining after applicable amounts have been withheld (e.g., tax-withholding and withholding of contributions to a cafeteria plan)." Defendants interpretation of the Plan contradicts the terms of the Plan and excludes credit card tip income from Compensation and effectively treats credit tip income as a withholding.

Finally, while Host may currently implement the appropriate tax withholding through its payroll system, there is nothing that precludes Host from making any necessary tax or cafeteria plan withholdings at the point of sale before cashing out the remaining credit card tips or, as Russell states, withhold income tax, FICA, and Medicare from available regular wages to satisfy the withholding obligations with respect to the credit card tip amounts.

**Defendants' Proposed Finding of Fact No. 34 (¶ 65)**

Because the Plan Administrator is given deference to interpret the terms of the Plan, that interpretation of the Plan is subject to deference absent an abuse of discretion.[5] *See*, *Conkright v. Frommert*, 559 U.S. 506, 509 ("an ERISA plan administrator with discretionary authority to interpret a plan is entitled to deference in exercising that discretion."); *Sanders v. Hartford*, 2013WL 3944601, at *4 (D. Md. July 30, 2013) ("Courts usually review a plan administrator's interpretation of a plan for an abuse of discretion.").

**Plaintiff's Response:** Under an abuse of discretion standard, a plan administrator's decision must be reasonable. *Bernstein v. CapitalCare, Inc*., 70 F.3d 783, 787 (4th Cir. 1995).

*See Alan R. v. Bank of Am. Grp. Benefits Program*:

> An administrator's decision is reasonable if it is "the result of deliberate, principled reasoning process and if it is supported by substantial evidence." *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997). Where the decision is reasonable, it should not be disturbed by a court reviewing that decision for abuse of discretion. *Id.* "Substantial evidence is the quantum and quality of relevant evidence that is more than a scintilla but less than a preponderance and that a reasoning mind would accept as sufficient to support a particular conclusion." *Donnell v. Metro. Life Ins. Co.*, 165 Fed. App'x 288, 295 (4th Cir. 2006) (quotation marks omitted). Even if the Court would have come to a different conclusion independently, the Court will not reverse the plan administrator's decision if it is reasonable. *Booth*, 201 F.3d at 344.

2022 WL 413935, at *4 (W.D.N.C. Feb. 9, 2022).

In *Booth*, the Fourth Circuit identified the following eight nonexclusive factors, known as the *Booth* factors, that courts consider in determining if an administrator's decision is reasonable:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth*, 201 F.3d 335, 342–43 (4th Cir. 2000); *Champion v. Black & Decker* (U.S.), Inc., 550 F.3d 353, 359 (4th Cir. 2008) (quoting *Booth*, 201 F.3d at 342-43). All eight *Booth* factors may not be relevant in a given case. *Helton v. AT&T, Inc.*, 709 F.3d 343, 357 (4th Cir. 2013). In applying the *Booth* factors, the court does not weigh the evidence in the administrative record but, rather, reviews it to confirm that the claim decision was the product of a principled, reasoned decision-making process supported by substantial evidence. *Williams v. Metropolitan Life Ins. Co.*, 609 F.3d 622 (4th Cir. 2010). If so, the claim determination will be upheld. *Id.*

**Defendants' Proposed Finding of Fact No. 35 (¶ 66)**

Thus, the thrust of Plaintiff's ERSA Section 502 claims is that Host has misinterpreted the Plan document to mean that "effectively available Compensation" is Compensation paid through the payroll system. Plaintiff suggests that tips that are processed through a credit card system are also "effectively Available Compensation" even though they have not been processed through the payroll system or had other applicable amounts withheld.

**Plaintiff's Response:** The thrust of Plaintiff's ERISA 502 claim is that Defendants failed to follow the unequivocal terms of the Plan that mandate Host to implement the pre-tax elective deferrals of participants based on their Compensation as defined by the terms of Plan, applying whatever system it elects to contribute the pre-tax deferrals of Compensation through payroll, the Pilot

Project, the use of the point of sale system, or any other system that allow it to meet its obligations to make the contributions in a timely manner.

The failure to follow the terms of the Plan results in fiduciary breaches, discrimination against Plaintiff and the proposed Class, and the failure to provide benefits to which Plaintiff and the proposed Class are entitled.

**Defendants' Proposed Finding of Fact No. 36 (¶ 67)**

Without addressing the merits of that claim, for purposes of class certification, the important implication is that Plaintiff would interpret the Plan to mean that any compensation made available to Host, including through its credit card system, is "effectively available Compensation." If Plaintiff prevailed on that argument, the Plan would then have to have access to all those credit card tips for any employee participating in the 401(k) plan. There could be no "option" available to employees. That definition of "effectively available Compensation" must be applied consistently across all participants in the Plan. Thus, employees could not determine which part of their compensation they deem to be "effectively available Compensation."

**Plaintiff's Response:** Under the terms of the Plan, the pre-tax deferral elections of Plaintiff must be applied to the Compensation available to Host and contributed to the Plan in accordance with the law, including Compensation based on salary and credit card tips that are in the control of Defendants. *See* ECF No. 80-3 at 12, 14. As Defendants concede, all Plan terms must be consistently applied across all participants in the Plan and all participants in the Plan, whether union or non-union, must be treated the same. *See* ECF No. 147-2 at 19:13–16.

Currently, Defendants are not applying Compensation consistently across all participants in the Plan as the current administration of the Plan (i) allows participants in non-union locations and select union locations to defer pre-tax Compensation that includes credit card tipped income, and (ii) disallows participants in certain union locations to defer pre-tax Compensation that includes credit card tipped income because Host mandates that those participants cash out credit card tips at the end of each shift. *Id.* at 29:3–5.

Defendants' operation of the Plan results in Defendants' failure to follow the express terms of the Plan by misapplying the term "effectively available compensation," a term provides that "in no event shall a Participant be permitted to make Deferral Contributions in excess of his "effectively available Compensation." Defendants' explanation of the "effectively available Compensation" does not support Defendants' decision to exclude credit card tip income from the definition of Compensation or excuse Defendants from following the terms of the Plan that require Defendants to contribute the contributions of Plaintiff and the proposed class based on their pre-tax deferral elections.

Moreover, Defendants inconsistent and arbitrary operation of the Plan is further illustrated by Defendants' use of credit card compensation to enjoy the benefit of the Plan's safe harbor status on the one hand and then, on the other hand, exclusion of credit card compensation to limit the amount of its obligation to contribute to the Plan the participants' pre-tax deferrals elections.

## Defendants' Proposed Finding of Fact No. 37 (¶ 68)

The implication of Plaintiff's interpretation is that tipped employees who wanted to participate in the 401(k) Plan would have no option to receive their tips in cash at the end of the shift because the plan must have access to those tips if they are to remain "effectively available compensation." Plan document, supra n. 1; Class Cert. Hrg. Tr. 31:3-10 (ECF No. 109) (for participants who want to get their tips 100 percent in cash at the end of the day, their only options are to not take any pretax deferral or not participate in the plan).

**Plaintiff's Response:**  Under the express terms of the Plan, tipped employees may elect to participate in the Plan and may elect to make pre-tax deferrals of Compensation to the Plan.  *See* ECF No. 147-2 at 19:11–16; ECF No. 80-2 at 8.  Should participants elect to participate in the Plan and receive all of their credit card tips at the end of the shift, they can elect to make after tax contributions to the Plan.  Participants may also elect to reduce their percentage of pre-tax deferral so that they contribute a portion of their credit card tips to the Plan and receive the remainder in cash at the end of each shift.

## Defendants' Proposed Finding of Fact No. 38 (¶ 69)

Plaintiff's claim under ERISA Section 510. Of course, the Host Plan, and the fiduciaries of the Host Plan (the defendants in Plaintiff's fiduciary breach claims) do not have control over Host corporate functions, such as how credit card tips are paid. Those decisions are made (to the extent that Host has the ability to make them) by Host as a company. Class Cert. Hrg. Tr. 164:19-25. The Plan, and its fiduciaries, can only be held responsible for actions that lie within the discretion of Plan fiduciaries.

**Plaintiff's Response:**  It is the explicit responsibility of the Plan fiduciaries to ensure that the Plan is being administered properly and according to the Plan terms, in the best interests of the Plan participants.  If it is apparently outside the "discretion of Plan fiduciaries" to implement necessary changes to ensure compliance, then it seems as though the Plan would be perpetually out of compliance and in violation of ERISA, with Plan fiduciaries incapacitated.  Further, Defendants willfully ignore the fact that Plan fiduciaries are employees of Host as a company and acting *on behalf of Host*.  The lines that Defendants are attempting to draw between the Host Plan and Host are meaningless.

## Defendants' Proposed Finding of Fact No. 39 (¶ 71 fn. 6)

Defendants argue that the means of payment of tips would not constitute a violation of Section 510 because Section 510 only applies to actions that affect the employment relationship (such as discipline or termination). *See, e.g., Gross v. St. Agnes Health Care, Inc.*, 2013 WL 4925374, at * 18 (D. Md. Sept. 12, 2013) ("in applying § 510, courts require that the employer engage in conduct affecting the employment relationship.") (citing *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 143 (1990). They also argue that the means of tip payment could not constitute discrimination under Section 510, as the company had adopted its Tips Policy before even adopting the Plan, and that the Tips Policy simply recognizes that Tips are the property of employees, as required by law. Further, that Tips Policy (and its impact on deferrals) has been known to Plaintiff and all class members for many years, and thus any statute of limitations has already run.

25

**Plaintiff's Response:** Defendants make a legal argument, rather than state facts.

### Defendants' Proposed Finding of Fact No. 40 (¶ 72)

Without resolving the legal question about the scope of application of Section 510, the Court finds there is another impediment to Plaintiff's Section 510 claim. Plaintiff assumes that Host, as an employer, could itself have decided to have tips paid through payroll such that the tips might have been effectively available to the Plan, and that its failure to do so constitutes discrimination. But, if the decision to pay tips in cash is not a policy over which Host had unilateral control, it is difficult to conclude that Host discriminated against tipped employees in continuing that policy.

**Plaintiff's Response:** Host has unilateral control over whether to implement a system to ensure the contribution of pre-tax deferral elections made by tipped employees who elected to contribution a portion of their salary and credit card tip income to the Plan. *See* ECF No. 1 ¶ 6. Host also has the unilateral control to implement the systems to ensure that the contributions be made in a timely manner through its point of sale or payroll systems. *See* ECF No. 147-5 at 35:2–6.

It is not the responsibility of the Plaintiff or proposed class members to develop and implement the systems required for Host to comply with its obligations under the Plan.   Should Host determine that it cannot implement a system that will allow it to comply with the terms of the Plan, Host, as the settlor, has the ability to amend the Plan in a manner that will avoid the operational failure resulting from its failure to follow the terms of the Plan. *See* ECF No. 1 ¶ 6.  For example, as in the Hyatt 401(k) matter, Host could amend the Plan to reduce the amount of the pre-tax deferral election based on availability of funds that participants have to contribute to the Plan. *See* ECF No. 147-7.

### Defendants' Proposed Finding of Fact No. 41 (¶ 73)

As noted above, the unions contend that the payment of tips is a mandatory subject of bargaining under the NLRA, such that Host could not have unilaterally determined to have tips paid through payroll. Baumann Dep. Tr. 22:13-25:18, ECF No. 136-4; Mar. 27, 2024 Hrg. Tr. 48:8-49:1 (Baumann). Indeed, many unions continue to strenuously oppose making a concession in negotiations regarding the payment of tips through payroll. Thus, the Court finds that even if Plaintiff could succeed on a claim under Section 510, the Court would have to determine, perhaps on a local by local basis, if and when Host might have had the ability to have tips paid through Host's payroll system.

**Plaintiff's Response:** As Defendants concede, the Plan must be operated consistently and it must treat union and non-union members the same. *See* ECF No. 147-2 at 19:13–16; ECF No. 147-4 at 26:11–17; ECF No. 147-3 at 11.  The unions have no rights or responsibilities with regard to the Plan as they waived any such rights in their respective CBAs. *See* ECF No. 147-2 at 61:6–62:4, 94:10–12.

The Court does not have to determine on a local-by-local basis if and when Host has the ability to have credit card tips considered as part of the Compensation used to determine pre-tax elective

deferrals to be contributed to the Plan. Host has the information relating to the pre-tax deferral elections and it has the obligation to make the pre-tax contributions required by the Plan whether it does so under its pilot program, withholds the contributions amounts at the point of sale so that it can make the contributions through its payroll system, or pays all compensation (salary and credit card tip income) thought its traditional payroll system.

**Defendants' Proposed Finding of Fact No. 42 (¶ 74)**

Plaintiff proposes the following class: "All current and former [Plan] participants . . . who (i) received reported credit card tips as compensation outside a regular paycheck or paycard, and (ii) had a deferral election in place at the time [they] received the reported tips within six years of the date this action was filed [April 28, 2014] to the present." ECF No. 145. However ill-defined and imprecise, it is clear that Plaintiff's proposed class includes all directly tipped plan participants, regardless of whether (1) they oppose any change to the Tips Policy; (2) their paychecks adequately covered their deferral election; (3) they are a member of a union that is party to a CBA governing the terms of their compensation with Host (and which may include a prohibition on unilateral changes by Host to how tips are paid); or (4) they are harmed at all by the Tips Policy (e.g., individuals who kept their tips and benefited from doing so).

**Plaintiff's Response:** The proposed definition of the class includes those Plan participants who (i) received reported credit card tips as compensation outside a regular paycheck or paycard; and (ii) had a deferral election in place at the time [they] received the reported tips within six years of thedate this action was filed [April 28, 2014] to the present. ECF No. 145.

All members of the proposed class have been harmed by Defendants failure to comply with terms of the Plan and the missed deferral opportunity resulting from the failure to include credit card tip income as part of Compensation. The harm includes not only the financial harm caused by the missed deferral opportunity but also the harm to the Plan and its participants resulting from the failure to follow the terms of the Plan and the operational failure that may result in a disqualification of the Plan.

The purported Tips Policy (which essentially is no longer followed in all non-union and select union locations) does not govern the operation of the Plan or excuse Defendants from failing to follow the terms of the Plan.

The CBAs do not govern or control the operation and management of the Plan as the unions waived all rights with regard to bargaining over the Plan and its operation. *See* ECF No. 147-2 at 35:10–15, 69:7–12, 95:1–16.

Defendants agree that the Plan must follow the law and that all participants in the Plan must be treated the same whether they are in a union or not, whether they oppose changes to the Tips Policy or not, whether the individual participants have sufficient salary Compensation to cover their elective deferrals or not, and whether they were harmed by the tips policy or not. *See* ECF No. 147-2 at 19:13–16; ECF No. 147-4 at 26:11–17; ECF No. 147-3 at 11. The amount of the missed deferral opportunities can be estimated by using the DOL and/or IRS tables. The amount of the calculated loss need not be exact, and all members of the proposed class have been harmed by

Defendants' operational failures.  *See* Rev. Proc. 2021-30, https://www.irs.gov/pub/irs-drop/rp-21-30.pdf.

## Defendants' Proposed Finding of Fact No. 43 (¶ 75)

Plaintiff readily admits he does not know any other potential class members that share his concerns about the Tips Policy or their 401(k) deferral elections. ECF No. 84 at 16; Frankenstein Dep. Tr. 11:25-12:3; 138:21-23, ECF No. 136-3. Indeed, Plaintiff did not, and apparently cannot, point to a single individual who agrees with his position or supports the relief he seeks. The one individual with whom Plaintiff discussed this case – an employee named "Wilma"- told him that she relies upon Host's current Tips Policy because she uses the cashed-out tips to budget her income and expenses. Frankenstein Dep. Tr. 139:4-11, 140:14-18, ECF No. 136-3. Standing alone, these concessions reflect that Plaintiff's interests may not be shared by any, let alone all, members of the class, and that at least one member of the putative class is opposed to Plaintiff's position.

**Plaintiff's Response:**  Potential class members share Plaintiff's concerns as evidenced by the fact that in 2018 his union requested that the Tips Policy be changed in part to allow its members to defer credit card tip Compensation pre-tax pursuant to the participants' elected pre-tax deferrals.

There is no evidence of a single proposed class member who opposes Plaintiff's position.  *See* ECF No. 147 at n. 8.  There is no evidence that Wilma or any of the union members who oppose the pilot program have made pre-tax deferral elections.

There is no evidence of any proposed class member who does not share Plaintiff's position or who opposes Plaintiff's position.  *See generally* ECF No. 147-2.

## Defendants' Proposed Finding of Fact No. 44 (¶ 76)

But this is not the only evidence that no one else supports Plaintiff's lawsuit. This Court instructed Plaintiff to obtain evidence from any other proponents of his case. He failed to do so, although apparently not for lack of trying. As Plaintiff's counsel noted at the hearing, "Mr. Frankenstein … talked to people, but no one else has come forward" to support his claims. Mar. 27, 2024 Hrg. Tr. 16:15-16. The Court finds this lack of support among purported class members for Plaintiff's position to be significant, particularly when placed alongside the ample (and unrebutted) evidence that most, if not all, of the members of Plaintiff's class oppose this lawsuit.

**Plaintiff's Response:**  There is no evidence of any members of the proposed class who oppose this lawsuit.  *See generally* ECF No. 147; ECF No. 147-2.

The "opposition" to the pilot program presented by Defendants at the hearing on March 27, 2024 failed to include any evidence from a proposed class member (one who has elected to make a pre-tax deferral contribution to the Plan).  ECF 147-5 ¶ 60 n. 8.

Despite the fact that only Defendants know the identities of the proposed class members (as they have failed and refused to provide the identities of the proposed class member in response to interrogatories propounded by Plaintiff), at the hearing on March 27, 2024, Defendants failed to present any evidence from any proposed class members.  ECF No. 147-5 at ¶ 5.

Despite Defendants' representation and contention that Plaintiff's own union opposes Plaintiff's action and the Court's specific request to hear from Plaintiff's own union at the March 27, 2024 hearing, Defendants failed and refused to provide a witness from Plaintiff's own union to support Defendants' bald contention. Indeed, Defendants did not present any testimony or evidence of any opposition by proposed class members to Plaintiff's lawsuit. *See generally* ECF No. 147-2. There is none.

There is no objective reason for any proposed class member to oppose Plaintiff's claims. If successful, to cure the missed deferral opportunity, class members will receive the benefit of (i) additional benefits; and (ii) assurances that the Plan will be operated in accordance with the law and its terms, thereby preserving its tax qualified status.

### Defendants' Proposed Finding of Fact No. 45 (¶ 77)

Plaintiff has attempted to circumvent the lack of witnesses or testimony in support for his lawsuit, by pointing to the fact that purported class members have made deferral elections in the Plan. See Mar. 27, 2024 Hrg. Tr. 10:2-9. Effectively, Plaintiff argues that the fact that Host employees made deferral elections means conclusively that they would rather have their credit card tips deferred into the Plan rather than paid out in cash at the end of their shift. The Court does not find this argument credible based on the record.

**Plaintiff's Response:** To respond to the Court's question about numerosity, the number of proposed Class members impacted by Defendants' failure to implement the pre-tax contributions of proposed Class members, counsel for Plaintiff cited the number of proposed Class members who made pre-tax deferral elections during the class period, more than 500, and the approximate amount of missed deferral opportunities provided by Defendants in response to discovery requests. *See* ECF No. 80-9. The total number of proposed class members is in excess of 2,291.

Should participants wish to receive their credit card tips in cash at the end of the shift, they can simply elect to make after tax contributions to the Plan or no contributions at all.

### Defendants' Proposed Finding of Fact No. 46 (¶ 78)

Since 2014, not a single Plan participant (other than Plaintiff) has requested to defer credit card tips on a pre-tax basis, let alone filed a claim for benefits or exhausted their administrative remedies asserting similar concerns as Plaintiff. ECF No. 84 at 17; Falkenstein Dep. Tr. 113:7-18, ECF No. 85-01. And at least one putative class member even complained when his full deferral election was fulfilled as a result of his credit card tips being paid through payroll following the implementation of the electronic paycard system and then immediately changed his deferral election to 0%. See Falkenstein Decl. ¶ 35, ECF No. 85-05; Ex. K, ECF No. 85-07. Specifically, this individual complained that "[a]ll of [his] paycheck was sent into [his] 401(k) instead of [his] bank account" when he elected to leave his credit card tips on his electronic paycard to be paid through payroll; he was not aware of his 75% deferral election since he "ha[d] not received a paycheck in years as a tipped employee." He then changed his deferral election to 0%. Ex. K, ECF No. 85-07, at HOST0009903. This exchange demonstrates that a purported class member who made a deferral

election nonetheless prefers not to defer his compensation to the Plan, in direct conflict with the position Plaintiff advances in this lawsuit.

**Plaintiff's Response:**  The example cited by Defendants only further supports Plaintiff's claims as it demonstrates the control each participant has with respect to whether he or she wishes to make a pre-tax deferral election or receive the entire amount of credit card tips in cash.

The fact that no other participants filed a claim relating to Defendants' failure to implement pre-tax deferral elections in no way demonstrates any intra-class conflicts.  There is none.  As set forth above, the proposed class members only stand to benefit by Plaintiff's claims – compensation for MDO and preserved plan qualification by following the terms of the Plan and applicable law.

Defendants' argument that no other participants were interested in deferring credit card tips on a pre-tax basis is belied by their own documents promoting the pay card system (touting the benefit of the pay card system to meet the requests to defer credit card tip income and union negotiator requests to change the tips policy to allow for the pre-tax deferrals).

### Defendants' Proposed Finding of Fact No. 47 (¶ 79)

Furthermore, the evidence from the live witnesses at the class certification hearing, all of whom are familiar with the opinions of the thousands of union members who would be pulled into Plaintiff's class, demonstrates that these purported class members overwhelmingly want their credit card tips paid out in cash, rather than deferred into the 401(k) Plan. The unions have extracted significant economic concessions from Host to even negotiate a change to the manner in which credit card tips are paid. Moreover, these employees are not ignorant of the advantages that electronic payment of tips would have for their ability to make pre-tax contributions to the Plan. Evidence adduced at the hearing shows that the advantages to retirement savings were expressly presented to union members and this advantage failed to reduce opposition to the payment of credit card tips daily in cash to tipped employees. The Court simply does not find it credible that Host's employees – with the sole exception of Mr. Frankenstein – would rather have their pre-tax 401(k) deferrals satisfied, if it meant an end to the decades-long practice of receiving credit card tips in cash.

**Plaintiff's Response:**  The evidence from the live witnesses at the class certification hearing who purportedly were familiar with the opinions of the thousands of union members failed to include even one proposed class member who made a pre-tax deferral election.  *See generally* ECF No. 147-2.

Instead, Defendants' witnesses merely presented hearsay evidence of union members who dislike the specific paycard system proposed by Defendants because it was inconvenient and/or costly. Or the union members and/or their representatives opportunistically attempted to use the Company's request to move to electronic tips as a tool to secure other benefits for union members. None of this evidence in any way related to the operation and/or management of the Plan – a Plan about which the unions all agreed should be operated in accordance with the law and the terms of the Plan, and a Plan that must treat union and non-union employees the same.  *See generally id*; Ex. A at at 19:13–16.

**Defendants' Proposed Finding of Fact No. 48 (¶ 80)**

Plaintiff seeks both prospective relief and retrospective damages. Prospectively, Plaintiff seeks an interpretation of the Plan that would result in all credit card tips being deemed "effectively available Compensation." Such an interpretation would mean that if a participant chose to participate in the Plan and take pre-tax deferrals, those deferrals would have to be taken from both the participant's credit card tips and salary, regardless of whether the participant wanted the deferral to be made from credit card tips and regardless of whether the participant preferred to receive those credit card tips in cash or electronically. Class Cert. Hrg. Tr. 31:3-10 (ECF No. 109). Further, Plaintiff would require Host to make all credit card tips available electronically (e.g., not paid in cash at the end of the shift) regardless of whether the employee or the union preferred that result. Finally, Plaintiff seeks damages to compensate the plan for alleged missed contributions from all Plan participants, regardless of whether those participants would have made pre-tax contributions from their credit card tips or not.

**Plaintiff's Response:** Plaintiff seeks retrospective and prospective relief.

Retrospectively, Plaintiff seeks relief for the missed deferral opportunities from 2014 through the present. Defendants concede that credit card tips are included in the definition of Compensation under the term of the Plan, and for those participants who elected to make pre-tax deferrals of Compensation to the Plan, Defendants failed to implement the pre-tax deferrals in violation of the terms of the Plan and applicable law, resulting in a missed deferral opportunity.

Prospectively, Plaintiff would require Defendants to comply with the terms of the Plan and implement pre-tax deferrals of credit card tip compensation before mandating the distribution of credit card tips in cash. This may be done through payroll, through the pilot program, or through a point-of-sale program developed by Host.

Defendants incorrectly claim that the relief requested by Plaintiff somehow fails to take into account the preferences of proposed class members i.e., whether they would like to contribute their pre-tax Compensation (salary and credit card tips) up to the percentage of the election. To the contrary, the participants have made their elections and can change the elections at any time.

Defendants' conduct impedes the ability of Plaintiff and the proposed class to receive the benefit of their pre-tax elections.

Finally, Plaintiff's request does not require that Host make all credit card tips available electronically. Host can, for example, develop a point-of-sale system the honors the pre-tax deferral elections of participants and then pays the remainder to the participants in cash at the end of the shift or amend the Plan and exclude tips from the definition of Compensation or automatically reduce the percentage of the contribution should there be insufficient funds and thereby avoid violating the terms of the Plan.

## II.     RESPONSE TO DEFENDANTS' PROPOSED CONCLUSIONS OF LAW

**Defendants' Proposed Conclusion of Law No. 1 (¶ 81)**

The class action device is an "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 155 (1982)). Class certification requires "rigorous analysis" of the plaintiff's claims, which "frequently entail[s] overlap with the merits ... because a class determination [is] enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013) (internal citation omitted).

**Plaintiff's Response:**   "[I]n a class certification analysis, the court determines whether the Rule 23 requirements have been satisfied without considering whether the proposed class is likely to prevail on the merits."  *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 95 F.4th 181, 188 (4th Cir. 2024) (citation omitted).  While the court must conduct a "rigorous analysis" to determine whether the elements of Rule 23 have been satisfied, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011), "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the class certification stage."  *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).  "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied."  *Id.*

As to Defendants' reliance on *Comcast*, this Court has already addressed where Defendants' argument falls short:

> Although the issue of liability may present common questions of law and fact among all proposed class members, class certification can be denied if the calculation of damages requires individual computation. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013); *Hewlett*, 185 F.R.D. at 220. However, "courts generally find the predominance standard of Rule 23(b)(3) to be satisfied," even when individualized damages determinations are required, if common questions still predominate as to liability. *See Gunnells*, 348 F.3d at 427–28.

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 685–86 (D. Md. 2018); *see Fernandez v. RentGrow, Inc.*, 341 F.R.D. 174, 212 (D. Md. 2022) (citing *Comcast*, 569 U.S. at 38):

> The Supreme Court found that the model's failure to attribute its underlying calculus to any one legal theory prevented its application to the entire class in a way that would satisfy Rule 23(b)(3). *Comcast* is inapposite here because of the nature of the damages at issue: there, the damages model sought to compensate the aggrieved parties for expected losses as a result of Comcast's anticompetitive behavior. As already discussed, the statutory damages provided for by [statute] do not serve such a function. *Comcast* therefore does not preclude class certification in this case.

Here, is is quite clear that common questions predominate as to liability. Whether Defendants violated the terms of the Plan and caused missed deferral elections by denying tipped employees the opportunity to defer credit card tip income is central to the question of liability—and it pertains to uniform corporate conduct. Further, ERISA provides for statutory relief for *existing*, not expected, injury to the Plan.

### Defendants' Proposed Conclusion of Law No. 2 (¶ 83)

In many actions brought under ERISA, the appropriateness of class treatment is clear and often uncontested. This is not such an action. For the reasons set forth below, the Court concludes that class certification is improper based on the evidentiary record developed through discovery and briefing specific to this issue and two, separate evidentiary hearings on this question.

**Plaintiff's Response:** Indeed, many courts in this Circuit have recognized that "ERISA litigation involving a claim for breach of fiduciary duty presents a paradigmatic example of a [Rule 23](b)(1) class." *Tatum v. R.J. Reynolds Tobacco Co.*, 254 F.R.D. 59, 67 (M.D.N.C. 2008) (citing *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 453 (S.D.N.Y. 2004)) (internal alterations omitted); *Knight v. Lavine*, 2013 WL 427880, at *4 (E.D. Va. 2013); *DiFelice v. U.S. Airways, Inc.*, 235 F.R.D. 70, 80 (E.D. Va. 2006). The "clarity" of class treatment in such cases is because actions involving breaches of fiduciary duty under ERISA § 502(a)(2) address legal and factual questions that concern Plan-wide misconduct.

### Defendants' Proposed Conclusion of Law No. 3 (¶ 85)

The Court has heard argument on class certification, and then asked the parties to offer evidence through written submissions and live testimony, regarding the existence, or non- existence, of a conflict of interest within the class. Based on the ample evidentiary record before it, the Court concludes that Plaintiff has failed to meet his burden under Rule 23(a). As discussed further below, Plaintiff's proposed class contains significant intra-class conflicts, which alone precludes certification. In addition, Plaintiff has failed to meet his burden of showing that his claims satisfy the requirements of numerosity, commonality, typicality, or adequacy of representation. Nor has Plaintiff carried his burden of showing that his claims meet the requirements for certification under Federal Rule 23(b)(1), which is the sole basis upon which Plaintiff seeks to certify the class.

**Plaintiff's Response:** Plaintiff obviously disputes the conclusion that he has not met his burden under Rule 23(a). Not only has Plaintiff shown numerosity, commonality, typical, and adequacy of representation, but the supposed "significant intra-class conflicts" that Defendants tout are the product of manufactured conflicts and mischaracterizations of the record testimony.

### Defendants' Proposed Conclusion of Law No. 4 (¶ 86)

Courts consistently hold that the existence of, or potential for, material conflicts among putative class members renders class certification inappropriate. *See, e.g.*, *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 337 (4th Cir. 1998); *Morris v. McCaddin*, 553 F.2d 866, 870-71 (4th Cir. 1977) (affirming denial of certification where "the interests of the named plaintiffs would have been antagonistic to the interests of many of the unnamed members of the class"). The Fourth Circuit has recognized that "[t]he first obstacle to class treatment . . . is a conflict of interest

between different groups of [class members] with respect to the appropriate relief." *Broussard*, 155 F.3d at 337; *see also* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 7A Federal Practice & Procedure § 1768 (4th ed. 2021) ("It is axiomatic that a putative representative cannot adequately protect the class if the representative's interests are antagonistic to or in conflict with the objectives of those being represented.").[7] Significant intra-class conflict is so antithetical to class treatment that it is an overarching issue impacting each of the four ordinary factors for class certification: commonality, typicality, numerosity, and adequacy of representation. Fed. R. Civ. P. 23(a); *Broussard*, 155 F.3d at 337.

**Plaintiff's Response:**  While class certification can be denied where intra-class conflict exists, it must be *true* conflict and not hypothetical or speculative conflict manufactured by Defendants. *See In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at *14 (E.D. Va. Sept. 4, 2020) ("To this end, courts should endeavor to uncover conflicts of interest between named plaintiffs and proposed class members, while also keeping in mind that any such differences exist 'only where those differences create [actual] conflicts between the named plaintiffs' and the class members' interests."); *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) ("[A] conflict will not defeat the adequacy requirement if it is 'merely speculative or hypothetical[.]'") (quoting *Gunnells*, 348 F.3d at 430).

## Defendants' Proposed Conclusion of Law No. 5 (¶ 86 fn. 7)

*See also, e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 (1997) (adequacy is not met if remedies benefit some class members at the expense of others, such that "the interests of those within the single class are not aligned). *Gresser v. Wells Fargo Bank, N.A.*, 2014 WL 1320092, at *4 (D. Md. Mar. 31, 2014) (finding no typicality or adequacy where despite a single claim of breach of contract, some alleged defendants breached the agreement by waiting too long, while others acted too early, creating a "fundamental conflict"); *Plotnick v. Comput. Scis. Corp. Deferred Comp. Plan for Key Execs.*, 182 F. Supp. 3d 573, 584 (E.D. Va. 2016) (proposed class failed adequacy requirement because the relief sought could have harmed certain class members), *aff'd*, 875 F.3d 160 (4th Cir. 2017).

**Plaintiff's Response:**  Defendants' authorities are inapplicable and irrelevant here, precisely because there is no actual intra-class conflict nor any misalignment between Plaintiff's interests and the proposed Class's interests. *Amchem* and *Plotnick* both pre-suppose that some class members would be harmed by the relief sought, which is not the case in this matter.  Plaintiff seeks only to ensure that Defendants administer the Plan according to its stated terms and grant *all* Plan participants the opportunity to defer credit card tipped income.  The ability to opt-*out* is an inherent function of an *opportunity* provided; any Plan participants who do not wish to make deferral elections would still be free not to take advantage of the opportunity.

Further, *Gresser* confronts the issue that the named plaintiffs' *theory of liability* (that the defendant breached its duty by acting too late) was the *exact opposite* to that of some of the proposed class members, such that a judgment in the named plaintiffs' favor could estop those class members from making the opposite argument (that the defendant breached its duty by acting too soon).  *See* 2014 WL 1320092, at *4.

In contrast, Defendants proffer no evidence that there are potential Class members who might want to argue that Defendants breached their fiduciary duties to the Plan by properly making deferral elections—nor could they, as making the deductions requested in accordance with the Plan terms would result in no liability in the first place.

## Defendants' Proposed Conclusion of Law No. 6 (¶ 88)

Here, the Court concludes Plaintiff's proposed class presents serious intra-class conflicts, such that Plaintiff's claims are not common or typical of the proposed class. Nor can Plaintiff adequately represent the absent litigants whose interests do not align with his. Indeed, the elected representatives for the unionized class members have negotiated for exactly the opposite of Plaintiff's requested relief—that tips should be paid out in cash at the end of the shift, not included in payroll or paid on a pay card.

**Plaintiff's Response:**  Once again, there are no intra-class conflicts to stand in the way of class certification in this matter.  Defendants continue to mischaracterize Plaintiff's requested relief, which is not to mandate a certain way in which Defendants comply with the Plan terms but only that Defendants *do* comply and provide the *opportunity* to defer credit card tip income.  Further, the relief Plaintiff requests to compensate Plan participants for missed deferral opportunities poses no conceivable "harm" to proposed Class members.

## Defendants' Proposed Conclusion of Law No. 7 (¶ 89)

First, the proposed class includes individuals who oppose the relief Plaintiff is requesting. *See* Donohoe Decl. ¶ 22, ECF No. 85-08, Ex. T, ECF No. 85-16 at HOST0007924 (email explaining some tipped employees in Hawaii opposed changes to the Tip Policy); Donohoe Decl. ¶ 23, ECF No. 85-08, Ex. U at HOST0007976, ECF No. 85-17 (email explaining some local unions' employees "unanimously rejected" any change to the Tips Policy); *see also* Frankenstein Dep. Tr. 11:25-12:3; 138:21-23, ECF No. 136-3 (admitting he does not know any other potential class members that share his concerns about the Tips Policy or their deferral elections in connection with the Plan and admitting that the one employee he could reference prefers to receive her credit card tips in cash); *id.* 108:24-109:15 (admitting that Host employees on Local 11's negotiating team did not want to have their credit card tips paid through their paycheck); Falkenstein Dep. Tr. 112:7-20, ECF No. 85-01 (since 2014, no one other than Plaintiff has requested pre-tax deferrals of tip income); Falkenstein Decl. ¶ 22, ECF No. 85-05 (statistics showing a significant number of directly tipped Plan participants still have arrears even though they participate in the electronic paycard system, reflecting that they prefer to take their credit card tips immediately instead of rolling into payroll for deferral into the Plan); Baumann Dep. Tr. 22:13- 23:11, ECF No. 136-4 (noting that adoption of paycard policy "was not a popular change with our members at all"); *id.* at 25:5-10 (noting that union employees in Charlotte "weren't thrilled about" the paycard system, and that "people definitely preferred the old system, getting the cash."); *id.* at 25:19-26:2 (noting that if adoption of the paycard system was up to his members, they would have said no, but they otherwise got a good contract, so the paycard system "was the poison pill we had to take"); *id.* at 32:6-16 (asked whether the union would object to class certification, responded "I know our members in Tampa, and my experience over the years talking to servers, I think they would be very much against it."); *id.* at 37:3-16 (explaining that the availability of pre-tax deferrals was not

"a thing that really excited the servers.") *id*. at 38:5-8; 40:21-41:10 (noting that the servers did not like the paycard program; "servers like cash.").

**Plaintiff's Response:**  The proposed class does not consist of *all* employees and participants.  The proposed class includes only participants with pre-tax deferral elections.  As previously noted, Defendants do not cite any participants with pre-tax deferral elections who opposed the relief requested by Plaintiff.

Rather, Defendants bring forth complaints from employees who rejected the Pilot Program's elimination of the cash-outs because some preferred or needed to receive their credit card tips in cash daily, *see* ECF No. 88 at 9 (citing ECF No. 85-16; ECF No. 84-18; ECF No. 85-5 ¶¶ 22, 35); employees who did not trust Host's electronic paycard system, *see* ECF No. 85-17; employee-participants who preferred taking their credit card tips immediately despite being enrolled in that electronic paycard system, *see* ECF No. 88-5 ¶ 22, and union representatives who oppose the Pilot Program.  All of the testimony proffered shows that some employees objected to the *inconvenience, fees, and difficulty* of retrieving credit card tips from the paycard system, *see* ECF No. 147-2 at 79:1–5, 85:9–20, 96:20–97:3, while others objected to the use of third-party systems to manage the program, *see id.* at 95:17–24, and to the necessity for "change" in order to implement a new policy.  *See id.* at 96:9–19.

None of these complaints and objections pertain to the Plan or Plaintiff's requested opportunity to make pre-tax contributions to the Plan from credit card tip income.  Thus, Defendants offer objections that irrelevant and in response to a "request" that Plaintiff is not making (*i.e.*, the forced cash out of all tips).

### Defendants' Proposed Conclusion of Law No. 8 (¶ 90)

For many participants, a victory for Plaintiff would harm them, as Plaintiff's proposed relief would preclude the participants from receiving their tips before they receive their paycheck. For servers who use their tips to meet daily, or emergency, expenses, such a delay may impact their ability to meet expenses. *See Di Biase v. SPX Corp.*, 2017 WL 4366994, at *4 (W.D.N.C. Oct. 2, 2017) ("If class members do not share the same interests then it is illogical to presume that a class representative would be able to represent all of the varying and perhaps contrary interests with equal gusto."). This is not a hypothetical concern. The statistics demonstrate over 50% of directly tipped employees at locations using the electronic paycard system still prefer to "cash out" their credit card tips in lieu of receiving those tips through payroll. *See* Falkenstein Decl. ¶ 22, ECF No. 85-05; Mar. 27, 2024 Hrg. Tr. 40:8-11, 44:2-13 (Baumann); 77:19-78:6 (Martin). And at least one purported class member even complained and changed his deferral election to 0% after his full deferral election was fulfilled as a result of the electronic paycard system. Falkenstein Decl. ¶ 35, ECF No. 85-05.

**Plaintiff's Response:**  Defendants continue to mistake Plaintiff's "proposed relief" for something that it is not.  Even if the "statistics" suggest that somewhere around half of directly tipped employees at locations with the Pilot Program in place prefer to cash out their tips, that opposite is also true—somewhere around half or just under half of those employees are taking advantage of the *opportunity* provided by the paycard system to defer their credit card tips.  That one individual decided to change his deferral election to 0% and was actually able to do so, tailoring

his deferral elections to his own preferences, only further demonstrates that Plan participants benefit from the ability to make deferral election decisions with their *full* income in play. Plan participants who wish to cash out do, and those who wish to deferral their tips to payroll do. They *all* have the opportunity to choose, and their interests in a properly administered Plan are aligned.

That is precisely the relief that Plaintiff requests. The paycard system is just one way in which Defendants can follow the terms of the Plan and allow Plan participants to defer their credit card tips.

## Defendants' Proposed Conclusion of Law No. 9 (¶ 91)

The unions with which Host has CBAs not only oppose the relief Plaintiff seeks, but also the method he is using to seek that change. Mar. 27, 2024 Hrg. Tr. 64:23-65:9 (Baumann); 106:22-107:2 (Martin). Wages – including the manner and method of paying tips - are considered a mandatory subject of bargaining under the NLRA. *See Dorsey Trailers, Inc. v. NLRB*, 233 F.3d 831, 838 (4th Cir. 2000) ("Matters falling within the category of wages, hours, and other terms or conditions of employment are mandatory subjects of bargaining. An employer commits an unfair labor practice under Section 8(a)(5) [of the NLRA] when it makes a unilateral change or otherwise fails to bargain in good faith on any mandatory subject."); *MV Transp., Inc.*, 368 NLRB No. 66 (2019) ("The National Labor Relations Act (the Act) imposes on employers and unions the mutual duty to bargain in good faith concerning wages, hours, and other terms and conditions of employment. The resulting collective-bargaining agreement imposes obligations and confers rights on the parties to the agreement, as well as on the employees it covers. The terms of the agreement represent the parties' bargained-for deal, arrived at through the give-and-take of negotiations, and the parties are entitled to the benefit of their bargain based on the language they agreed to include in their contract."); *Remington Lodging & Hosp., LLC*, 363 NLRB 53, 89-90 (2015) (collecting cases) ("The Board has found that the distribution of tips among employees is a mandatory subject of bargaining and a unilateral change in the manner of tip distribution is unlawful."). *Siren Retail Corp. d/b/a Starbucks*, 2023 WL 1389181, at *2 (NLRB Div. of Judges Jan. 31, 2023) (finding that the collection and payment of credit card tips was a mandatory subject of bargaining, reasoning that "[t]he definition of wages is broad. It includes tips and gratuities that employees receive from customers, even though the employer is not the source of the benefit."); *See also*, Mar. 27, 2024 Hrg. Tr. 48:4-22 (Baumann). Part of the wage provisions in each CBA is a section dealing with tips. *See, e.g.*, CBA with UNITE HERE, Local 11 at John Wayne Int'l Airport ¶ 4.5, ECF No. 84-29 (Plaintiff's union); CBA with UNITE HERE, Local 100 at Newark Int'l Airport ¶ 12.2, ECF No. 84-32; CBA with UNITE HERE, Local 8 at Spokane WA ¶ 12.2, ECF No. 84-33. The specific provision governing tips differs from local union to local union, but most CBAs provide that tips are the property of the employee. See, e.g., CBA for Local 11 ¶ 4.5, ECF No. 84-29 ("All tips and gratuities are the property of the Employee . . ."); CBA for Local 100 ¶ 12.2, ECF No. 84-32 ("Gratuities shall be the sole property of the serving person or persons."); CBA for Local 8 ¶ 12.2, ECF No. 84-33 (same). The local unions consider the subject of tips payments to be a mandatory subject of bargaining. Baumann Dep. Tr. 22:13-26:2, ECF No. 136-4; Mar. 27, 2024 Hrg. Tr. 48:4-22 (Baumann). As one representative explained, that the gratuity is the sole property of the employee means that "it's their money. . . that's why we were bargaining over how that money is distributed . . . . So that's why this was a mandatory subject of bargaining." Baumann Dep. Tr. 130:20-131:20, ECF No. 136-4. Indeed, when Plaintiff's own union believed that Host was trying to unilaterally implement a Pilot program that might impact

how tips are paid to servers, it filed an Unfair Labor Practice Charge against Host. *See* Donohoe Decl. ¶¶ 21, 22, ECF No. 85-08; Ex. R, ECF No. 85-14; Ex. S, ECF No. 85-15; Mar. 27, 2024 Hrg. Tr. 112:10-113:1 (Donohoe).

**Plaintiff's Response:** As detailed in Plaintiff's response to Proposed Finding No. 18, none of the CBAs cited by Defendants reflect the manner of payment of credit tips to employees who have a pre-tax deferral election under the Plan. In fact, each of the unions waived the right to bargain over the management and operation of the Plan and the requirements of Defendants to comply with the terms of the Plan and to treat all participants in the same manner.

Additionally, Defendants continue to avoid the fact that when Local 11 originally brought its unfair labor practice charge against Defendants, Host asserted that it can modify the tips policy without having to bargain with the unions.

> Host asserts that it never unilaterally changed its tip payment methods and processes or modified any other terms and conditions of employment even though it has the authority to take such actions consistent with the negotiated terms of the [collective bargaining agreement].

ECF No. 80-19 at 2; ECF No. 80-20 at 2; ECF No. 80-21 at 2.

Indeed, *many* CBAs contain an identical or substantially similar "Management Rights" provision that explicitly retains for Host the "full and exclusive authority to determine and direct the policies, procedures and methods of operating its business."

## Defendants' Proposed Conclusion of Law No. 10 (¶ 92)

Each union is elected by the unionized employees to be the employees' exclusive negotiating representative with respect to the terms and conditions of employment. *See* Sherwyn Report 5, ECF No. 136-2; Mar. 27, 2024 Hrg. Tr. 66:12-14 (Baumann). For the same reason that the unions oppose Host unilaterally implementing a change in the tips payment process, they also oppose an effort by Plaintiff to have himself appointed as the representative of all union employees to negotiate the payment terms for tips across all union locations. Mr. Baumann explained that the union would be against certifying a class in this case if it resulted in a change in the way tips are paid without negotiating with the union. Baumann Dep. Tr. 30:8-32:16, ECF No. 136-4; Mar. 27, 2024 Hrg. Tr. 51:11-24 (Baumann). He explained that "[Tip payment] is a mandatory subject of bargaining, and union members have a right to bargain around these issues, and I think any union leader you talk to would have concerns about this precedent." Baumann Dep. Tr. 32:1-5, ECF No. 136-4; Mar. 27, 2024 Hrg. Tr. 48:12-49:1 (Baumann). Indeed, Mr. Baumann testified that while his Tampa bargaining unit ultimately agreed to use a paycard, the Union received "one of our best economic contracts," and the paycard was the "poison pill" the union had to accept to get a good contract. Baumann Dep. Tr. 22:13-26:2, ECF No. 136-4.

**Plaintiff's Response:** Notably, Mr. Baumann represents only one local chapter of one national union. He previously testified that he cannot speak for what the national union might do. Any supposed "conflict" arising between Plaintiff and potential Class members is purely speculative, which is not enough to overcome class certification. *See Ward*, 595 F.3d at 180 (4th Cir. 2010)

("[A] conflict will not defeat the adequacy requirement if it is 'merely speculative or hypothetical[.]'") (quoting *Gunnells*, 348 F.3d at 430).

Further, the state of Host's union negotiations is not actually relevant to Plaintiff's proposed relief. Host would still free to bargain over how exactly tip payment and wages will be paid at each union, just as normal. The final decision simply must allow for the opportunity to defer credit card tip income, in compliance with the Plan terms. The rest is up to Host and the unions to settle.

**Defendants' Proposed Conclusion of Law No. 11 (¶ 93)**

The union opposition to a change in how tips are paid, and their insistence that any change must be negotiated with the unions, precludes class certification. As a foundational matter, the union's opposition to Plaintiff's lawsuit conclusively demonstrates that there is a conflict within the class. Plaintiff attempts to mitigate this conflict in two weak and fatally flawed ways. First, Plaintiff argues that the unions have "waived" all of their rights to bargain any issue affecting the 401(k) through the terms of the CBAs. Mar. 27, 2024 Hrg. Tr. at 35:10-15. This misrepresents the CBAs and the unions' position. *See* FoF ¶¶ 56-57, ECF No. 135. Clearly, the unions consider any issue affecting members' compensation, including and especially the payment of tips, to be a mandatory subject of bargaining. FoF ¶ 47, ECF No. 135. It is a bedrock principle of contract interpretation that contracts should effectuate the intention of the parties. *Horlick v. Capital Women's Care, LLC*, 896 F. Supp. 2d 378, 393-94 (D. Md. 2011). Indeed, in the context of collective bargaining agreements, the NLRB has repeatedly held that the a union does not waive its right to bargain over a mandatory subject of bargaining unless the contractual waiver is "explicitly stated, clear and unmistakable." *Twinbrook Opco, LLC*, 373 NLRB No. 6 (2023). The Court does not agree with Plaintiff's argument that the unions intended to have the 401(k) Plan dictate the means by which members receive compensation. *See* FoF ¶ 56, ECF No. 135. Second, Plaintiff argues that there is not really a conflict because Plaintiff is not dictating how Host assuages the unions' vehement opposition to Plaintiff's lawsuit. Mar. 27, 2024 Hrg. Tr. 68:17-21. For Plaintiff's theory to succeed, however, there must actually be a way for Host to pay out tips electronically in a way that does not run afoul of its obligations to the unions (and thus run smack into their opposition). Plaintiff has offered nothing to suggest this is possible[8] and the evidence at the hearing showed that Plaintiff's weakly-argued solutions are based in conjecture, not reality. FoF ¶¶ 49-50, ECF No. 135. Moreover, even if such a solution were available, it does not take the unions out of the equation. The specific means by which such a solution would be implemented is subject to union-by-union negotiations. The evidence at the hearing has shown that, even in attempting to implement electronic payment of credit card tips, Host ended up with various solutions that differed between unions based on their individualized negotiations. *See* Supplemental FoF ¶ 55, ECF No. 148. The evidence also showed that this will continue to be an issue requiring individualized negotiation with each union (which may, in turn, yield individualized solutions). This last point also demonstrates that the availability of tips (under Plaintiff's theory) is not an issue that is common across the class.

**Plaintiff's Response:**  Defendants distract from the primary purpose of these proceedings—to determine the appropriateness of class certification—with a sideshow into contract interpretations with their unions and debates on the merits of Plaintiff's claims.

Contrary to Defendants' arguments, if a class is certified, it does not have to impact union negotiations regarding the mechanism used to distribute credit card tips as Host maintains the ability to amend the terms of the Plan to conform to its current practice.  *See* Plaintiff's Resp. to Finding No. 18, *supra.*

For those class members who work at locations where Host has implemented the paycard system or where Host pays credit card tips through payroll, the Court need only determine the relief to be afforded to those participants as a result of the past missed deferral opportunity.

For those class members who currently work at locations where Host continues to mandate that the participants cash out credit card tips at the end of each shift resulting in a missed deferral opportunity, Host may implement one of a variety of mechanisms to ensure compliance with the terms of the Plan, including but not limited to the contributions of the deferrals at the point of sale prior to the mandatory cash out of tips, a paycard system, or payment of credit card tips through payroll.  Additionally, to avoid future violations of the terms of the Plan, Host could amend the terms of the Plan to comport with its actual practices.

## Defendants' Proposed Conclusion of Law No. 12 (¶ 93 fn. 8)

This is also a potential issue on the merits of Plaintiff's claim. The case may turn on whether credit card tips were Compensation that was "effectively available" to the Plan. That issue might be resolved against the Plaintiff based solely on ERISA principles and the language of the Plan (as Defendants contend), but even so for Plaintiff to receive any relief, it must be possible to make those tips effectively available as a technological matter. Thus far, the evidence suggests no such technological solution exists.

**Plaintiff's Response:**  It bears repeating the merits of Plaintiff's claims are not to be settled through class certification proceedings.  Amgen, 568 U.S. at 466 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the class certification stage.  Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied.").  That Defendants continuously delve into the merits only demonstrates their attempts to conflate class certification with merits issues and distract the Court.

## Defendants' Proposed Conclusion of Law No. 13 (¶ 94)

Plaintiff asks this Court to force the Company to change its Tips Policy without regard to any of these practical or legal impediments. By doing so, however, Plaintiff's requested relief raises fundamental questions under Federal labor law. As an initial matter, it is not clear whether the Court has the statutory authority to order the Company to bargain with its unions or to compel a particular bargaining outcome. Indeed, the NLRA vests the NLRB—not this Court— with the exclusively statutory authority to make an order compelling a party to bargain. *See* 29 U.S.C. § 160 (vesting NLRB with jurisdiction to enter bargaining orders under the NLRA); *American Security Programs, Inc.*, 368 NLRB No. 151 (2019) (noting that a limited bargaining order was the appropriate remedy for unilateral changes in mandatory subjects of bargaining).

**Plaintiff's Response:**  Plaintiff asks no such thing of the Court.  Rather, Plaintiff asks that the Court enforce federal law under *ERISA*, for breaches of fiduciary duties that Defendants are obligated to perform under *ERISA*, and for forms of relief that are guaranteed by *ERISA.* Defendants cannot avoid liability for failing to follow the terms of the Plan.

Grievance or arbitration procedures do not apply to ERISA benefits claims "unless the ERISA benefits sought are either: (i) derived directly from an ERISA plan established and maintained by or incorporated into a CBA . . . or (ii) created by a separate ERISA plan and that plan and/or the CBA provide that adverse benefit determinations by a plan administrator are subject to the CBA's grievance procedure . . . ."  *United Steelworkers of Am., AFL-CIO-CLC v. Rohm & Haas Co.*, 522 F.3d 324, 326–27 (3d Cir. 2008).  Here, there is nothing in the Plan's governing documents that remotely suggests that the Plan was "established or maintained by or incorporated into a[ny] CBA" or that its benefit determinations are "subject to [any] CBA's grievance procedure."  *Id.*

Rather, those documents confirm that the Plan and the Class members' rights thereunder are governed exclusively by ERISA and vests Defendants with final authority over claims determinations.  *See* ECF No. 80-3 (§ 18.11) ("The Plan and the accompanying Adoption Agreement shall be construed, administered and enforced according to ERISA, and to the extent not preempted thereby, the laws of the Commonwealth of Massachusetts"); *id.* (§ 19.01) ("The Administrator shall have all such powers and authorities as may be necessary to carry out the provisions of the Plan, including the discretionary power and . . . to make benefit determinations").

## Defendants' Proposed Conclusion of Law No. 14 (¶ 95)

Therefore, the only other reasonable reading of Plaintiff's request is that he is asking the Court to order the Company to change its Tips Policy unilaterally. Not only would such unilateral action expose the Company to potential unfair labor practice liability under the NLRA, *see Dorsey Trailers, Inc.*, 233 F.3d at 838 ("An employer commits an unfair labor practice under Section 8(a)(5) [of the NLRA] when it makes a unilateral change or otherwise fails to bargain in good faith on any mandatory subject."); *Pessoa Const. Co. v. NLRB*, 507 Fed. App'x 304, 309 (4th Cir. 2013) ("Unilateral action by an employer without prior discussion with the union . . . amount[s] to a refusal to negotiate and constitutes a violation of § 158(a)(5) [of the NLRA].") (internal quotation marks omitted), but it could create an unnecessary conflict between ERISA and the NLRA—a conflict this Court seeks to avoid. *See Pittsburg & Lake Erie R.R. Co. v. Ry. Labor Executives' Ass'n*, 491 U.S. 490, 510 (1989) (holding that courts "are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective"); *Servotronics, Inc. v. Rolls-Royce PLC*, 975 F.3d 689, 695 (7th Cir. 2020) ("We interpret Congress's statutes as a harmonious whole rather than at war with one another. When a statute is susceptible of two interpretations, one that creates a conflict with another statute and another that avoids it, we have an obligation to avoid the conflict if such a construction is possible and reasonable.").[9]

**Plaintiff's Response:**  By Defendants' own standards, Host cannot be held liable for an unfair labor practice for changing the terms of the Tips Policy.  Even if that *were* the exact relief Plaintiff is requesting (which it is not), and Defendants had to change the credit card tips policy to implement the pre-tax deferral elections required by the Plan, Defendants previously have taken

the position that they can modify the tips policy without having to bargain with the unions.  When Plaintiff's union, Unite Here Local 11, challenged the Pilot Program on behalf of its members and argued that Defendants had violated the NLRA by unilaterally implementing the change, Defendants firmly denied any obligation to bargain with the union over the Tips Policy or Pilot Program.  *See* ECF No. 79-27 at 2 ("Host asserts that it never unilaterally changed its tip payment methods and processes or modified any other terms and conditions of employment even though it has the authority to take such actions consistent with the negotiated terms of the [collective bargaining agreement].") (emphasis added).

## Defendants' Proposed Conclusion of Law No. 15 (¶ 95 fn. 9)

Beyond these statutory conflicts, requiring the Company to unilaterally change its pay practices over the objection of many of its unions would undermine their authority as the employees' exclusive bargaining representative and frustrate the collective bargaining process. *See* 29 U.S.C. 159(a) (union designated by majority of employees in a collective bargaining unit "shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment."); *NLRB v. McClatchy Newspapers, Inc. Publ. of Sacramento Bee*, 964 F.2d at 1162 (noting that unilateral action could "injure[] the process of collective bargaining itself[,]" "minimize[] the influence of organized bargaining[,]" and "interfere[] with the right of self-organization by emphasizing to the employees that there is no necessity for a collective bargaining agent").

**Plaintiff's Response:**  Requiring Defendants to comply with ERISA and the terms of the Plan does not require the Host to unilaterally change its pay practices over the objection of its unions or undermine the authority of unions in any way.  Host remains free to implement the terms of the Plan in a manner consistent with applicable law and/or amend the Plan to operate it in a manner consistent with its practices.

## Defendants' Proposed Conclusion of Law No. 16 (¶ 96)

Nor could this Court require the fiduciaries to take an action that would violate the law. *Fifth Third Bancorp. v. Dudenhoffer*, 573 U.S. 409, 428 (2014) ("[T]he duty of prudence, under [a statute] as under the common law of trusts, does not require a fiduciary to break the law."); *see also* Restatement (Second) of Trusts § 166, Comment a ("The trustee is not under a duty to the beneficiary to do an act which is criminal or tortious").

**Plaintiff's Response:**  Plaintiff's requested relief that Defendants be required to follow the terms of the Plan and administer the Plan according to the duties imposed on them by federal law can hardly be understood as a request to force Defendants to "violate the law."  This is yet another irrelevant non-issue that Defendants nevertheless hope to use as a defense on the merits, which is inappropriate at this stage of proceedings.

## Defendants' Proposed Conclusion of Law No. 17 (¶ 97)

Further, the class certification device, and Federal Rule 23, may not be used to "abridge, enlarge or modify any substantive right," including the right of unions to represent employees in negotiating the form of payment of tips. *See* 28 U.S.C. § 2072(b) (Rules Enabling Act).[10]

**Plaintiff's Response:** Plaintiff's proposed relief does not "modify" the unions' right to represent their employees in negotiations over the payment of tips. Their rights, as dictated by the terms of their CBAs, would be just the same as before: with no authority to bargain over the administration of the Plan and associated Plan issues, such as deferral elections. *See* Resp. to Proposed Finding No. 18, *supra*.

### Defendants' Proposed Conclusion of Law No. 18 (¶ 97 fn. 10)

*See also Amchem Prods.*, 521 U.S. at 629 (Rule 23 must be interpreted with fidelity to the limits set forth in the Rules Enabling Act); *Dukes*, 564 U.S. at 360, 367 (Rules Enabling Act precludes certification where defendant would be stripped of its statutory defenses, and Rule 23(b)(2) does not authorize certification when each class member would be entitled to a different injunction).

**Plaintiff's Response:** The Rules Enabling Act is inapplicable here because class certification requires no "modification" to the union's rights.

### Defendants' Proposed Conclusion of Law No. 19 (¶ 98)

Plaintiff argued at the class certification hearing that the unions had no responsibility for the ERISA plans and had waived rights to administering and operating the Plan. Mar. 27, 2024 Hrg. Tr. at 35:10-15. But Plaintiff misconceives the relevant issue to be addressed. The Court does not perceive the unions to be asserting any right to dictate how the ERISA plan is operated. The unions are asserting a right to negotiate over how wages are paid.

**Plaintiff's Response:** The relevant issue to be addressed is precisely the operation of the Plan under ERISA. Defendants tacitly admit that the focus on the unions and their "right" to negotiation over wages has little to no relevance to the subject of class certification, as Plaintiff is bringing this case on behalf of the Plan for violations of ERISA duties. The question of whether Defendants failed to follow the terms of the Plan by denying tipped employees the opportunity to defer credit card tip income and therefore breached their fiduciary duties has little to do with the unions and everything to do with ERISA and Plan administration.

### Defendants' Proposed Conclusion of Law No. 20 (¶ 99)

The ERISA plan provides that deferrals to the Plan will only be made from "effectively available compensation," which is compensation that is available after all other applicable withholdings are made. *See* BPD § 5.03, ECF No. 1-2. The withholdings are all made through the Host payroll system. So, the Plan effectively provides that "effectively available compensation" is that compensation that has been paid through payroll and from which all other withholdings have been made.

**Plaintiff's Response:** As discussed previously, Defendants goes beyond the terms of the Plan itself, which does *not* exclude credit card tips from "effectively available compensation." *See* Resp. to Proposed Finding Nos. 5–6, *supra*. Additionally, the fact that withholdings are *currently* processed through the Host payroll system does not inject additional provisions or caveats into the

43

Plan terms; the same terms would apply if the withholdings were taken at the point-of-sale or prior to hitting the payroll system, for instance.

### Defendants' Proposed Conclusion of Law No. 21 (¶ 100)

The unions, in asserting their right to determine how wages are paid, have insisted that certain compensation – tipped compensation – not be processed through the payroll system. In so doing, the unions are not negotiating over the terms of the 401(k). Indeed, those terms apply equally to all employees (contrary to Plaintiff's counsel's suggestion during the hearing). All employees, whether salaried, union or non-union, will have deferrals made from effectively available compensation. The unions are simply negotiating over how wages are paid. While that may impact the wages that are effectively available, the union is not negotiating regarding the ERISA Plan terms itself.

**Plaintiff's Response:**  "Effective available compensation" is defined by the Plan documents to include *all* compensation, which includes credit card tips.  Defendants are correct that this definition applies to *all* Plan participants—and thus it must also be true that union negotiations have no bearing or impact on what wages are "effectively available."  To allow otherwise would be to allow unions to negotiate over the Plan terms, which Defendants here insist they are not doing.  This argument only further serves to establish Plaintiff's point, which is that the unions have no bearing on the Plan administration and should have no bearing on class certification in an ERISA case strictly concerning the Plan.

### Defendants' Proposed Conclusion of Law No. 22 (¶ 101)

This point ultimately highlights the real issue with Plaintiff's claim here. It is not the unions seeking to modify the ERISA plan terms by negotiating over how wages are paid. It is Plaintiff who is trying to modify how wages are paid by using the ERISA Plan as legal leverage. Recall that Plaintiff had unsuccessfully tried to amend how wages were paid on two other occasions before finally resorting to this ERISA class action. Having been rebuffed by both the Company and his own union, Plaintiff proceeded on his own to force a change in the way tips are paid out. Plaintiff may, or may not, ultimately succeed on the merits of his claim (the Court is not prejudging that issue), but it would not be proper to use the class action device to impose a change on the substantive rights of other employees and the unions, particularly given the substantial conflict that exists over this issue within Plaintiff's putative class. *See* 28 U.S.C. § 2072(b) (Rules Enabling Act).

**Plaintiff's Response:**  Defendants hope to penalize Plaintiff for exhausting administrative remedies and seeking a solution with Host directly, prior to bringing this suit.  Plaintiff's only objective throughout each stage of this dispute has been to convince Defendants to abide by the terms of the Plan and allow him (and other proposed Class members) make contributions to the Plan using credit card tipped income to cover the full deferral election.

Further, Defendants mischaracterize Local 11's actions by claiming they "rebuffed" Plaintiff. Local 11 in fact raised the issue in a bargaining session on November 28, 2018, and proposed that tipped employees be given the option of receiving credit card tips as part of their paycheck instead

of in cash at the end of one's shift. *See* ECF No. 88-4 at 59:12–16, 60:6–12, 107:11–110:17, 111:5–23; ECF No. 88-7. The proposal was tabled following Host's rejection. *See id.* at 109:19–110:1.

Notably, for retroactive relief, there is no issue with the unions as Plaintiff seeks only to ensure that the participants be compensated for the missed deferral opportunity and discrimination caused by Defendants' actions. For prospective relief, Plaintiff is not seeking to modify how wages are paid by using the Plan as legal leverage. To the contrary, Plaintiff is seeking that Defendants comply with the terms of the Plan and develop a suitable mechanism to do so. Host has shown that it can successfully develop mechanisms to do so, including a program at John Wayne Airport and other union locations throughout the country. As discussed above, not only have the unions waived their rights to negotiate with the Plan, they also have conceded that they want Defendants to comply with the terms of the Plan and follow the applicable law.

## Defendants' Proposed Conclusion of Law No. 23 (¶ 102)

Faced with analogous circumstances, courts both within and beyond the Fourth Circuit have recognized the obstacles to certification presented by intra-class conflicts in ERISA plans between participants who might have "won" or "lost" as a result of the challenged conduct, and who therefore may harbor conflicting positions about the claim. *See Bond*, 296 F.R.D. at 409 (certification "is usually inappropriate where the alleged conduct harmed some participants and helped others") (internal quotation marks omitted); *see also Spano v. Boeing Co*., 633 F.3d 574, 587-88, 591 (7th Cir. 2011) (rejecting adequacy and typicality under Rule 23(a) where "some members will actually be harmed by [the] relief" sought); *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 315 (5th Cir. 2007) (vacating certification where "[s]ubstantial conflicts" existed among participants " affected by" the drop in the price of company stock "in dramatically different ways," including some who benefited and some who were harmed); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003) (vacating class certification, noting that "no circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class"). Under *Bond* and the other authorities cited above, the presence of serious intra-class conflicts, and lack of evidence that Plaintiff's sought relief will help rather than harm everyone he seeks to represent, makes certification of the proposed class inappropriate under Rule 23(a).

**Plaintiff's Response:** Contrary to Defendants' assertions, the relief requested by Plaintiff will only benefit the Plan and Plan participants; it will not harm the Plan or any proposed Class members by requiring Defendants to comply with participant deferral elections and make timely contributions to the Plan in accordance with ERISA. The proposed authority is therefore inapposite.

## Defendants' Proposed Conclusion of Law No. 24 (¶ 103)

At the outset of the March 27 hearing, based on the Parties' submissions, the Court noted that this case presented a "serious issue of numerosity" that Plaintiff needed to address. Mar. 27, 2024 Hrg. Tr. 16:2-4. By the conclusion of the hearing, it was clear the Plaintiff had not and could not address this issue. Indeed, at the conclusion of the hearing, the Court posed the question: "Is Frankenstein in a class by himself?" *Id*. 133:2-3. Based on the evidentiary record before, the Court answers that

question in the affirmative. Mr. Frankenstein appears to be the sole person who wants the relief he is seeking and he has presented no evidence to the contrary.

**Plaintiff's Response:**  To satisfy the numerosity requirement, the *proposed class* must be so numerous that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Numerosity is not determined by how many proposed class members have discovered the Plan violations, as numerosity can exist where there is one plaintiff complaining about procedures or plan provisions policies applicable to the putative class.  *See Kohl v. Ass'n of Trial Laws. of Am.*, 183 F.R.D. 475, 483–84 (D. Md. 1998) (numerosity established where one plaintiff claimed that she did not receive her full retirement benefits under the terms of the pension plan requiring a cost of living adjustment); *see also Call v. Ameritech Mgmt. Pension Plan*, 2003 WL 27384268, at *4 (S.D. Ill. Aug. 26, 2003) (numerosity satisfied where one plaintiff complained of improper lump-sum calculation under the terms of the plan affecting 725 members of the plan).

Plaintiff's proposed Class includes all current and former participants of the HMSHOST 401(k) Retirement Savings Plan and Trust who (i) received reported credit card tips as compensation outside a regular paycheck or paycard, and (ii) had a deferral election in place at the time he or she received the reported tips within six years of the date this action was filed to the present.

With *at least* 2,291 tipped employee-participants with deferral elections (and potentially as many as 4,000) in the proposed Class, and with more than 500 participants with missed deferral elections each year from 2014 to 2021, numerosity is clearly met.  Whether or not each and every potential Class member might actually take advantage of credit card tip deferrals is irrelevant, when Plaintiff's Class turns on those who were denied the *opportunity* to do so.

**Defendants' Proposed Conclusion of Law No. 25 (¶ 104)**

At the hearing, Plaintiff's counsel argued that there were over 500 active participants who had annual pretax deferral shortfalls, which is more than the 100 needed for numerosity. Mar. 27, 2024 Hrg. Tr. 132:5-14. But that evidence, standing alone, does not suggest that there is a sufficiently numerous class of employees that seek the relief that Plaintiff wants. The evidence to which Plaintiff's counsel refers simply identifies the number of participants to whom an arrears notice was sent. Tang Ex. K, ECF No. 80-09. Arrears notices notify the employee that their effectively available compensation was not sufficient to cover the full amount of the employee's pre-tax deferral, and provides the employee an opportunity to make that deferral on an after tax basis. Importantly, that evidence says nothing about whether any of those members actually would have wanted to contribute more money on a pre-tax basis to the 401(k) plan.

**Plaintiff's Response:**  The arrears notices notify employees that their *payroll compensation* was not sufficient to cover their pre-tax deferral elections, *not* their "effectively available compensation," which as previously discussed clearly includes *all* compensation, including credit card tips.  These are employees who would have specifically opted into deferral elections, set their desired elections, and expected their full compensation to be used to make those deferrals, per the terms of the Plan.  There would be no reason to make deferral elections if the employee *did not* want to contribute pre-tax elections to the Plan.  Thus, each and every arrears notice constitutes a missed deferral opportunity and indicates that a Plan participant who wanted to make pre-tax contributions was prevented from doing so.  The opportunity to make *post*-tax contributions is not

a suitable alternative when Plan participants are entitled to make *pre*-tax contributions under the terms of the Plan.

## Defendants' Proposed Conclusion of Law No. 26 (¶ 105)

In the first instance, the same evidence reflects that in any given year, less than 18% percent of employees who received that notice made any contribution into the Plan on an after tax basis. *See* Tang Ex. K, ECF No. 80-09. Rather than supporting Plaintiffs' claim, this data confirms that the preference for most employees is not to defer their income into retirement, but to spend their income when it is received. ECF No. 94-01.

**Plaintiff's Response:** Whether an employee chose to make an *after*-tax contribution to the Plan after receiving an arrears notice has no bearing on whether that same employee would have rather contributed the full amount of the *pre*-tax deferral elections that they made. Being forced to use a what may well be a second-best option (or perhaps a "better than nothing" option) should not warrant denying Plan participants the opportunity to contribute their credit card tips pre-tax, as they elected to do and as they are entitled to under the terms of the Plan.

## Defendants' Proposed Conclusion of Law No. 27 (¶ 106)

Further, even among the small group of employees who made their after-tax arrears contribution, there is no evidence from Plaintiff that any of those employees would have preferred to not be paid in cash at the end of each shift in order to enable a pre-tax contribution. In short, there is no indication that any other employee wants the same relief as Plaintiff.

**Plaintiff's Response:** Had those employees preferred to make arrears contributions, they could have done so. Instead, the fact that the participants elected to make pre-tax contribution to defer their income establishes the preference of those participants to take advantage of the opportunity to defer their income. Plaintiff's argument is that the Plan requires that they have the opportunity to make the pre-tax deferral election and that once elected Defendants will implement the election in accordance with ERISA. Under Defendants' current system, many Plan participants are denied the opportunity to make their *full* pre-tax contributions.

## Defendants' Proposed Conclusion of Law No. 28 (¶ 107)

This conclusion means that Plaintiff cannot satisfy the numerosity prong of Rule 23(a). Numerosity is only shown if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, even if Plaintiff could find another employee or two who might want the same relief that plaintiff seeks (and Plaintiff has disclaimed knowing even one other person who shares his interest), this action could readily proceed as to the named plaintiff(s) without affecting the rights of hundreds of Host employees (and unions) who oppose the relief that Plaintiff seeks.

**Plaintiff's Response:** As set forth above, the joinder of thousands of members of the proposed class located throughout the United States is impracticable.

## Defendants' Proposed Conclusion of Law No. 29 (¶ 109)

Circumstances in which certain class members are not harmed (e.g., because they have suffered no injury or received some benefit from the challenged conduct) do not meet the requirements of commonality. *See Bond*, 296 F.R.D. at 408 ("Plan participants who have already been paid benefits equal to or in excess of what they would have received" under Plan provisions and those who have not suffered "any monetary damages at all" "have no viable cause of action").

**Plaintiff's Response:**  *All* proposed Class members in this matter have suffered the same injury as Plaintiff—that is, the missed deferral opportunity caused by Defendants' failure to follow the terms of the Plan.  Defendants proffer proposed Class members whose paychecks have always covered their deferral elections, without considering that many employees may have chosen not to increase their elections because they believed their paychecks *couldn't* cover the elections, or those who were forced to submit post-tax arrears.  Plaintiff's requested remedy would grant retrospective relief to those Plan participants who had MDOs at any point during the Plan period, as well as prospective relief in the prevention of future discrimination against tipped employees and future MDOs.  Thus, all Class members were harmed and stand to benefit from class certification.

## Defendants' Proposed Conclusion of Law No. 30 (¶ 110)

Similarly, circumstances where the Court would be required "to conduct an individualized analysis of the viability of claims for each class member . . . defeats commonality." *Bond*, 296 F.R.D. at 408. In the latter circumstance, where the defendant has affirmative defenses, such as the statute of limitations, that "may depend on facts peculiar to each plaintiff's case, class certification is erroneous." *Id*. (quoting *Broussard*, 155 F.3d at 342).

**Plaintiff's Response:**  Defendants ignore that the Court specifically set aside the consideration of statute of limitations and other affirmative defenses at this stage.  *See* ECF No. 109 at 33:17–20.

## Defendants' Proposed Conclusion of Law No. 31 (¶ 111)

Here, multiple elements of Plaintiff's claim (and the defenses that apply to them) would require individualized determinations, making class certification inappropriate.

**Plaintiff's Response:**  Again, Defendants get ahead of the proceedings.  Loss calculations are performed after loss causation and liability is established.  *See Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1134–6 (D. Colo. 2020), *aff'd*, 1 F.4th 769 (10th Cir. 2021) (determining loss calculations after finding that the "*Banner* Defendants breached their fiduciary duty of prudence … [which] resulted in losses to the Plan" at trial).  "[I]ndividual issues of loss causation do not predominate, indeed are not relevant, unless and until it becomes necessary to allocate any [p]lan recovery to participants" and "any recovery of loss benefits will go the Plan and will be held allocated, and ultimately distributed in accordance with the requirements of the [p]lan and ERISA."  *Sims v. BB & T Corp.*, 2017 WL 3730552, at \*4 (M.D.N.C. Aug. 28, 2017) (internal citations omitted)

## Defendants' Proposed Conclusion of Law No. 32 (¶ 112)

Plaintiff's proposed class includes a significant number of participants who have not been harmed by the alleged conduct, including participants whose paychecks have always covered their deferral

elections, and those participants at locations where tips were paid through the payroll system, and thus available for deferral.

**Plaintiff's Response:**  The Class definition provides for participants who had elective deferrals in place and received credit card tips outside of payroll or the paycard system.  Defendants failed to include credit card tip income as part of the participants' compensation, resulting in missed deferral opportunities.

To the extent participants had sufficient wage compensation contributed to the Plan to meet their deferral elections, the participant would not have a missed deferral opportunity.  However, because the Defendants failed to implement required deferrals under the Plan, the Plan suffered an operational error that must be corrected.  Additionally, even these Plan participants were denied the chance to potentially increase their deferral elections if the opportunity to still have them covered by their income existed.

Moreover, dramatic differences may exist among class members as to the respective damages suffered by individual members. Varying damage levels rarely prohibits a class action if the class members' claims possess factual and legal commonality.  *Mayer v. Mylod*, 988 F.2d 635, 640 (6th Cir. 1993) (in securities fraud action, commonality and typicality requirements are met even where some investors made money and some lost money because the questions of liability are common to all class members regardless of their level of damages); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) (in mass tort action, even though damages may be disparate, where liability can be determined on a class-wide basis because it arises from a single course of conduct that is identical for each plaintiff, class action is suitable for adjudication).

## Defendants' Proposed Conclusion of Law No. 33 (¶ 113)

Many participants had paychecks that were sufficient to cover their deferral elections, even where the tips were paid in cash. *See* Falkenstein Decl. ¶¶ 19-20, ECF No. 85-05. This includes over a quarter of the purported class of tipped employees. Because their paychecks were sufficient to cover their deferral elections, they could not have suffered any injury at all because all elected deferrals were met. Certification of a class including such members would be inappropriate.

**Plaintiff's Response:**  Defendant concedes that three-quarters of the proposed class of tipped employees incurred a missed deferral opportunity, *i.e.*, the participants did not have sufficient compensation to cover their deferral elections because their credit card income was paid in cash.

It bears repeating that to the extent participants had sufficient wage compensation contributed to the Plan to meet their deferral elections, the participant would not have a missed deferral opportunity.  However, because the Defendants failed to implement required deferrals under the Plan, the Plan suffered an operational error that must be corrected.

## Defendants' Proposed Conclusion of Law No. 34 (¶ 114)

For participants at non-unionized locations and some unionized locations, the participants were able to defer tips through the payroll system through the paycard program initiated by Host. Those participants similarly could not have suffered any injury of the kind Plaintiff seeks to redress. See

*Broussard*, 155 F.3d at 337; *Bond*, 296 F.R.D. at 408 (fact that many proposed class members already received benefits negated commonality).

**Plaintiff's Response:**  From 2014 through the date Defendants began to implement the Pilot Program, Defendants' actions resulted in thousands of missed deferral opportunities for participants at union and non-unionized locations alike.  *See* Plaintiff's Resp. to Conclusion No. 24, *supra.*

After the implementation of the Pilot Program in 2020, participants at non-unionized locations and some unionized locations were able to defer tips through the payroll system through the paycard program, thereby preventing future missed deferral opportunities for those class members. However, for many participants at unionized locations, Host continues to violate the terms of the Plan and participants continue to suffer harm where they do not have sufficient compensation to cover their deferral elections because their credit card income was paid in cash.

## Defendants' Proposed Conclusion of Law No. 35 (¶ 115)

Plaintiff implicitly concedes that the class may not include those participants who were able to defer tips through the payroll system or the paycard system by amending his class definition to exclude those participants. However, that modification of the class definition—coming almost two years after Plaintiff first filed for class certification—creates its own administrative challenges. It would require identification on a location-by-location (and perhaps employee by employee) basis as to when participants had the ability to defer compensation through those systems. Moreover, at each location, there would be a factual issue about whether Host could have implemented the change in payment system at an earlier date. For example, the Court would have to determine on a location-specific basis whether Host could or should have negotiated a change to the payment process with the relevant union sooner than it actually did.

**Plaintiff's Response:**  Not only are Defendants' hypothetical "administrative challenges" not a basis to deny class certification, but these hypothetical "administrative challenges" are without merit.  Defendants know which locations have implemented the Pilot Program or agreed to process credit card tips through payroll.  The timing as to when Defendants could have implemented the Pilot Program earlier is not a factual question that needs to be determined by the Court. Participants entitled to retroactive relief would be compensated from the beginning of the Class period through the date Defendants implemented the change at the participant's location.  The Court need not determined whether Host could have or should have implemented the Pilot Program sooner than it actually did.

## Defendants' Proposed Conclusion of Law No. 36 (¶ 116)

Nor has Plaintiff produced any evidence that any other members of the putative class even want the relief he seeks. Plaintiff was unable to identify even one other class member who sought the same relief at his deposition, and, despite the Court's urging to produce a witness or other evidence showing that any other members of the proposed class want the relief he seeks, Plaintiff has failed to do so. *See Kidwell v. Transp. Commc'ns Int'l Union*, 946 F.2d 283, 305 (4th Cir. 1991) (affirming denial of class certification where, among other things, some potential members "might not even care" to receive the relief requested by the named plaintiffs).

**Plaintiff's Response:** Plaintiff has produced evidence that other members of the proposed Class want the relief he seeks. In 2018, during union negotiations, Plaintiff was part of a group of employees who requested the relief that Plaintiff requests. *See* ECF No. 88-4 at 59:12–16, 60:6–12, 107:11–110:17, 111:5–23, 109:19–110:1.

Defendants have produced documents and information establishing that hundreds of participants had missed deferral opportunities resulting from Defendants' failure to implement deferral elections under the terms of the Plan and discrimination against Plaintiff and the proposed class members. *See* Plaintiff's Resp. to Finding No. 24; ECF No. 80-9.

Notably, Defendants have not produced any evidence of any proposed class members who *do not* want the opportunity to make pre-tax deferral elections from their credit card tip income.

## Defendants' Proposed Conclusion of Law No. 37 (¶ 117)

As previously discussed, the critical inquiry necessary for Plaintiff's claim to be viable, even under Plaintiff's theory, is whether Host had the ability to make tips available to class members. If it did not, then it could not have discriminated against the class members, and could not have violated ERISA section 510 (even assuming the tips policy could be considered a violation of that section).

**Plaintiff's Response:** It is uncontested that Host discriminated against all Class members from 2014 to the point in time that it implemented the Pilot Program. It was only under the Pilot Program that Host was able to meet its deferral obligations by not forcing participants to cash out credit card tips at the end of each shift.

Alternative methods may also be employed by Host to honor the deferral elections of participants and avoid missed deferral opportunities, including withholding the credit card compensation at the point-of-sale, discussed previously. *See* Plaintiff's Resp. to Finding No. 15.

For those locations where Host has failed to implement a method to allow for Host to comply with the pre-tax deferral elections, Host continues to interfere with those participants' ability to defer pre-tax compensation in accordance with their deferral elections.

Host already has demonstrated the ability to implement methods to defer credit card income through the pilot program or through payroll. To establish a violation of ERISA section 510, Plaintiff does not need to establish whether Host has the ability to make tips available to all class members – it already has done so.

## Defendants' Proposed Conclusion of Law No. 38 (¶ 118)

To determine whether Host had the ability to pay tips through the payroll system will require a review of the unique and different CBAs at each location. Each of those determinations would have to be made across dozens of different CBAs and over the six-year period of time covered by Plaintiff's claims. The lack of a common answer to those questions means that even if Plaintiff were to succeed on his claim—in other words, to show that Host could have negotiated with UNITE HERE Local 11 to have tips paid through the payroll system —it would not dispose of

similarly situated class members who belong to other union locals. That lack of commonality precludes class certification. *See Broussard*, 155 F.3d at 340 (no commonality due to differing contract language, as the differences "raise the distinct possibility that there was a breach of contract with some class members, but not with other[s]").

**Plaintiff's Response:** To determine whether Host had the ability to pay tips through the payroll system does not require a review of the unique and different CBAs at each location. Each of the CBAs cited by Defendants includes a provision whereby the respective unions waived the right to negotiate with regard to the Plan. Each CBA contains a management rights provision that provides Host with the ability to manage its business. Each union agrees that the Plan must follow the law and treat all participants, union and non-union members the same. *See* Plaintiff's Resp. to Finding No. 18.

The rights of the participants, whether union or non-union, are all governed by the same contract, the Plan, and there is no "differing contract language" applicable to the claims made by the proposed Class members. *See* ECF No. 147-2 at 19:13–16; ECF No. 147-4 at 26:11–17.

## Defendants' Proposed Conclusion of Law No. 39 (¶ 119)

In addition to demonstrating that he shares the same injury and interests as his putative class (which he has not done), Plaintiff must establish that Defendants' conduct—*i.e.*, their failure to permit pre-tax deferrals of certain tipped income—caused the losses he now alleges. On a class-wide basis, Plaintiff would have to demonstrate that but-for Defendants' conduct, all class members would have suffered a loss in exactly the same way. Proving the existence of a loss that applies to every class member is separate from quantifying the amount of damages (another hurdle that could not be achieved on a class-wide basis) and is a key element of establishing liability in the first instance. In other words, if a plaintiff would have suffered no loss regardless of the claimed conduct, that plaintiff cannot succeed on a claim for a breach of fiduciary duty.

**Plaintiff's Response:** The injury suffered by Plaintiff and proposed Class members is the missed deferral opportunity caused by Defendants failure to implement a method to defer compensation under the terms of the Plan, which resulted in an operational failure of the Plan, subjected the Plan to possible disqualification, and discriminate against Plan participants who receive the majority of their compensation from tip income.

But for Defendants' misconduct, Plaintiff and the proposed Class would not have the missed deferral opportunities that are the subject of the lawsuit.

## Defendants' Proposed Conclusion of Law No. 40 (¶ 120)

In this instance, loss causation is not amenable to class-wide adjudication. As explained in the expert report of Mr. Eastman, ECF No. 94-01, for a Plaintiff to show that he suffered a loss from Host's failure to permit pretax deferrals from tipped income, the plaintiff would have to show at least two things (1) that the plaintiff would have taken advantage of those pre-tax deferrals if they were available; and (2) that the plaintiff would have been better off economically if they had taken advantage of a pre-tax deferral as opposed to an after tax deferral. Neither of those two elements are susceptible to class-wide proof.

**Plaintiff's Response:** Putting aside the fact that the Court specifically declined to consider expert testimony at this stage, *see* ECF No. 109 at 6:16–21, 39:11–20, loss causation is amendable to class wide adjudication. Defendants already prepare arrears reports identifying the missed deferral opportunities resulting from Defendants' conduct. *See, e.g.*, ECF No. 80-9; ECF No. 89-3.

Dr. Eastman's report fails on several accounts. First, by electing to defer their compensation pre-tax, Plaintiff and the proposed Class have demanded that their compensation, which includes credit card tip income, be deferred on a pre-tax basis. Second, to establish the losses caused by the missed deferral opportunity, Plaintiff and the proposed Class do not have to show they would have been better off economically if Defendants had complied with their obligations under the Plan as opposed to an after-tax deferral that they did not elect.

To estimate losses caused by a missed deferral opportunity, the IRS and DOL have developed reasonable calculators to estimate the losses. *See* Rev. Proc. 2021-30, https://www.irs.gov/pub/irs-drop/rp-21-30.pdf. Courts have accepted these tools to estimate the losses. *See, e.g., Chaaban v. Criscito*, 468 F. App'x 156, 164 (3d Cir. 2012) (use of the VFCP calculator was an appropriate way for the District Court to resolve the problem of calculating damages).

Further, Plaintiff and the proposed Class have no obligation to mitigate the losses caused by the fiduciary breaches of defendants. "Indeed, several courts have either cast doubt on the applicability of a failure-to-mitigate defense in the ERISA context or rejected its application to the facts presented." *Maryland Elec. Indus. Health Fund v. MESCO, Inc.*, 2014 WL 853237, at *9 (D. Md. Feb. 28, 2014) (collecting cases). "[T]o the extent other courts have recognized the possibility of a mitigation defense in the ERISA context, they have indicated that a failure to mitigate argument would apply at most to the determination of damages, and not to liability." *Id.*, at *10 (collecting cases).

### Defendants' Proposed Conclusion of Law No. 41 (¶ 121)

Whether Participants Would Have Taken Advantage of Pre-Tax Deferral requires an Individualized Determination. On the first issue, Frankenstein would have to show that all participants, if given the option to defer tipped income, would in fact have deferred that income rather than receiving it in cash at the end of the shift to be used to meet current financial obligations. Whether a participant would make that determination is an issue that would have to be adjudicated on an individual basis. As just one example, Exhibit K to Ms. Falkenstein's declaration reflects that one Host employee in the Charlotte location, when he learned that his tips would be withheld on a pretax basis through the paycard program, elected to reduce his deferral rate to 0% so that he would receive all his tipped income at the time earned and it would not be deferred. Such actions confirm that for many individuals, even if tipped income could have been deferred, they would have elected not to defer that income. ECF No. 85-07. Thus, the alleged conduct would not have caused harm to those individuals.

**Plaintiff's Response:** To establish their claims, Plaintiff and the proposed Class do not have to establish that they would have taken advantage of the pre-tax deferral of credit tip compensation. By electing to defer their compensation (which includes credit card tip income), Plaintiff and the proposed Class have established that they preferred to defer their compensation and not to be

forced to cash out the credit card tips.  Should a participant not wish to defer their credit card tip income, they could elect to not participate in the Plan, reduce their deferral rate to zero, or make only post-tax arrears contributions.

The example cited by Ms. Falkenstein of one employee at the Charlotte location who changed his deferral election to not defer credit card tip income shows that participants can control the amount of compensation that they wish to defer.  The fact that one employee changed his deferral election does not show that "even if tipped income could have been deferred, they would have elected not to defer that income."  Such rank speculation is irrelevant to class certification.

Moreover, once a fiduciary is shown to have breached his fiduciary duty and a loss is established, the fiduciary bears the burden of proof on loss causation.  *See Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 363 (4th Cir. 2014).  Here, the overwhelming evidence shows that Defendants' breach resulted in a *prima facie* showing of loss to the Plan and the proposed class – more than $3 million in 2016 alone.

### Defendants' Proposed Conclusion of Law No. 42 (¶ 122)

Other evidence confirms that this conduct is not an isolated example. For example, Host had rolled out its paycard program to certain non-union locations and in Charlotte. If participants wanted their tipped income to be deferred in accordance with their deferral elections made to the Host Plan, they would have had the option to do so by simply leaving their tipped income on their paycard. Yet, evidence from Ms. Falkenstein's declaration reflects that of the 305 employees who had deferral elections in place at those locations, 183 of those employees still had arrears amounts for 2021. Falkenstein Decl. ¶ 22, ECF No. 85-05.

**Plaintiff's Response:**  Ms. Falkenstein's declaration and Defendants' conjecture as to why 183 out of 305 employees had arrears amounts in 2021 does not establish that any member of the proposed Class with pre-tax deferral elections in place before the implementation of the Pilot Program did not want Defendants to comply with the Plan.  Nothing indicates that they did not want Host to make the required pre-tax deferrals of all compensation under the terms of the Plan.

Under the amended Class definition, because those participants referenced in Falkenstein's declaration decided not to leave their credit card tip income on the paycard, the missed deferral opportunity was not caused by Host; rather, the participant elected not to make the pre-tax deferral election and to take the money out of the paycard system.

### Defendants' Proposed Conclusion of Law No. 43 (¶ 123)

Arrears amounts reflect the difference in deferrals between the amount on the employees' deferral election, and the amount actually deferred. Because employees at those locations had the opportunity to defer tips from their paycards sufficient to cover their deferral election, the existence of arrears at those locations confirms that employees chose not to defer the full amounts that would have been implied by their deferral elections. In other words, even where Host made deferrals of tipped income available, many employees chose not to take advantage of that opportunity. For such employees, it would not be possible to show that Host's conduct caused them any injury.

**Plaintiff's Response:** Under Plaintiff's amended Class definition, participants who receive credit card tips on a paycard and elect to take the tipped income rather than allowing the tipped income to be processed through payroll, do not have a missed deferral opportunity caused by Host, and those claims would not be part of the Class.

## Defendants' Proposed Conclusion of Law No. 44 (¶ 124)

Indeed, this evidence further undercuts Plaintiff's argument that numerosity is shown by the existence of arrears amounts for over 500 employees. Plaintiff infers from the fact that an employee set a deferral election percentage (for example to defer 15% of his compensation into the 401(k)) at an amount that would result in an arrears notice, that the employee wanted to defer into the plan more than the employee was permitted. But the evidence from Ms. Falkenstein shows that even when employees have the opportunity to defer their tipped income into the Plan, 60 percent of those employees choose not to do so to the full percentage that they had elected. In other words, the existence of an arrears amount does not correlate (as Plaintiff argues) to a desire by a participant to contribute more to the Plan on a pre-tax basis.

**Plaintiff's Response:** From 2014 to the date the Pilot Program was implemented, Host prevented Class members from contributing their credit card tipped income to the Plan by forcing them to take the credit card tips at the end of each shift, creating a missed deferral opportunity that is reflected in the arrears amounts provided by Ms. Falkenstein for over 500 employees for each of those years. This number easily satisfies the numerosity requirements. *See McKenzie v. CDA, Inc.*, 2021 WL 1220620, at *2 (W.D.N.C. Mar. 31, 2021) (collecting cases) ("A class of 'at least 100 putative [] members' satisfies the numerosity requirement.").

## Defendants' Proposed Conclusion of Law No. 45 (¶ 125)

As discussed above, the existence of arrears that are unpaid by participants further underscores the individualized issues that preclude class-wide proof of causation. As Dr. Eastman explains, a participant's pre-tax and after-tax contribution to the 401(k) reflects individuals' "revealed preferences" for how much they would contribute to the Plan. Eastman Report ¶ 14, ECF No. 94. That many participants whose tips were not available for deferral did not make contributions in arrears (as the Plan permitted) shows their revealed preference regarding how much of their income to defer to retirement and how much to spend now.

**Plaintiff's Response:** Defendants cannot defeat the proposed Class by speculating on the preferences of Class members who made pre-tax elections. The fact that some participants whose tips were not available for deferral did not make contributions in arrears in no way shows that the participants incorrectly made pre-tax deferral elections that the Plan was required to follow. What the participants may have done with the possibility of making an arrears contribution does not excuse Defendants' fiduciary breaches or the missed deferral opportunity.

Defendants' speculation and hypothetical possibility that some putative class members might have preferred not to defer their credit card tipped income does not prove an actual conflict supporting the denial of class certification. *See, e.g. Cooper v. IBM Pers. Pension Plan*, 2001 WL 36412295 at *5 (S.D. Ill. Sept. 17, 2001) ("While [it] may theoretically be true in every large class action [that some class members prefer the status quo], it does not prevent class certification[.]").

**Defendants' Proposed Conclusion of Law No. 46 (¶ 126)**

Plaintiff Frankenstein's own conduct shows the individualized nature of such decisions. He acknowledged that he chose not to make arrears contributions in many years because he had other priorities for his money. See Frankenstein Dep. Tr. 165:1-17, ECF No. 136-3 (acknowledging that the reason why he was not trying to defer his tips in 2014 was because "it was not an important issue at the time" because "[h]e had other things [he] was working on."). Given his preference to spend his tips income in other areas, there is no reason to believe that he would have deferred his tips income on a pre-tax basis if that option had been made available to him. Thus, even Plaintiff would struggle to show that the purported conduct caused him to suffer any losses.[11]

**Plaintiff's Response:**  Contrary to Defendants' assertions, Plaintiff and the proposed Class elected to make pre-tax contributions under the terms of the Plan.  The missed deferral opportunity is common to all Class members, whether they were aware of the missed opportunity or not.  How individual Class members elected to spend their tip income and whether to make arrears contribution is not relevant to the issue of the missed deferral opportunity and operational error of the Plan resulting from Defendants' failure to operate the Plan in accordance with its terms.

**Defendants' Proposed Conclusion of Law No. 47 (¶ 126 fn. 11)**

Plaintiff incorrectly claims that the Fourth Circuit recently found common questions focused on the elements of an ERISA breach of fiduciary duty "generally meet the commonality requirement, as 'they may generate common answers to drive the resolution' of the [defendants'] liability.'" Dkt. 80 at 16 (citing Peters v. Aetna Inc., 2 F.4th 199, 243 (4th Cir. 2021)). The Fourth Circuit found that questions focused on the elements of an ERISA breach of fiduciary duty claim involve "common issues of law and fact," but made no finding as to whether they generate a common answer. See Peters, 2 F.4th at 243-4 (vacating and remanding class certification denial "so that the district court may consider anew its analysis of all the Rule 23 requirements in conformity with this opinion").

**Plaintiff's Response:**  In reviewing commonality, the Fourth Circuit in *Peters v. Aetna Inc*., 2 F.4th 199, found that "although the rule speaks in terms of common questions, 'what matters to class certification ... is ... the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.'"  *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (first alteration in original) (citation and internal quotation marks omitted).  A single common question will suffice, *id.* at 359, but it must be of such a nature that its determination "will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 350.  This Court reviews the district court's certification decision for an abuse of discretion. *Doe v. Chao*, 306 F.3d 170, 183 (4th Cir. 2002); *Peters v. Aetna Inc.*, 2 F.4th 199, 242 (4th Cir. 2021).

The *Peters* court also found that the district court abused its discretion when assessing commonality, stating that "the evidence indicates that, in the aggregate, the Aetna-Optum contracts saved plans and their participants millions of dollars," implying that Peters could not demonstrate that the proposed class members suffered the same injury.  The district court's basis of analysis was erroneous as it failed to recognize the totality of the claims actually made.  The Court found that there were "common issues of law and fact, including, for instance, whether Aetna was a fiduciary; whether it breached its duties to plans and plan participants by directing Optum to bury

its administrative fee in the claims process; and whether its breach amounted to a harm as to the particular plan and plan participants. *See In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009) (finding the commonality requirement met where the following common questions were identified: "whether the defendants were fiduciaries; whether defendants breached their duties to the Plan by failing to conduct an appropriate investigation into the continued investment in Schering-Plough stock;" whether they failed to adequately to monitor the plan's investment committee; whether they failed to hire independent fiduciaries; and whether their breaches caused plan losses). These types of common questions may be sufficient to meet the commonality requirement, as they may "generate common answers apt to drive the resolution" of the Appellees' liability. *Wal-Mart*, 564 U.S. at 350, 131 S.Ct. 2541 (citation and emphasis omitted).

Similarly, here there are common issues of law and fact, including, *inter alia*,

> a. Whether the Basic Plan Document and other governing Plan documents require Defendants to implement the deferral elections of Plaintiff and members of the Class to their reported credit card tip compensation on a pre-tax basis;

> b. Whether Defendants acted as fiduciaries to the Plan under ERISA when they failed to implement the deferral elections of Plaintiff and members of the Class to their reported credit card tip compensation on a pre-tax basis;

> c. Whether Defendants breached their fiduciary duties under ERISA when they (i) failed to implement the deferral elections of Plaintiff and members of the Class to their reported credit card tip compensation on a pre-tax basis; and/or (ii) failed to deposit the deferred compensation in a timely manner;

> d. Whether Defendants breached their fiduciary duties under ERISA by their failure and refusal to correct the operational errors resulting from Defendants' failure and refusal to comply with the terms of the Plan and to implement the deferral elections of Plaintiff and members of the Class to their credit card tipped compensation on a pre-tax basis;

> e. Whether Defendants can implement the participant's pre-tax deferral election at the point of sale and before paying the remainder of the credit card tips in cash.

> f. Whether Defendants' application of the Host tip policy to interfere with the ability of Plaintiff and members of the Class to receive the benefit of deferring their reported credit card tips on a pre-tax basis discriminated against tipped employees, in violation of ERISA section 510; and

> g. Whether and what form of relief should be afforded to Plaintiff and the Class.

*See* ECF No. 79-1.

The *Peters* court also rejected the defendants' claim that class certification was improper because the legal questions could not be answered with common evidence (*e.g.*, varying EOBs, plans, and

damages).  The *Peters* court noted that while "these distinctions among proposed class members may affect the dollar amount or scope of the available remedies, they do not reflexively defeat class certification when the underlying harm derives from the same common contention—that Appellees' fee-shifting scheme breached the terms of the applicable Plan and constituted a breach of fiduciary duty." *Peters*, 2 F.4th at 243.

Similarly, Plaintiff's claims are derived from the same common contention—that Defendants failed to follow the terms of the Plan resulting in missed deferral opportunities for the proposed Class.

## Defendants' Proposed Conclusion of Law No. 48 (¶ 127)

Where an element of a Party's claim will turn on that individual's own decisions and preferences, the need for individualized proof on that issue will preclude certification. The decision in *Wiseman v. First Citizens Bank & Trust Co.*, 212 F.R.D. 482 (W.D.N.C. 2003), illustrates this point. There, the plaintiffs alleged that a decision to change one of the 401(k) plan's investment options was a breach of fiduciary duty. After receiving notice that their existing plan account holdings would be mapped over to the new investment, plaintiffs allowed their accounts to stay in the fund, which later declined in value as they took no action to alter their investments. *Id.* at 487-88. The court denied class certification, finding no commonality, typicality, or adequacy because determination of whether (and to what extent) "the Plaintiffs' loss was the result of their exercise of independent control over their own accounts, ... will require an individual analysis for each class member." *Id.* at 487 (internal citation omitted). Similar to the *Wiseman* defendants, Defendants here have presented evidence that participants had control over whether to submit arrears contributions to the Plan and that some made such investments while others did not. *Id.* The necessary "individual analysis" required to determine causation would "defeat[] the benefits of efficiency and economy provided by a class action." *Id.* at 488.

**Plaintiff's Response:**  *Wiseman v. First Citizens Bank & Trust Co.*, 212 F.R.D. 482 (W.D.N.C. 2003) is distinguishable.  In *Wiseman*, the district court found individual analysis of each plaintiff's acquisition of knowledge and reliance on knowledge, for causation determinations, would cause individual issues to predominate the litigation and thereby made class certification inappropriate. 212 F.R.D. at 487.

Unlike *Wiseman*, such an individual analysis is not required in this case as reliance is not an element of the claim.  Members of the proposed Class distinctly made the decision to elect to defer compensation pre-tax under the terms of the Plan, and there is no need for individualized proof to establish the breach of the Plan's terms and the breaches of fiduciary duty of the fiduciary defendants who failed to ensure compliance with the Plan.

Moreover, the calculation of the losses resulting from the missed deferral opportunity involves only the calculation of the losses based on the known missed deferral amounts and lost earnings.

## Defendants' Proposed Conclusion of Law No. 49 (¶ 128)

Existence of Loss Will Also Require Individualized (and speculative) Assessment of Tax Rates.
Under the Plan, any participant who could not make pre-tax deferrals due to a lack of sufficient

"effectively available Compensation" could nonetheless contribute to the Plan on an after-tax basis. Participants making after-tax contributions would also receive the same company matching as they would have on a pre-tax basis. Those participants would also receive the benefit of any gains in their investment options over time. The only difference between those who made pre-tax and after-tax contributions to the Plan is whether they would be taxed on their income at the time they earned the income, or whether they would be taxed on their income at the time they withdrew their funds from the Plan (presumably during retirement). Thus, to know whether any participant suffered a loss at all due to the inability to contribute on a pre-tax basis to the plan, one would have to compare the taxes that person would pay at the time the income was earned, and the amount the participant would pay at the time the funds are withdrawn from the plans. The latter tax rate is inherently speculative—it depends on the tax bracket the participant would be in at the time of withdrawal at some point in the future. But it is also highly individualized. Servers who make a modest income while employed at Host may go on to earn substantial incomes later in their career and fall into a high tax bracket at the time of retirement. For those servers, they would have been better off paying the taxes on their income when they are in a relatively low bracket; and deferral of their tax obligation would have actually made them worse off.

**Plaintiff's Response:**  Existence of the loss will not require an individualized assessment of tax rates.  Reasonable estimates of the losses may be determined by using the DOL or IRS calculators designed to determine the amount of the losses caused by the missed deferral opportunities.

In addition, Plaintiff and the proposed Class have no obligation to mitigate their losses resulting from the fiduciary breaches of Defendants. *MESCO*, 2014 WL 853237, at *9 ("Indeed, several courts have either cast doubt on the applicability of a failure-to-mitigate defense in the ERISA context or rejected its application to the facts presented."); *id*. at *10 (collecting cases) ("[T]o the extent other courts have recognized the possibility of a mitigation defense in the ERISA context, they have indicated that a failure to mitigate argument would apply at most to the determination of damages, and not to liability.").  Thus, Plaintiff and the proposed class had no obligation to take the amounts of the missed deferral opportunities caused by Defendants' breaches and make after-tax contributions based on the arrears amounts – an election that they did not choose when they elected to defer income.

The facts and circumstances of each individual class member as to why they may not have elected to make arrears contributions is not relevant to the claims of Plaintiff and the proposed class.

## Defendants' Proposed Conclusion of Law No. 50 (¶ 129)

Because the issues of loss causation are inherently dependent on the individual situation of each Host participant, resolution of Frankenstein's claim would not resolve the claims of all absent class members. Instead, even to determine the question of liability, the Court would need to conduct mini-trials for every participant to understand whether the participant would have deferred more on a pre-tax basis if that option was available, and whether that pre-tax deferral would have left the participant better or worse off. In those circumstances, class certification is not appropriate.

**Plaintiff's Response:**  Contrary to Defendants' assertions, the Court would not have to conduct mini trials to determine if the "participant would have deferred more on a pre-tax basis if that option was available, and whether that pre-tax deferral would have left the participant better or

worse off." Plaintiff and the proposed class made the pre-tax deferral election that was available and Defendants failed to comply with the elective deferrals and interfered with the rights of Plaintiff and the proposed class to receive the benefits to which they are entitled under the terms of the Plan by forcing Plaintiff and the proposed class to receive their credit card tips in cash at the end of each shift.

### Defendants' Proposed Conclusion of Law No. 51 (¶ 130)

As shown above, the evidentiary record indicates that there is little commonality of claims and defenses between proposed class members and, indeed, individualized analysis of proposed class members' claims would be legally required on several important issues. Against the weight of evidence against class certification, Plaintiff offers nothing more than a conclusory statement that he suffers the same injury in his inability to utilize his tips for pre-tax deferral and has the same interest as the other Class members, *see* Br. 18-19, ECF No. 80. But such conclusory statements in the absence of evidence that other tipped employees want to defer their tips into the Plan do not satisfy his burden to show compliance with Rule 23. And as shown by the number of participants who do not make full arrears contributions, many participants prefer to use the tips for other purposes and, thus, benefit from the Tips Policy. Plaintiff claims his proposed class satisfies commonality simply by listing 7 "core questions" he claims are "common to all Class members," *see* Br. 15, ECF No. 80, but, tellingly, he makes no effort to demonstrate how answers to these questions can be reached on a common basis, or how resolution of them would drive class-wide resolution of his claims.

**Plaintiff's Response:** Defendants are wrong on several accounts. First, Plaintiff has provided conclusive evidence that other tipped employees elected to defer their tips into the Plan. Second, whether participants elect to make arrears contributions is irrelevant to the determination of whether class certification is appropriate. And third, subsequent to the breaches by Defendants, whether proposed class members elect to use the tips for other purposes is not relevant to the claims or class certification. *See MESCO*, 2014 WL 853237, at *9 ("Indeed, several courts have either cast doubt on the applicability of a failure-to-mitigate defense in the ERISA context or rejected its application to the facts presented."); *id*. at *10 (collecting cases) ("[T]o the extent other courts have recognized the possibility of a mitigation defense in the ERISA context, they have indicated that a failure to mitigate argument would apply at most to the determination of damages, and not to liability.").

### Defendants' Proposed Conclusion of Law No. 52 (¶ 131)

"The typicality requirement goes to the heart of a representative parties' ability to represent a class," and often "tends to merge with the commonality and adequacy-of-representation requirements." *Deiter*, 436 F.3d at 466. In circumstances where affirmative defenses "depend on facts peculiar to each plaintiff's case," courts have determined that both commonality and typicality are not satisfied. *See Bond*, 296 F.R.D. at 408 (presence of affirmative defenses, such as statute of limitations, requiring individualized determinations defeated both commonality and typicality). This is such a case.

**Plaintiff's Response:**  Unlike *Bond*, the Court need not conduct an individualized analysis of the viability of claims for each class member.  There are no issues involving alleged individual releases or that any members of the proposed class had actual knowledge of the claims.

As to the statute of limitations issue, which remains irrelevant at this stage, the SPD distributed by Defendants does not have the specific terms of the Plan or the definition of compensation to provide notice to participants that Defendants had failed to follow the terms of the Plan.

## Defendants' Proposed Conclusion of Law No. 53 (¶ 133)

The Court concludes that there appears to be a significant factual issue regarding whether Plaintiff's claims are time-barred. To the extent that Plaintiff's own claims are (or may be) time barred, Plaintiff may not be an adequate representative of that class, or Plaintiff's claims may be atypical of the class Plaintiff seeks to represent. In any event, it appears the statute of limitations defenses to Plaintiff's claims will turn on unique questions of fact regarding the knowledge of each participant. Thus, the claims are not susceptible to class-wide adjudication. *Bond*, 296 F.R.D. at 408 ("[W]hen the defendant[s'] 'affirmative defenses (such as ... the statute of limitations) may depend on facts peculiar to each plaintiff's case,' class certification is erroneous.") (quoting *Broussard*, 155 F.3d at 342); *Thorn*, 445 F.3d at 320 (Fourth Circuit's "accrual rule, which focuses on the contents of the plaintiff's mind, is not readily susceptible to class-wide determination.").

**Plaintiff's Response:**  As previously noted, the Court has already indicated that statute of limitations concerns will not bar class certification.

## Defendants' Proposed Conclusion of Law No. 54 (¶ 134)

An ERISA breach of fiduciary duty claim "must be filed within one of three time periods, each with different triggering events." *Intel Corp. Inv. Policy Comm. V. Sulyma*, 140 S. Ct. 768, 774 (2020). "The first begins when the breach occurs." *Id.*; *see also* 29 U.S.C. § 1113(1). The plaintiff must file suit "within six years of 'the date of the last action which constituted a part of the breach or violation' or, in cases of breach by omission, 'the latest date on which the fiduciary could have cured the breach or violation.'" *Sulyma*, 140 S. Ct. at 774 (quoting 29 U.S.C. § 1113(1)). This period is a statute of repose, effecting "a legislative judgment that a defendant should be free from liability after the legislatively determined period of time." *Id.* (quoting *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 505 (2017)). The statute of repose runs from the date of the alleged violation, not from its alleged later discovery. "The second period, which accelerates the filing deadline, begins when the plaintiff gains 'actual knowledge' of the breach." *Id.* at 774; *see also* 29 U.S.C. § 1113(2). The plaintiff must file suit "within three years of 'the earliest date on which the plaintiff had actual knowledge of the breach or violation.'" *Id.* This "encourage[s] plaintiffs to pursue diligent prosecution of known claims." *Id.* (internal citation omitted). The third period only "applies 'in the case of fraud or concealment,'" which Plaintiff does not allege. *Sulyma*, 140 S. Ct. at 774 (quoting 29 U.S.C. § 1113).

**Plaintiff's Response:**  Not only are these arguments irrelevant to class certification, but there is no evidence that Plaintiff's claims are time barred. Plaintiff did not have actual notice of his claims until he received a copy of the Plan document in 2018.  The case was filed within the three-year time period required by ERISA.

Defendants have provided no evidence that any member of the proposed class had actual knowledge of the claims.

## Defendants' Proposed Conclusion of Law No. 55 (¶ 136)

For an ERISA § 510 claim, courts look to the most analogous state-law limitations provision, typically that governing wrongful discharge claims. *See A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011); *Bellon v. PPG Emp. Life & Other Benefits Plan*, 2021 WL 2656753, at *5 (N.D. W. Va. June 28, 2021), *vacated in part on other grounds*, 41 F.4th 244 (4th Cir. 20922) ("Although the Fourth Circuit has not yet squarely addressed this issue, 'the majority of courts of appeals that have addressed this issue have concluded that ... the most analogous statute of limitations for Section 510 claims are based on employment discrimination and/or wrongful termination law.'") (quoting *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1137– 38 (7th Cir. 1992)). In Maryland, the statute of limitations for a wrongful discharge claim is three years from the date of discharge. *See* Md. Code Ann., Cts & Jud. Proc. § 5-101. In California, it is two years. *See* Cal. Code Civ. Proc. § 335.1.

**Plaintiff's Response:**  These arguments are not relevant to class certification.

## Defendants' Proposed Conclusion of Law No. 56 (¶ 137)

The Court believes that, because Plaintiff has had "actual knowledge" of his fiduciary breach claims since at least January 2014[12]—and therefore should have filed his lawsuit by January 2017 and did not do so until April 28, 2020—his ERISA fiduciary-breach claims appear to be time-barred. To the extent Plaintiff can even proceed with an ERISA § 510 claim (since he has never suffered an adverse employment action), that claim would also be time barred. A claim based on Section 510 would run from the moment that Host took the action that purportedly discriminated against Plaintiff. In this case, Plaintiff claims the adoption of the Tips Policy resulted in precluding tipped employees from deferring credit card tips through the 401(k). Yet, the Tips Policy has been in place for decades, and far more than three years prior to when Plaintiff filed suit in 2020. Because each of Plaintiff's claims are precluded under the statute of limitations, the Court concludes that Plaintiff would be an inadequate representative to represent the class's interests, as those defenses will uniquely bar his own claims.

**Plaintiff's Response:**  These arguments remain irrelevant, but Plaintiff rejects Defendants' conclusory mischaracterizations of the facts.  Plaintiff did not have actual knowledge of his claims in 2014 when his deferral election was not covered.  He did not receive the Plan document until 2019, shortly after he made his initial inquiry to Host's Benefits Department in February 2019, and his claims are based on the language of the Plan documents and Defendants' breach of those agreements.  *See* ECF No. 88 at 14–15.

## Defendants' Proposed Conclusion of Law No. 57 (¶ 138)

Whether any other class member (aside from Plaintiff) could avoid dismissal under the above limitations period entails a series of unavoidably individualized inquiries into when each member learned of the facts supporting his claim. Because those answers will all differ, resolution of

Plaintiff's claim will not resolve the claims of absent class members. Thus, class certification is not appropriate.

**Plaintiff's Response:**  None of the proposed Class members had actual knowledge of their claims, and Defendants have not produced any evidence indicating that any of the proposed Class members had actual knowledge of their claims.  Certification is appropriate here.

## Defendants' Proposed Conclusion of Law No. 58 (¶ 139)

Adequacy of representation is only satisfied where: (1) "the named representative must not have antagonistic or conflicting interests with the unnamed members of the class"; and (2) "the representatives must appear able to vigorously prosecute the interests of the class through qualified counsel." *See Valerino v. Holder*, 283 F.R.D. 302, 318 (E.D. Va. 2012) (quotations omitted). As discussed at length above, Plaintiff has interests antagonistic to and which conflict with the unnamed members of the proposed class. Even if no such conflicts existed, however, Plaintiff has demonstrated he will not vigorously prosecute the interests of the class. Plaintiff readily admits he did not pursue in 2014 the claims he now brings because "it was not an important issue at the time." Frankenstein Dep. Tr. 165:1–17, ECF No. 136-3. Plaintiff's 7-year delay in bringing these claims—when nothing about the Plan's arrears mechanism has changed—reveals a lack of vigor and raises a serious question as to his commitment to pursuing this action for the benefit of others.

**Plaintiff's Response:**  As discussed above, Plaintiff does not have any interests that are antagonistic to the proposed Class.  Further, Plaintiff has demonstrated that he has and will continue to vigorously prosecute the interests of the class.

Contrary to Defendants' false assertions, Plaintiff did not admit that he did not pursue his current claims in 2014, and he did not have actual knowledge of his claims until he received the Plan in 2019, providing him with notice of the missed deferral opportunity and Defendants' failure to follow the terms of the Plan.  *See* ECF No. 88 at 14–15.

## Defendants' Proposed Conclusion of Law No. 59 (¶ 140)

Moreover, Plaintiff cannot serve as an adequate representative of absent class members who have arguments and interests that diverge from the interests of the Plaintiff. In particular, the Plaintiff is a member of the UNITE HERE local 11. There is no Plaintiff who represents the interests of non-unionized employees. Nor is there any Plaintiff representing members of other union locals. Each of those groups will have interests and arguments that must be advanced that are different from those that Plaintiff Frankenstein would need to advance. And because he is not a member of those groups, Plaintiff Frankenstein would have no incentive to vigorously prosecute those interests.

**Plaintiff's Response:**  Defendants concede that they must treat union and non-union members alike and that they must follow the terms of the Plan and the applicable law.  *See* ECF No. 147-2 at 19:13–16; ECF No. 147-4 at 26:11–17; ECF No. 147-3 at 11.  Defendants also concede that the unions that have agreed to participate in the Plan have waived all rights and responsibilities concerning the Plan.  *See* Plaintiff's Resp. to Finding No. 18, *supra*.  Accordingly, Plaintiff is an adequate representative of Plan participants who have had pre-tax deferral elections and who have

received their credit card tip compensation outside of the payroll or paycard systems of Defendants.

Frankenstein has been and continues to be an active class representative since he exhausted his administrative remedies and filed his clam in 2020 and has every incentive to vigorously prosecute the interests of all Class members and to ensure that Defendants operate the Plan in accordance with its terms and relevant law.

## Defendants' Proposed Conclusion of Law No. 60 (¶ 141)

For example, for non-unionized employees, Host would argue that its decision to implement the paycard program satisfied any obligation to make credit card tips available electronically, and that those employees therefore have no basis to seek injunctive relief. Because that argument would not impact Plaintiff Frankenstein's claim, he would have little incentive to develop a counter-argument. As a result, the interests of those non-unionized employees would be conclusively determined without any representative able to advance an argument on their behalf.

**Plaintiff's Response:**  The interests of the non-unionized and unionized members of the Plan are alike.  For the locations that no longer mandate that the participants with elected pre-tax deferrals cash out their credit card tips at the end of each shift and instead receive their credit card tips through the paycard system and/or payroll, those participants would no longer have a missed deferral opportunity.

Plaintiff adequately represents all participants: participants who suffered the missed deferral opportunity from 2014 through 2020 or until the credit card tips were process through the paycard and/or payroll as well as the participants from 2020 through the present who continue to suffer missed deferral opportunities as a result of Defendants breaches.

## Defendants' Proposed Conclusion of Law No. 61 (¶ 142)

Plaintiff's revision to his class definition only further compounds this problem. Under his revised class definition, the class will exclude those participants (such as non-union tipped employees) who were able to defer tips through the Paycard program. But the relevant issue might then become when Host could have offered a Paycard program to those non-unionized employees. If no solution was technically available, there could be no claim that the tips were "effectively available" or that Host discriminated against those employees by not deploying a Paycard program. The Court has heard, however, that the availability and effectiveness of the Paycard programs differs based on the fees being charged and ATM networks that may be available (among other reasons). Mar. 27, 2024 Hrg. Tr. 64:8-22 (Baumann); 85:2-86:2 (Martin); 107:11-17 (Donohoe); Not only might this be adjudicated on a location-by-location basis, but Plaintiff does not sit in the same position as those non-unionized employees, and therefore may have no incentive to discover and advance those arguments. Even assuming Plaintiff's theory was legally viable, this would leave the non-unionized employee class with no representative who shares their interest in advancing those issues.

**Plaintiff's Response:**  The revised class definition does not create a problem with regard to class certification.  First, the revised class definition does not exclude those participants (such as non-

union tipped employees) who were able to defer tips through the paycard program. The paycard program only serves to cure the missed deferral opportunity when the program was implemented. The paycard program does not compensate these participants for the missed deferral opportunities that occurred prior to the implementation of the paycard program.

Contrary to Defendants' argument, the relevant issue is not "when" or "whether" Host could have offered a paycard program or any other program to participants. The issue is whether Defendants caused a missed deferral opportunity by failing to comply with the participants pre-tax deferral elections.

The feasibility of the various mechanisms that Defendants may employ to conform to the terms of the Plan is not relevant to class certification. Nor is the feasibility of the mechanism relevant to any of the defenses. Defendants were and are obligated to comply with the terms of the Plan to make contributions to the Plan in accordance with the elections of the participants.

To avoid complying with their obligations, Defendants have manufactured a defense that does not comport with their obligations under the Plan. The inconvenience or cost of the mechanism that Defendants may have available to comply with the terms of the Plan is not relevant to whether Defendants must comply with the terms of the Plan and ERISA.

### Defendants' Proposed Conclusion of Law No. 62 (¶ 143)

Similarly, with respect to those union locations where the union has agreed to implement a paycard program, or where Host and the union agreed to have credit card tips paid through the payroll system, Host has shown that members of those unions similarly have no claim for prospective or retrospective relief. Because resolution of those arguments will not impact Plaintiff Frankenstein's claim, he will not have an adequate incentive to advance arguments on behalf of those participants. Where plaintiff's interests diverge from that of the group plaintiff seeks to represent, the plaintiff may not be an adequate representative of that group. *See, e.g., Baugh v. Fed. Sav. Bank*, 337 F.R.D. 100, 112 (D. Md. 2020) (where plaintiff was not a member of the group who suffered from one alleged scheme, the class representative was an inadequate representative for claims related to that scheme); *Amchem Prods.*, 521 U.S. at 594-595 (representatives must be part of the class and possess the same interest and suffer the same injury as the class members).

**Plaintiff's Response:** Contrary to Defendants' assertion, plan participants who are union members who work at union locations that have implemented the paycard program or where Host and the union have agreed to pay credit card tips through payroll have claims for retrospective relief for the period of time when created the missed deferral opportunity by mandating that the participant take his credit card tip income at the end of each shift.

The interests of Plaintiff and the union member participants are aligned, and Plaintiff has every incentive to vigorously prosecute all claims for retrospective relief as well as prospective relief where Defendants continue to violate the terms of the Plan and cause missed deferral opportunities.

Unlike the plaintiff in *Baugh v. Fed. Sav. Bank*, 337 F.R.D. 100, 112 (D. Md. 2020), Frankenstein is a member of the group of participants who suffered retrospective relief as well as a member of the group of participants who seeks prospective relief due to Defendants' ongoing breaches.

**Defendants' Proposed Conclusion of Law No. 63 (¶ 144)**

Finally, "[l]awsuits fueled by the spite or hostility of an unduly antagonistic litigant or by some other ulterior motive or irrational purpose unrelated to the claims alleged in the complaint may also prevent class certification." *Martinez v. Barasch*, 2004 WL 1367445, at *4 (S.D.N.Y. June 16, 2004) (internal quotation marks omitted). "In short, the class action device may not be used simply for the personal purposes of a named plaintiff." *Id*. at *5. Here, the timeline of Plaintiff's actions are telling. He admitted he requested that Host change its corporate policy, which was rejected. Frankenstein Dep. Tr. 57:16-58:10, ECF No. 136-3. He then tried to "put pressure" on Host to change the Tips Policy through bargaining negotiations, which again did not garner the results he wanted. *See id.* 58:14-59:11, 59:17-22. He then increased his deferral contribution to 75% in what seems a methodical attempt to maximize his damages in this lawsuit. *See id*. 70:23-71:6. Only then did he request a copy of the Plan document and pursue his claim for benefits. Thus, it appears that Plaintiff either is not especially committed to pursuing this cause of action, or that his motivations for doing so are personal and specific to him—both of which call into question whether he is an adequate representative for his proposed class.

**Plaintiff's Response:**  The facts cited by Defendants demonstrate that Plaintiff is an adequate representative who seeks to vigorously prosecute the claims on behalf of the proposed class and the Plan and to ensure that the Plan is operated in accordance with its terms and not be subject to disqualification.

**Defendants' Proposed Conclusion of Law No. 64 (¶ 145)**

Plaintiff moves to certify his proposed class pursuant to Rule 23(b)(1) only.[13] A class certified under Rule 23(b)(1) is a "mandatory" class, in that the resolution of the class claims will be binding upon every class member without affording the opportunity to opt out of the suit. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846-48 (1999). Rule 23(b)(1) only allows a class where prosecuting separate actions would create "incompatible standards of conduct for the party opposing the class," or if adjudication would be dispositive of the interests of absent class members or would substantially impair or impede their ability to protect their interests. Fed. R. Civ. P. 23(b)(1)(A)-(B). Given its mandatory nature, the Supreme Court has "cautioned strongly against overuse of (b)(1) classes," and courts must ensure that the named plaintiffs share a "necessary identity of interest" with all other class members. *Spano*, 633 F.3d at 587-88 (citing Ortiz, 527 U.S. at 841-48). "Too liberal an application of the mandatory-class device risks depriving people of one of their most important due process rights: the right to their own day in court." *Id*. at 587.

**Plaintiff's Response:**  Plaintiff moves to certify his proposed class pursuant to Rule 23(b)(1) because (i) prosecuting separate actions would create "incompatible standards of conduct for the party opposing the class;" and (ii) adjudication would be dispositive of the interests of absent class members.  Fed. R. Civ. P. 23(b)(1); *see Amchem*, 521 U.S. at 613–14.

First, allowing individual Class members, i.e., individual tipped employee-participants, to pursue those claims separately could result in varying adjudications over whether: (a) Defendants' interpretation and application of the Plan's governing documents is correct; (b) whether Defendants are liable for these actions; (c) how to measure the injury to the Plan and tipped participants; or (d) what, if any, prospective and retrospective relief should be provided. *See Berry*,

2018 WL 9989754, at *12 ("Separate lawsuits over these issues could result in different outcomes, making it impossible for the Deferral Plan's administrator to treat similarly situated participants alike as required by ERISA"); *West v. Cont'l Auto., Inc.*, 2017 WL 2470633, at *3 (W.D.N.C. Jun. 7, 2017) ("In the instant case, there is a risk that class members would seek relief in other courts, leading to conflicting interpretations of the Plan and conflicting remedies. Inevitably, this will likely lead to "incompatible standards of conduct for the party opposing the class") (citation omitted).

Second, Defendants have conceded that the Plan must treat all participants the same irrespective of whether they are in a union. The adjudication of Plaintiff's claims would thus be dispositive of the interests of all proposed class members. "[A]n action which charges a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class of security holders of beneficiaries, and which requires an accounting or like measures to restore the subject of the trust," is a typical Rule 23(b)(1)(B) action. Fed. R. Civ. P. 23, Adv. Comm. Note, 1966 *amend.*, *sub.* (b)(1)(B); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834 (1999) (quoting Advisory Committee Note).

## Defendants' Proposed Conclusion of Law No. 65 (¶ 146)

Where, as here, the alleged conduct underlying the named plaintiffs' claims "harmed some participants and helped others," the lawsuit lacks the "common interest" required to certify a claim under either prong of Rule 23(b)(1). *See Spano*, 633 F.3d at 588; *Bond*, 296 F.R.D. at 409. *Bond* is particularly instructive. There, the plaintiffs argued that their claims satisfied both Rule 23(b)(1)(A) and (b)(1)(B) because they required a single determination as to whether the plan at issue was properly classified as a top-hat plan. 296 F.R.D. at 409. The court rejected this argument, primarily because "some class members suffered no injury and some could be harmed by the requested relief," making Rule 23(b)(1) certification inappropriate. *Id.*; *see also Spano*, 633 F.3d at 588 (rejecting Rule 23(b)(1) certification for fiduciary breach claims involving 401(k) plan where alleged conduct "harmed some participants and helped others," meaning the class lacked the "necessary identity of interest"). Finally, the *Bond* court observed that the defendants themselves did not contend that they would be prejudiced if the class were not certified, a primary concern underlying Rule 23(b)(1)(B). 296 F.R.D. at 409.

**Plaintiff's Response:** Unlike *Spano* and *Bond*, the alleged conduct underlying Plaintiff's claims did not help any of the proposed Class members, and no proposed Class members will be harmed by the requested relief. Plaintiff seeks relief for the missed deferral opportunities and to ensure that Defendants comply with the terms of the Plan and honor the pre-tax deferral elections made by participants.

## Defendants' Proposed Conclusion of Law No. 66 (¶ 147)

Much like in *Bond*, some putative class members Plaintiff seeks to represent suffered no injury. Frankenstein's class definition proves this alone. Plaintiff does not limit his class to participants with shortfalls in their paycheck for their elected deferral. *See supra* at 15-16. In other words, Plaintiff includes in his class participants who were able to defer the full amount of income desired. Thus, some of the people in Plaintiff's proposed class plainly suffered no injury.

**Plaintiff's Response:** All members of the proposed class have suffered an injury resulting from Defendants' failure to follow the terms of the Plan and risk possible disqualification of the Plan.

To the extent proposed class members had sufficient compensation from their salary and there was not a missed deferral opportunity, those class members may not have a monetary loss for that pay period; however, they still have been harmed by the Defendants' failure to comply with the terms of the Plan and ERISA and consequences of Defendants' failure to operate the Plan in accordance with its terms and applicable law.

## Defendants' Proposed Conclusion of Law No. 67 (¶ 148)

Also like *Bond*, the Court concludes that Plaintiff's requested relief would hurt putative class members who need or prefer to receive credit card tips in cash at the end of their shift. Because those participants could not opt out of this class, they would be compelled to defer payment of their credit card tips until their payroll is processed.

**Plaintiff's Response:** Unlike *Bond*, Plaintiff's requested relief only benefits proposed Class members and would not hurt any putative class members who prefer to receive credit tips in cash at the end of their shift. First, the requested retrospective relief-compensation for missed deferral opportunities-only benefits proposed class members who already were forced to receive their credit card tips and suffer a missed deferral opportunity. These Class members will receive compensation for the missed deferral opportunity and any lost earnings from the date the contribution should have been made to the Plan.

Second, regarding prospective relief, those proposed class members with an election to contribute a percentage of their compensation on a pre-tax basis will also receive the benefit of deferring their credit card tips on a pre-tax basis. To the extent any of the proposed Class members would prefer to receive their credit card tips immediately or through the paycard system, those participants can easily change their election to ensure that none of their credit card compensations be contributed to the Plan on a pre-tax basis and/or they can elect not to participate in the Plan.

## Defendants' Proposed Conclusion of Law No. 68 (¶ 149)

Moreover, by certifying a mandatory class action without an ability to opt out, Plaintiff is overriding the interests of the unions, who have been elected to represent the unionized Host employees (including Plaintiff) with respect to aspects of their wages. Certifying this class would impede the unions' ability to protect the interests of their union members by negotiating changes, in line with the interests of their union membership, with respect to Host's tips policy. If this class is certified, those unions who are presently negotiating contracts with Host, and those who have strongly opposed Host's efforts to adopt a paycard, will be unable to opt out. Thus, their members would be subject to a court's determination of how Host distributes tipped income, and the unions would have been denied the ability to negotiate any concessions or other relief with respect to that policy.

**Plaintiff's Response:** The unions are not participants of the Plan and have no standing to object. *See United Food & Com. Workers Loc. 204 v. Harris-Teeter Super Markets, Inc.*, 716 F. Supp. 1551, 1561 (W.D.N.C. 1989) (collecting cases) ("This Court holds that the Union lacks standing

as a plaintiff under Section 1132(a) of Title 29, United States Code, because it is neither a participant nor a beneficiary of the Plan.").

**Defendants' Proposed Conclusion of Law No. 70 (¶ 150)**

The Court thus concludes this lawsuit lacks the "common interest" necessary for a 23(b)(1) class, and dangerously risks subjecting all tipped employees to the whims and personal desires of one individual who does not need his tips at the end of each shift. Rule 23 is not a device for imposing one's personal agenda on an unsuspecting mass of people, as Plaintiff attempts here.

**Plaintiff's Response:**  The Court concludes that the lawsuit has the "common interest" necessary for a 23(b)(1) class.  Plaintiff's interest in the lawsuit is to prosecute the rights of the proposed class members to receive the benefits lost due to the missed deferral opportunities caused by Defendants' failure to follow the terms of the Plan and breaches of their fiduciary duties.

**CONCLUSION**

In sum, and for all of the reasons stated herein and in the record, Plaintiff requests that the

Court conditionally certify the proposed Class or grant leave to amend the Class definition.

Dated: May 29, 2024                        Respectfully submitted,

                                           **MILLER SHAH LLP**

                                           /s/ *Ronald S. Kravitz*
                                           Ronald S. Kravitz (admitted *pro hac vice*)
                                           Madison A. Gregg (admitted *pro hac vice*)
                                           456 Montgomery Street, Suite 1900
                                           San Francisco, CA 94101
                                           Telephone: (415) 429-5272
                                           Facsimile: (866) 300-7367
                                           Email: rskravitz@millershah.com

                                           **JOSEPH GREENWALD & LAAKE, PA**
                                           Timothy F. Maloney (Fed. Bar ID #03381)
                                           Alyse L. Prawde (Fed. Bar ID #14676)
                                           6404 Ivy Lane, Suite 400
                                           Greenbelt, Maryland 20770
                                           Telephone: (240) 553-1206
                                           Facsimile: (240) 553-1737
                                           Email: tmaloney@jgllaw.com
                                                  aprawde@jgllaw.com

                                           *Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 29th day of May, 2024, a copy of the foregoing was served on all counsel of record via the Court's ECF system.

      /s/         
Alyse L. Prawde
