## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DAN FRANKENSTEIN,                          *

Plaintiff,                                 *

v.                                         *          Civil Action No. **20-1100-PJM**

HOST INTERNATIONAL, INC., *et al.*,
                                           *

Defendants.

***

### MEMORANDUM OPINION

In this putative class action, Dan Frankenstein has sued his employer, Host International, Inc., the HMSHost 401K Retirement Savings Plan and Trust Retirement Committee, plan trustee Coleman Lauterbach,[1] and other as-yet unidentified trustees (collectively, "Host"), alleging that Host's administration of its retirement plan for employees violates the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*

Frankenstein has filed a Motion for Class Certification (ECF Nos. 79, 80), to which Host has filed a response (ECF No. 84, 85), and Frankenstein has filed a reply (ECF Nos. 88, 89). The parties have also filed surreplies (*see* ECF Nos. 98, 105), and supplemental briefs (*see* ECF Nos. 134, 135, 136, 138, 147, 148, 149, 151, 152). The Court has held two hearings on Frankenstein's Motion (ECF Nos. 108, 141).

For the following reasons, the Court will **DENY** Frankenstein's Motion for Class Certification.

---

[1] Lauterbach's surname has been misspelled on the case's docket and in certain of the parties' filings. The Court will **ORDER** that the Clerk correct his name to read "Coleman Lauterbach."

I.    **Background and Factual Findings**

*The Parties and the Plan.*    Host, a company headquartered in Bethesda, Maryland,
provides hospitality services at various venues, including airports around the country. *See* ECF
No. 136 at 7; ECF No. 1 ¶ 5.[2]  Like many American employers, Host offers a defined contribution
retirement benefits plan to help the company's eligible employees save for retirement. *See* ECF
No. 1 ¶¶ 4-5; ECF No. 136 at 7; ECF No. 135 at 4.    The HMSHost International 401(k)
Retirement Savings Plan and Trust ("Plan") is sponsored by Host and is administered by its
Retirement Committee. ECF No. 1 ¶ 6.  Lauterbach, a Plan trustee, is also a member of the
Committee. *Id.* ¶ 7.  The remaining Doe Defendants are other members of the Committee who
have yet to be identified. *Id.* ¶ 8.  All parties agree that the Plan is subject to the statutory
requirements of ERISA. *See, e.g.*, ECF No. 136 at 7; ECF No. 135 at 4-5.

Frankenstein, for some time, has been a bartender at Host's John Wayne airport location in
Santa Ana, California and, since November 2012, has been an active participant in the Plan. *See*
ECF No. 135 at 4; ECF No. 136 at 17-18.

The Plan consists of three documents: (1) an Adoption Agreement; (2) a Basic Plan
Document; and (3) a Trust Agreement. *See* ECF Nos. 1-3. 1-2, 1-4.  Union and non-union
employees who receive tips at the majority of Host's airport locations are eligible to participate in
the Plan; the remaining union employees have separate retirement plans subject to the terms of
their collective bargaining agreements with Host. *See* ECF No. 136 at 7.

As set forth in the Adoption Agreement, Plan participants may make both pretax and after-
tax retirement contributions. *See* ECF No. 1-3 §§ 1.07, 1.08; ECF No. 135 at 5; ECF No. 136 at 7.
As to pretax contributions, a participant may elect to defer up to 75 percent of his or her

---

[2] Unless otherwise noted, all citations to page numbers in the parties' filings are to the page numbers assigned by the
Court's CM/ECF system.

"Compensation," as defined by the Basic Plan Document, as a contribution to his or her retirement fund, up to the annual limit allowed by federal law. *See* ECF No. 135 at 5-6; ECF No. 136 at 7. The Basic Plan Document defines "Compensation" as "wages as defined in [Internal Revenue] Code Section 3401(a) (for purposes of tax withholding at the source[.])" ECF No. 1-2 at 8; *see* 26 U.S.C. § 3401(a) (defining "wages" as "all remuneration (other than fees paid to a public official) for services performed by an employee for his employer, including the cash value of all remuneration (including benefits) paid in any medium other than cash").

In addition to limiting pretax deferrals to 75 percent of a Plan participant's Compensation, the Plan prohibits participants from deferring amounts in excess of his or her "effectively available Compensation." ECF No. 1-2 at 20. Host has taken the position that "effectively available Compensation" means compensation that is effectively available to the Plan for purposes of withholding and deferral, and that tips paid out to Plan participants at the end of each night's work shift are *not* included within that definition. *See* ECF No. 136 at 8 n.1; ECF Nos. 84-13, 84-15.

As to after-tax contributions, a Plan participant may either (a) make contributions with his or her post-tax dollars without having a deferral election in place, or (b) may make "arrears" contributions if the deferral election is in an amount greater than the sum of what the employee would receive through Host's payroll system. *See* ECF No. 136 at 8; ECF No. 1-2 at 20; ECF No. 1-3 at 14. The consequences of this will be explained *infra*.

***Host's Tips Policy.*** Host maintains a written Tips Policy specifying that "[g]ratuities/tips are considered the sole property of the associate(s) to whom they are given." ECF No. 136 at 12; ECF No. 84-7 at 2; *see* ECF No. 135 at 6. The Tips Policy further states that "[t]ips from credit cards must be paid out at the end of each shift." ECF No. 84-7 at 3. In other words, tips included on credit card bills must be paid out to the employee in cash at the end of each day's shift. Although tips are deemed the property of employees under the Tips Policy and "[m]anagement

3

must have no involvement in how gratuities/tips are distributed," *id.* at 2, Host requires tipped employees to report all their tips so that those amounts may be withheld for purposes of federal income and other payroll taxes. *See id.*

According to Frankenstein, Host's Tips Policy poses a problem for tipped Plan participants, which he seeks to correct in this lawsuit. He contends that if an employee, such as himself, makes a deferral election greater than the amount he receives through his paycheck, the Tips Policy prevents him from fulfilling his contribution goals because he cannot defer credit card tips on a pretax basis once they are cashed out to him at the end of each day's shift. The Court understands the dilemma in this way:

> [F]or a two week pay period, assume that Plaintiff earned $500 in regular wages, received $500 in reported tips, has $200 in tax withholdings, and elected to defer 75% of his Compensation into his 401(k) account. His compensation for the two-week pay period would be $1,000 and his 401(k) deferral would be $750. However, since he [already] received $500 of his Compensation in tips . . . his paycheck includes $500 in regular wages only. Deduct from that amount $200 in taxes, which leaves only $300 to be deferred to Plaintiff's 401(k) account. The remaining $450 would have to be contributed after-tax [through an arrears contribution] if Plaintiff chose to do so.

ECF No. 37 at 2-3 n.1.

The reason for characterizing tips as the property of the employee, according to Host, is that its unionized locations have bargained for this language in their respective collective bargaining agreements, and Host wishes to apply the Policy uniformly across all its locations. *See* ECF No. 136 at 12-13. Indeed, the collective bargaining agreement between Host and the union of which Frankenstein himself is a member, UNITE HERE Local 11 ("Local 11"), provides that

"[a]ll tips and gratuities are the property of the Employee and will not be considered other than his or her sole property." ECF No. 84-29 at 7.[3]

***Prelude to the Present Suit.*** Since 2014, Frankenstein has increased his pretax deferral elections to amounts that exceed the amount of his paycheck, such that his paychecks no longer cover his pretax deferral elections. *See* ECF No. 136 at 18; ECF No. 135 at 4.

In late 2018, he advised the leadership of Local 11 that he was unable to meet his retirement goals under Host's current Tips Policy and requested that the union seek Host's agreement to permit tipped employees to defer their credit card tips on a pretax basis, as opposed to receiving those tips in cash at the end of every shift. *See* ECF No. 135 at 7.

His efforts set in motion a years-long internal procedure at Host, which crystallized into what Host interpreted might be a formal benefits claim by Frankenstein. *See* ECF No. 135 at 8-11. Host eventually denied his claim. *Id.* at 11.

Around the same time that Frankenstein complained to his union and to Host, Host was in fact assessing the feasibility of "paying out credit card tips to its employees using a paycard rather than in cash, due to the increased volume of debit/credit card transactions and a push for more automation and less paper." ECF No. 136 at 14. In February 2020, Host announced that it would soon launch a "Pilot Program" for its paycards. *Id.*; ECF No. 136 at 13. One benefit of the Pilot Program explored by Host was that participants would be able to elect to contribute a portion of their tips—i.e., credit card tips—to their retirement accounts on a pretax basis, essentially the outcome Frankenstein is seeking to accomplish. *See* ECF No. 135 at 14; ECF No. 136 at 15.

According to Host, the announcement of the Pilot Program turned out to be poorly received by employees, particularly unionized employees. *See, e.g.,* ECF No. 136 at 15-17.

---

[3] Host has presented sample collective bargaining agreements with unions at certain of its locations, each containing nearly identical language with respect to tips. *See, e.g.,* ECF Nos. 84-32, 83-34, 84-38.

Indeed, the mere announcement of the Pilot Program led Frankenstein's union, Local 11, to file an unfair labor practice charge with the National Labor Relations Board ("NLRB"), *id.* at 15, on the ground that Host lacked the authority to unilaterally change the conditions and methods by which employees received their tips. *See id.* at 15-17.[4]

Since that time, while Host has rolled out the paycard system at its non-unionized locations, the system has only been adopted by a smattering of unionized locations, and this only after contentious negotiations with the respective unions on an individualized basis. *See id.*

***Procedural History.***   On April 28, 2020, Frankenstein filed this putative Class Action Complaint on behalf of himself and all similarly situated Host employees against Defendants, alleging that their refusal to permit tipped employees like himself to defer credit card tips on a pretax basis violates the terms of the Plan and constitutes a breach of Defendants' fiduciary duties under Section 502 of ERISA, 29 U.S.C. § 1132(a)(2).   Frankenstein also claims that Defendants' refusal to permit employees to defer credit card tips amounts to discrimination against tipped-employee participants in violation of Section 501(a), 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and that their decision to prevent such deferrals is arbitrary and capricious, in violation of Section 501(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).   *See* ECF No. 1 ¶¶ 38-60.   His Class Action Complaint initially defined the putative plaintiff class as follows:

> All current and former participants of the HMSHOST 401(k) Retirement Savings Plan and Trust who received reported tips as compensation and had a deferral election in place at the time they received the reported tips within six years of the date this action was filed. . . . Excluded from the Class is the Judge to whom this case is assigned and any other judicial officer having responsibility for this case, and Defendants.

---

[4] Local 11 has apparently withdrawn its unfair labor practice charge at the NLRB. *See* ECF No. 152 at 29.   The parties dispute the reasons for and significance of the withdrawal of Local 11's charge. *See id.* at 28-29; ECF No. 153 at 113:11-114:08.   But the fact that the union was sufficiently exercised by the Pilot Program's announcement that it decided to bring a charge in the first place remains undisputed.

ECF No. 1 ¶ 28.  In his suit, Frankenstein seeks declaratory, injunctive, and monetary relief on behalf of himself and the putative class.  *See id.* at 16-17.

On August 20, 2020, Defendants filed a Motion to Dismiss Frankenstein's Complaint. ECF Nos. 27, 28.  Following the parties' briefs and a hearing on the Motion, the Court by Memorandum Opinion and Order dated March 4, 2021 denied Defendants' Motion to Dismiss. *See* ECF Nos. 32, 33, 35, 37, 38.

On March 11, 2022, Frankenstein filed the present Motion to Certify Class.  ECF Nos. 79, 80.  On September 7, 2022, after the parties filed their respective opposition, reply, and surreply briefs, the Court held a hearing on the Motion.  ECF No. 108.

During the September 7, 2022 hearing, Court indicated that it needed "a better feel for what the class is exactly and what the opposition to the class is before [the Court is] even prepared to conditionally certify."  ECF No. 109 at 34:20-22.  To that end, the Court suggested a further evidentiary hearing to "see who potentially the class proponents and opponents are, including the unions."  *Id.* at 35:01-12.  The Court also permitted "discovery that goes toward trying to define the contours or what the class would be and also any objections, what objections there would be to the class."  *Id.* at 37:14-18.

Eventually, the Court set the second class-certification hearing for March 27, 2024.  *See* ECF No. 133.  Shortly before the second class-certification hearing, the parties filed proposed findings of fact and conclusions of law.  *See* ECF Nos. 134, 135, 136, 138.

On March 27, 2024, the Court held the second class-certification hearing.  *See* ECF No. 141.  Counsel for Frankenstein opened the hearing by advising the Court that Frankenstein intended to amend his proposed class definition to "shape [it] a little more and refine it."  ECF No. 153 at 06:09-21.  Frankenstein now defines the putative class as follows:

> All current and former participants of the HMSHOST 401(k) Retirement Savings
> Plan and Trust who (i) received reported credit card tips as compensation outside
> a regular paycheck or paycard, and (ii) had a deferral election in place at the time
> he or she received the reported tips within six years of the date this action was
> filed to the present.

ECF No. 145.[5] Proceeding on this understanding of the class, counsel for Frankenstein indicated

that, although no witnesses would appear at the hearing to testify in support of Frankenstein's

position, Frankenstein "knows people" who would like to have the option to defer their credit

card tips on a pretax basis, the relief that Frankenstein seeks here. ECF No. 153 at 09:14-09-24.

Specifically, counsel for Frankenstein represented that, when employees "elect to participate in

the plan . . . they can elect to take a pretax deferral," and those tipped workers that have elected to

do so would like their credit card tips to be deferred on a pretax basis. *Id.* at 10:02-14. Counsel

estimated that the class included "some 2,000 people" who had made a pretax deferral election,

*id.* at 10:06-07, and explained that his "understanding" was that "by making that election, they

want" their credit card tips deferred, "otherwise, they wouldn't make an election to make a pretax

deferral." *Id.* at 10:12-14.

In response to this argument, the Court reiterated the concern that it had expressed at the

first class-certification hearing: Frankenstein had failed to identify a single individual other than

himself who approved of or desired the relief that he seeks. *See id.* at 15:25-16:22. When asked

for any documentary or testimonial evidence that others in the proposed class "want[ed] what

Frankenstein wants," his counsel readily admitted, "[w]e don't have that," but nonetheless urged

the Court to conclude that all employees who elected to receive a pretax deferral shared

Frankenstein's desire simply by the fact of their deferral elections. *Id.* at 16:11-25.

---

[5] At the time of the March 27, 2024 hearing, Frankenstein had not provided the amended definition of the class in writing, so the Court ordered him to do so. *See* ECF No. 153 at 131:18-25; ECF No. 145.

For their part, Defendants called three witnesses at the hearing: Carl Christopher Baumann, the Workers United Southern Region Director for the Service Employees International Union (SEIU), *id.* at 37:10-38:02, and Matthew Blake Martin and Brian Donohoe, both of whom are Senior Directors of Labor Relations at Host. *See id.* at 72:08-20, 109:09-18. Each of these witnesses testified about how, to their understanding, many of the unions at Host's locations across the country in fact oppose efforts to adopt or implement the paycard system for processing and distributing credit card tips to employees. They testified that, while the nature of the opposition and its intensity varied to some extent across unions, the general consensus among Host's unionized workforce was that the paycard system hurt more than helped employees.

As Baumann explained, Host's tipped employees had grown accustomed to and, indeed, had structured their finances around the expectation that they would receive their credit card tips in cash at the end of every shift. *See id.* at 39:02-40:11, 46:02-22. For these workers, many of whom receive relatively modest hourly wages, receiving tips in cash at the end of each shift was a financial lifeline allowing them to pay their bills immediately. *See id.* at 44:02-46:12. When Host's paycard Pilot Program was proposed at a location that Baumann represented, he said he saw the proposed change as a "big bump in the road," over which the union and Host would "clash . . . at the bargaining table." *Id.* at 54:22-24. This was true even if tips were paid to employees via the paycard system "the next day." *Id.* at 54:25-55:06. That employees would have "the benefit of . . . defer[ring] their [tips] onto their 401(k)" on a pretax basis did not change the calculus, *id.* at 55:07-10, and the union eventually accepted the proposal only after extracting concessions, such as large salary raises for non-tipped employees. *See id.* at 55:20-57:05, 58:09-59:21.

Martin's testimony echoed Baumann's explanation of the opposition of unionized tipped employees to any attempt to alter the way in which they received their credit card tips. *See, e.g.,*

*id.* at 97:08-23 ("They were unhappy with everything related to the paycard program and any approach that would mean they would not get their tips paid out in cash at the end of the shift. . . . I've never negotiated a topic this controversial with any union since I've been at HMSHost.").

Donohoe, likewise, averred that changes to the Tips Policy were poorly received by unionized employees, including individuals working at the airport where Frankenstein serves as a bartender. *See, e.g., id.* at 112:19-113:01 ("Q: Okay. And what was Local 11's response to that pilot initiative? A: Their response was to file an unfair labor practice charge with the [NLRB] for our John Wayne location and our Phoenix location, alleging that HMS Host had violated the National Labor Relations Act and that it unilaterally changed terms and conditions of employment.").

At the close of the second class-certification hearing, the Court was constrained to acknowledge that it had heard evidence "about fairly widespread opposition to . . . movement from the cash payout program," and that this opposition could pose a "commonality issue . . . since people are in different situations and some feel they'd be harmed by a modification that might go the way plaintiff would want to go." *Id.* at 132:15-24. Nonetheless, the Court granted the parties leave to file post-hearing briefs or supplemental proposed findings of fact and conclusions of law, *see id.* at 135:17-22; ECF No. 144, which the parties have done, *see* ECF Nos. 148, 149, 151, 152.

## II.   Legal Standard

Class actions are certified pursuant to Federal Rule of Civil Procedure 23. To obtain class certification, a plaintiff must establish all four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir.

2006). "In addition, 'the class action must fall within one of three categories enumerated in Rule 23(b).'" *Id.* (quoting *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003)).

If a class is to be certified under Rule 23(b)(1), as Frankenstein proposes here,[6] Fourth Circuit precedent requires, as a threshold question before a court reaches the substantive requirements of Rule 23, that the plaintiff demonstrate that the members of the proposed class are "readily identifiable." *See id.* at 358; *Kadel v. Folwell*, 100 F.4th 122, 2024 U.S. App. LEXIS 10294, at *74 (4th Cir. 2024); *Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC*, 91 F.4th 202, 206 (4th Cir. 2024).

"The party seeking class certification must present evidence and demonstrate compliance with Rule 23." *Career Counseling*, 91 F.4th at 206; *Thorn*, 445 F.3d at 321 ("[I]t is *not the defendant* who bears the burden of showing that the proposed class *does not comply* with Rule 23, but . . . it *is the plaintiff* who bears the burden of showing that the class *does comply* with Rule 23.") (Emphasis in original). "Concomitantly, 'the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all the prerequisites have been satisfied." *Career Counseling*, 91 F.4th at 206 (quoting *EQT Prod.*, 764 F.3d at 358). Class certification is only appropriate where compliance with Rule 23's requirements is established by a preponderance of the evidence. *See, e.g.*, *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 336 (D. Md. 2012).

## III.    Discussion

The Court addresses the threshold question of whether the members of the proposed class are "readily identifiable," also known as the "ascertainability" requirement. *Career Counseling*,

---

[6] Frankenstein's Motion to Certify Class makes mention in passing to the possibility of class certification under Rule 23(b)(3). *See* ECF No. 80 at 2, 26. But the substance of his arguments in his Motion and subsequent filings only propose certification under Rule 23(b)(1). *See, e.g.*, *id.* at 26-29, ECF No. 89 at 28, ECF No. 135 at 32-34. To the extent that Frankenstein seeks class certification under any other subdivision of subsection (b), the Court concludes that he has waived this argument. *See, e.g.*, *K.I. v. Durham Pub. Sch. Bd. of Educ.*, 54 F.4th 779, 793 (4th Cir. 2022).

11

91 F.4th at 206. Although a plaintiff "need not be able to identify every class member at the time of certification," the proposed class members must be ascertainable "without extensive and individualized fact-finding." *EQT Prod.*, 764 F.3d at 358 (citation omitted). "A class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Id.*

Frankenstein suggests that the putative class is ascertainable because class members "can be easily identified" in Host's Plan participant and payroll records. ECF No. 80 at 21 (quoting *Clark v. Duke Univ.*, No. 1:16-CV-1044, 2018 U.S. Dist. LEXIS 62532, at *6 (M.D.N.C. Apr. 13, 2018)); *see* ECF No. 135 at 18. According to Frankenstein, "Host, as employer of the proposed Class members and the Plan sponsor[], has the records necessary to readily identify which tipped employees made deferral elections during the Class period." ECF No. 135 at 18. Defendants do not seriously dispute this proposition, focusing instead their opposition to class certification on other possible deficiencies of the class under Rule 23. *See, e.g.*, ECF No. 85 at 29-41.

It is apparent that Frankenstein's current class definition of "[a]ll current and former" Plan participants "who (i) received reported credit card tips as compensation outside a regular paycheck or paycard, and (ii) had a deferral election in place at the time he or she received the reported tips" within the relevant period presents contours of the proposed class that are identifiable "in reference to objective criteria." *EQT Prod.*, 764 F.3d at 358. Host's payroll records and documents reflecting tipped employees' deferral elections, examples of which Frankenstein has attached in support of his Motion, are all that is needed to meet the ascertainability requirement. *See Clark*, 2018 U.S. Dist. LEXIS 62532, at *6; *see also* ECF No. 80-22 (Frankenstein's 2014 payroll records), ECF No. 80-6 at 26:20-27:06 (acknowledging that Host maintains electronic records of deferral elections).

Having concluded that Frankenstein has satisfied the threshold inquiry of ascertainability, the Court next considers whether Frankenstein has satisfied the requirements of Rule 23(a).

## A. Rule 23(a)'s Requirements

As indicated, a plaintiff seeking class certification must establish the existence of four criteria in his or her proposed class: "numerosity, commonality, typicality, and adequacy of representation." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013); *see* Fed. R. Civ. P. 23(a). "[T]he final three requirements . . . 'tend to merge,' with commonality and typicality 'serving as guideposts for determining . . . whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 337 (4th Cir. 1998) (quoting *General Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)).

Defendants argue that the existence of an intraclass conflict here infects "each of the four ordinary factors" under Rule 23(a) for class certification. ECF No. 136 at 26. Defendants contend that the union opposition set forth in their documentary evidence as well as through live witnesses at the March 27, 2024 class-certification hearing, show that many of the members of Frankenstein's proposed class are in fact ardently opposed to the relief he seeks. *See, e.g., id.* at 27-33. Defendants once again emphasize that Frankenstein's own union, Local 11, went so far as to file an unfair labor practice charge against Host when it announced the paycard Pilot Project.[7] *See, e.g.*, ECF No. 149 at 40; ECF No. 85 at 37 & n.20.

---

[7] Frankenstein takes issue with this characterization of Local 11's alleged response, *see* ECF No. 152 at 15, pointing the Court to a Memorandum of Agreement dated April 16, 2024, whereby Frankenstein's union and Host seemingly agreed to implement an electronic payment system to replace cash payouts for credit card tips beginning January 1, 2025. *See* ECF No. 152-4 at 15-16. This development does not vitiate the fact that other unions and their members have voiced strenuous opposition to Frankenstein's requested remedy. However, it does raise questions about the viability of Frankenstein's individual claims for prospective injunctive relief after January 1, 2025, as it appears that

For his part, Frankenstein accuses Defendants of "manufactur[ing]" intraclass conflicts that do not exist, ECF No. 135 at 30, and faults Defendants for failing to identify any potential class member from Local 11 who actually opposes the relief he seeks. *See* ECF No. 152 at 10-11; ECF No. 89 at 16-17. Frankenstein suggests that no intraclass conflict exists because, essentially, he is merely asking that the Court order Defendants to provide Plan participants the *opportunity* to make pretax deferrals with credit card tips rather than mandating that Defendants implement a paycard system that would force credit card tips to flow through Host's payroll systems. *See, e.g.*, ECF No. 135 at 29-30. No employee, Frankenstein surmises, could be opposed to Host at least making this option available. *See id.*; ECF No. 89 at 16-17.[8]

The Court finds Frankenstein's argument unpersuasive.

In this Court's view, in fact, his theory turns the class-certification inquiry and the Court's previous directives upside down. It is well-established that the presence of intraclass conflicts will defeat a plaintiff's bid for class certification, and it is equally well-established that it is the *plaintiff's* burden to prove that intraclass conflicts do not exist. *See, e.g.*, *Broussard*, 155 F.3d at 337 ("The first obstacle to class treatment . . . is a conflict of interest between different groups of [class members] with respect to the appropriate relief."); *Thorn*, 445 F.3d at 321. At the first class-certification hearing, the Court was explicit in advising counsel for the parties that it wanted

---

Frankenstein will receive precisely the remedy his injunctive-relief claims seek—the opportunity to defer credit card tips on a pretax basis—after that date.

[8] Frankenstein faults Defendants for misapprehending the relief he seeks, asserting that Defendants need not implement the paycard system to offer tipped Plan participants the option of a pretax deferral of their credit card tips. ECF No. 135 at 31-32. Be that as it may, he has offered no evidence to suggest that Defendants would be capable of offering the pretax deferral opportunity by any means that would avoid raising the thorny issues of how and when unionized employees receive their wages. In contrast, Defendants have proffered evidence suggesting that it would not be feasible to permit pretax deferral of credit card tips without first running those tips through Host's payroll system. *See* ECF No. 153 at 91:20-93:18; 111:05-112:06; 129:17-130:03. Making such an adjustment would certainly appear to be a sea change in Host's Tips Policy, the terms of which have been bargained for by many unions. *See, e.g.*, ECF No. 84-23 at 7; ECF Nos. 84-32, 83-34, 84-38. And as already explained, Defendants have presented compelling evidence that the unions would vehemently reject any alteration to the method by which an employee is paid, if that alteration were made unilaterally by Host. *See, e.g.*, ECF No. 153 at 48:08-49:01.

14

to hear from the "class *proponents* and opponents" in a future certification or evidentiary hearing. ECF No. 109 at 35:01-36-11 (emphasis added). To that end, the Court granted the parties leave to conduct class discovery until the future contemplated class-certification hearing might take place, *id.* at 37:04-18, which was held more than a year later. But when the time came for Frankenstein to present other "class proponents," quite simply, he brought forth none. *See* ECF No. 153 at 16:11-25. Instead, the Court heard ample testimony from union and company representatives that significant opposition to Frankenstein's proposed relief existed within the ranks of unionized tipped employees at Host. *See supra* at 8-10; *see, e.g.*, ECF Nos. 85-16, 85-17. Based on the record before it, the Court finds that an intraclass conflict does exist in Frankenstein's proposed class and concludes that the existence of this conflict precludes class certification. The Court now undertakes to explain how this intraclass conflict defeats Frankenstein's bid for class certification under Rule 23(a)'s requirements.

*Adequacy of Representation.* Frankenstein's inability to serve as an adequate representative of the interests of the class is most potently illustrated by the obvious intraclass conflict the case presents. *See Broussard*, 155 F.3d at 338. "The premise of a class action is that litigation by representative parties adjudicates the rights of all class members, so basic due process requires that named plaintiffs possess undivided loyalties to absent class members." *Id.* That concern is especially pronounced where, as here, the plaintiff seeks to certify a class under Rule 23(b)(1), which does not permit class members to opt out of participating in the class action. *See id.* (citing *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993)). As already indicated, although he is not required to identify every potential class member at the class certification stage, *EQT Prod.*, 764 F.3d at 358, the unalterable fact is that Frankenstein has failed to identify a *single* person other than himself who shares his concerns and seeks the same remedy that he does. His failure to find anyone who stands with him in this litigation is telling, especially

15

when considered in light of the fact that the Court gave him more than a year to conduct such an investigation and the fact that Defendants, in marked contrast, have produced a trove of evidence suggesting that Frankenstein stands by himself. This speaks to an irreconcilable divergence of interests in the class, in which Frankenstein may only be representing what is perhaps a minority of one.[9] "If class members do not share the same interests, then it is illogical to presume that a class representative would be able to represent all of the varying and perhaps contrary interests with equal gusto." *Di Biase v. SPX Corp.*, No. 3:14-CV-00656-RJC-DSC, 2017 U.S. Dist. LEXIS 162465, at *12 (W.D.N.C. Oct. 2, 2017).

   ***Commonality.*** Commonality requires "the plaintiff to show that the class members share both a common contention and a common injury." *Id.* at *8 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-350 (2011)). The claims common to the class "must be of such a nature that [they are] capable of class wide resolution." *Dukes*, 564 U.S. at 350. Stated differently, commonality asks not only whether members of the class share a common injury, but whether those shared-or-similar injuries can be adequately redressed through class-wide disposition of their claims. *See Bond v. Marriott Int'l, Inc.*, 296 F.R.D. 403, 407-08 (D. Md. 2014); *Dukes*, 564 U.S. at 350.

   Frankenstein suggests that this requirement is satisfied in this, as in other ERISA cases, because Defendants, as fiduciaries of the Plan, may have their conduct altered through an injunction requiring the provision of a pretax deferral opportunity for all Plan participants, and

---

[9] Frankenstein requests that the Court take judicial notice of a decision by the Central District of California approving the settlement of a class action against the Hyatt Corporation involving what Frankenstein characterizes as claims similar to his own based on "missed deferral opportunities resulting from Hyatt's mandatory cash out of credit card tipped income." ECF No. 152 at 10 (citing ECF No. 152-2). Apart from the fact that this was litigation the parties *settled*, the California court apparently accepted the class settlement based in part on its conclusion that the "one named plaintiff who filed the action . . . was an adequate class representative." *Id.* But this Court has reviewed the settlement in question and finds it inapposite here for the simple reason that in that case, the defendant did not object to class certification for settlement purposes. Defendants here, of course, vigorously oppose certification of Frankenstein's proposed class.

because Defendants may be forced to compensate Plan participants for prior missed deferral opportunities if Frankenstein and the proposed class prevail on their claims. *See* ECF No. 80 at 23-24 (citing *Peters v. Aetna, Inc.*, 2 F.4th 199, 243 (4th Cir. 2021), *overruled on other grounds by Rose v. PSA Airlines, Inc.*, 80 F.4th 488, 503-04 (4th Cir. 2023)).

Although cases brought against ERISA fiduciaries frequently meet the requirements for class certification, Frankenstein's position glosses over the fact that many Plan participants who would be swept into his proposed class have not been injured at all by Defendants' policies. Defendants have provided evidence of several examples of such individuals, including those whose paychecks have always covered their deferral elections, and those who have elected to make certain pretax deferrals but who nonetheless still prefer having their credit card tips cashed out at the end of every shift. *See* ECF No. 85-5 ¶¶ 19-20, 22, 35; ECF No. 85-7; ECF No. 153 at 40:04-11. The presence of proposed class members who have not been injured by Defendants' conduct clearly undermines any effort to establish commonality in this case. *See, e.g., Bond*, 296 F.R.D. at 408 (finding commonality not met where certain members of the putative class were not injured because they "actually vested in and received more" than they would otherwise be entitled to under ERISA); *Kidwell v. Transp. Commc'ns Int'l Union*, 946 F.2d 283, 305 (4th Cir. 1991).

***Typicality.*** To establish typicality, a plaintiff must demonstrate that the class representative's claim "and the class claims [are] so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (citation omitted). "The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Id.* (quoting *Broussard*, 155 F.3d at 340). "[T]he appropriate analysis of typicality must involve a comparison of the plaintiffs' claims or defenses with those of the absent class members." *Id.* at 467. Under this analysis, as the Court on previous occasion explained, a class with "a

proposed class representative [who] is subject to a unique defense that cannot be asserted against other members of the class (other than minor discrepancies)" may fail to meet the typicality requirement. *Ostrof v. State Farm Mut. Auto. Ins. Co.*, 200 F.R.D. 521, 529 (D. Md. 2001).

Defendants suggest that Frankenstein suffers from just such an infirmity—his individual claims are barred by a unique statute of limitations defense. *See, e.g.*, ECF No. 85 at 36; ECF No. 136 at 42. This is so, say Defendants, because Frankenstein first learned that his paycheck would not cover his pretax deferral elections as early as 2014, but he did not bring suit until 2020, well past the three-year statute of limitations Defendants say applies to his claims. *See* ECF No. 136 at 42-44. Defendants contend that statute of limitations defenses may apply to other members of the proposed class as well, each of which would require individual adjudication. *See id.* Defendants go on: "Individual labor defenses" may apply to other members of the putative class, depending upon which union each proposed class member is part of, whether that union's collective bargaining agreement allows Host to change its Tips Policy without engaging in bilateral labor negotiations, and whether union members are required to seek redress for ERISA complaints through a specified grievance procedure. *See* ECF No. 85 at 37-39.

Frankenstein waves away these concerns by arguing that any statute of limitations defense speaks to a class member's potential recovery, not Defendants' liability, and by noting that Defendants have failed to produce any collective bargaining agreement that would require a proposed class member to resolve his or her ERISA claim through arbitration or another grievance process. *See* ECF No. 89 at 22-26. Frankenstein's individual claims, he says, overlap significantly with the claims of the absent class members because all putative class members have been injured in the same way by Defendants' purportedly unlawful conduct. *See id.*

The Court believes it unnecessary, given its rulings on other aspects of Frankenstein's Motion, to delve into the particulars of whether he is in fact subject to individual statute of

limitations defenses or whether other members of the putative class would be subject to individual statutes of limitations or individual labor defenses.

Whatever the validity of these arguments, the fact remains that "the commonality and typicality requirements of Rule 23(a) tend to merge," *1988 Tr. for Allen Children v. Banner Life Ins. Co.*, 28 F.4th 513, 523 (4th Cir. 2022) (quoting *Falcon*, 457 U.S. at 157 n.13), and here the commonality inquiry, for the reasons already stated, conclusively shows that Frankenstein's claims are hardly common among the proposed class. Indeed, as the Court has noted, the record before it strongly suggests that Frankenstein is in a class of one.

*Numerosity.* A plaintiff meets Rule 23(a)'s numerosity requirement by showing that the class is so numerous that "joinder of all members is impracticable." *Gunnells*, 348 F.3d at 457 (quoting Fed. R. Civ. P. 23(a)(1)). "Though no specified number is needed to maintain a class action . . . as a general guideline, . . . a class that encompasses fewer than 20 members will likely not be certified . . . while a class of 40 or more raises a presumption of impracticability of joinder based on numbers alone." *FWK Holdings, LLC v. Merck & Co. (In re Zetia (Ezetimibe) Antitrust Litig.)*, 7 F.4th 227, 234 (4th Cir. 2021) (citations and internal quotation marks omitted). "For the 'gray area' cases between twenty and forty members . . . 'all the circumstances of the case should be taken into consideration' in evaluating the impracticability of joinder." *Id.* (quoting *Ballard v. Shield of S.W. Va., Inc.*, 543 F.2d 1075, 1080 (4th Cir. 1976)).

Frankenstein argues that his proposed class of "all employee-participants who receive reported credit card tips with deferral elections in place" satisfies the numerosity requirement because Defendants' own records show that there are roughly 2,300 tipped plan participants with deferral elections in place. *See* ECF No. 89 at 27 (citing ECF No. 85; ECF No. 88-3 at 88:15-25 (estimating that approximately three to four thousand Plan participants received credit card tips during the relevant period)). But, as the Court noted at the March 27 class-certification hearing,

19

Frankenstein's failure to identify *any* other Plan participant who shares his concerns or would want the relief that he seeks in this lawsuit poses a "serious issue of numerosity." ECF No. 153 at 16:02-04.

Courts regularly deny class certification where a putative class includes only one member. *See e.g., Makuc v. Am. Honda Motor Co.*, 835 F.2d 389, 394 (1st Cir. 1987) (affirming denial of class certification where after "two years of discovery, the plaintiff was unable to provide any evidence that even one other person was injured" by the defendant's alleged misconduct); *Belles v. Schweiker*, 720 F.2d 509, 515 (8th Cir. 1983) (similar); *Mazus v. Dep't of Transp.*, 629 F.2d 870, 876 (3d Cir. 1980) (similar); *Davidson v. United States Steel Corp.*, 104 F.R.D. 1, 3 (W.D. Pa. 1984); *Haight v. Bluestem Brands, Inc.*, No. 6:13-cv-1400-Orl-28KRS, 2015 U.S. Dist. LEXIS 107010, at *16, *20 (M.D. Fla. May 14, 2015); *see also* 7A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1762 (4th ed. 2021) ("Of course, if there are no members of the class other than the named representative, then Rule 23(a)(1) obviously has not been satisfied.").

Frankenstein resists the conclusion that his case falls within this category of a single-member class primarily on the ground that thousands of tipped Plan participants have pretax deferral elections in place, and of those thousands, hundreds were sent arrears notices, demonstrating that those Plan participants' deferrals were not adequately met by their paychecks. *See, e.g.*, ECF No. 152 at 3-4 (citing ECF No. 80-9). But the evidence Frankenstein cites may actually be read to say just the opposite. Of those Plan participants who received arrears notices, only 18 percent ever made an arrears contribution. *See* ECF No. 80-9, ECF No. 149 at 47. Even that number is not indicative of a Plan participant's desire to make pretax deferrals of credit card tips, as Frankenstein suggests, because such arrears contributions do not specify whether they were made with funds acquired by credit card tips, by cash tips, or otherwise. It is just as likely

20

that employees with deferral shortfalls would like to be able to set aside money for retirement when they make deferral elections but, at the same time, when they receive their money in cash at the end of their shifts, they prefer to use it for immediate expenses instead of contributing to a retirement plan. This could explain the relatively low number of arrears contributions. *See* ECF No. 80-9; ECF No. 136-3 at 165:01-07.

As a final effort, Frankenstein argues that the numbers he recites indicate a broader class because the "gravamen" of his individual and class claims is that Defendants have deprived tipped Plan participants of having the *opportunity* to defer their credit card tips on a pretax basis, not that all class members will *actually* take advantage of such an opportunity if it were offered. *See* ECF No. 135 at 30. As an abstract matter, that may be so. But here, Frankenstein's failure to identify a *single* other person who feels wronged in the same way he does, a single other person who seeks the same remedy he does—whether that be because of the missed opportunity to defer credit card tips or otherwise—speaks volumes. The resonance of that failure intensifies when one considers that Frankenstein was given more than a year to identify other sympathetic proponents of the class and still came up empty-handed.

In sum, the Court finds Frankenstein has failed to carry his burden to demonstrate that the proposed class is too numerous to make joinder of the class members impracticable. *See* Fed. R. Civ. P. 23(a)(1).

**B. Rule 23(b)(1)**

Frankenstein seeks certification of his proposed class under Rule 23(b)(1). That provision states that a class action may proceed if Rule 23(a) is otherwise satisfied and:

> [P]rosecuting separate actions by or against individual class members would create a risk of:
> 　(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

21

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Fed. R. Civ. P. 23(b)(1).

The Court need not decide whether Frankenstein's proposed class meets these requirements because it has already determined that Frankenstein has failed to satisfy the requirements of Rule 23(a). However, the Court notes in passing that certification under Rule 23(b)(1) does not permit individual class members to opt out of the class, even if their interests are in conflict with those of the class representative. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846-48 (1999); *Spano v. Boeing Co.*, 633 F.3d 574, 587 (7th Cir. 2011). The mandatory nature of Rule 23(b)(1) class certification weighs heavily against certification in this case because of the evidence of a significant intraclass conflict.

## Conclusion

Frankenstein's Motion to Certify Class (ECF No. 80) is **DENIED**.

A separate Order will issue.

July __10__, 2024

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE