## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| DAN FRANKENSTEIN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | Case No.: MJM-20-1100 |
| v. | * | |
| | * | |
| HOST INTERNATIONAL, INC. et al, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

### MEMORANDUM

Plaintiff Dan Frankenstein ("Plaintiff") filed this civil action on behalf of himself and a putative class against his former employer, Host International, Inc. ("Host"), Host's Retirement Committee, and Host's Vice President of Human Resources (collectively, "Defendants") asserting violations of the Employee Retirement Income Security Act of 1974 ("ERISA"). Currently pending is Defendants' motion for summary judgment. ECF No. 159. No hearing is necessary to resolve the motion. *See* Loc. R. 105.6 (D. Md. 2023). For reasons explained herein, summary judgment shall be entered in favor of Defendant.

## I.      BACKGROUND

### A.  Factual Background

#### 1.  The Plan

Host offers a 401(k) retirement savings plan to eligible employees to help them save for retirement. The HMSHost International 401(k) Retirement Savings Plan and Trust (the "Plan") is a 401(k) defined contribution plan sponsored by Host, administered by its Retirement Committee,

1

and governed by ERISA. ECF No. 160 (Falkenstein Decl.), ¶ 30; ECF No. 159-6 at 4. The Plan consists of three documents: the Adoption Agreement, the Basic Plan Document, and the Trust Agreement. ECF No. 160, ¶ 29; ECF No. 159-7 (Basic Plan Document) at 7. Plan participants may make both pre- and after-tax contributions, which Host fully matches for the first 3% of contributions from eligible compensation and matches 50% for the next 3% contributed. ECF No. 159-8 (2017 Summary Plan Description) at 7, 12.

Participants may elect to have up to 75% of pre-tax "Compensation" contributed to the Plan, for each payroll period, up to the annual limit set by 26 U.S.C. § 402(g). ECF No. 159-6 (2017 Adoption Agreement) at 11 (§ 1.07(a)); ECF No. 159-7 at 18 (§ 5.03); ECF No. 159-8 at 11. However, § 5.03 of the Basic Plan Document explains that "in no event shall a Participant be permitted to make Deferral Contributions in excess of his 'effectively available Compensation.' A Participant's 'effectively available Compensation' is his Compensation remaining after all applicable amounts have been withheld (e.g., tax-withholding and withholding of contributions to a cafeteria plan)." ECF No. 159-7 at 20.

The Summary Plan Description ("SPD") provides clarification for tipped employees:

> Tipped employee contributions to the Plan include all reported gratuities as eligible compensation when determining the eligible contribution amount for the Plan. Consequently, tipped employees may receive a payroll check that is not sufficient for taking a deduction, which may result in an **Arrears Contribution** (calculated deductions not taken from the payroll check).

> **NOTE: Arrears contributions** are treated as After-tax contributions in the Plan regardless of the election on file at the time the Arrears contribution is created. Since Arrears contributions are taxed prior to the deduction or creation of the arrears on payroll checks, they are not subject to tax withholding when paid from the employee's account. . . .

ECF No. 159-8 at 12. Tipped employees whose payroll checks are insufficient to cover their elected deferrals receive quarterly letters notifying them of arrears amounts. *Id.* These letters provide Plan participants with their arrears balance and instructions on how to submit arrears contributions to the Plan. ECF No. 160, ¶ 15; ECF No. 159-12 (arrears letters examples).

## 2. Host and its Tips Policy

Host provides food and beverage operations for travel venues, like airports. ECF No. 160, ¶¶ 4–5. Many Host employees are tipped workers who receive tips in cash and through credit card payments. *Id.* ¶ 5. Host provides services at 76 airports in the United States. Host's workforce at 45 of those locations have union representation, with each location subject to its own collective bargaining agreement ("CBA"). *Id.* ¶ 6. The payment of tips to employees is governed by Host policies and provisions in the CBAs, where applicable. Host has a long-standing corporate policy that governs the payment of tips (the "Tips Policy"). ECF No. 159-13 (2014 Associate Handbook) at 50; ECF No. 159-14 (2016 Associate Handbook) at 53; ECF No. 159-15 (Tip Reporting and Tip Jars Policy); ECF No. 160-1 (Crosswhite Dep.) at 12:23–13:17; ECF No. 160-2 (Falkenstein Dep.) at 47:22–48:2. The Tips Policy predates the establishment of the Plan. ECF No. 160-2 at 75:1–3, 78:7–9.

As explained in the Tips Policy, Host treats credit card tips as the property of the employee and therefore requires credit card tips to be cashed out at the end of an employee's shift. ECF No. 159-13 at 50. Thirty-four of the 45 unionized Host locations participate in the Plan, and their governing CBAs control the manner of tip payment to employees. *See, e.g.*, ECF No. 159-18 (CBA between UNITE HERE Local 11 (SNA) and Host), ¶ 4.5 ("All tips and gratuities are the property of the Employee and will not be considered other than his or her sole property."); ECF No. 159-19 (CBA Between Host Int'l Inc. and UNITE HERE Local 23), ¶ 12.2(A), (B) ("Gratuities shall

be the sole property of the serving person or persons . . . . No manager shall accept or keep a tip or abandoned cash[,]" and providing that "the full amount of [18% automatic gratuities] shall be given to the server and/or bartender."); ECF No. 159-20 (CBA Between Host Int'l, Inc and UNITE HERE Local 5), ¶ 12.2 ("Gratuities shall be the sole property of the serving person or persons," and stating at quick serve restaurants, tips become the property of the employee and that no tips "may be placed in the register or deposited with Employer funds."); ECF No. 160-8 (Donohoe Dep.) at 23:8–24:21 (multiple union CBAs have "contractual language that require[s] the payment of credit card gratuities by the end of the [employee's] shift."). Union representatives have taken the position that the method of tip payment is a mandatory subject of bargaining with the employer. ECF No. 159-21 (Mar. 27, 2024, Hrg. Tr) at 48:12–22. During CBA negotiations, many unions insisted that all tips be paid in cash at the end of an employee's shift. *See id.* at 94:8–25 (on tip pay card program: "I've never negotiated a topic this controversial with any union since I've been at HMSHost."). ECF No. 160-3 (Donohoe Decl.), ¶¶18–21 (noting union grievances with electronic tips); ECF Nos. 160-4, 160-5, 160-6 (union grievance communications); ECF No. 160-7 (Baumann Dep.) at 21:4–21:18.

    In 2018, Host began investigating a means of paying out credit card tips in a method other than cash. *See* ECF No. 160-1 at 51:21–52:4, 72:7–18. Host ultimately landed on an electronic paycard system, which allowed Host to transition from paying tips in cash at the end of a shift to paying them electronically through the payroll process. *Id.* at 22:20–23:2, 26:18–20, 36:16–37:1. Changing to the paycard system allowed pre-tax elected deferrals to be taken from credit card tips. Host has implemented this system at all non-union U.S. locations and two union-represented locations. *Id.* at 23:21–24; ECF No. 160-8 at 26:16–19 (Minneapolis and Charlotte allow deferring of credit card tips). Host and UNITE HERE International and Local 11, the union at John Wayne

Airport in Santa Ana, California, agreed to implement the electronic payment of tips beginning on January 1, 2025. ECF No. 159-28 (Apr. 16, 2024, Host Int'l, Inc. at SNA Final Terms) at 14–16.

### 3. Plaintiff's Claim

Plaintiff has worked as a bartender at Host's John Wayne Airport location since July 2011, and his compensation includes regular wages and tips, both in cash and via credit card payment. ECF No. 160-10 (Frankenstein Dep.) at 27:9–21, 79:19-25. Since he began working at Host, Plaintiff has received his credit card tips in cash at the end of his shift. *Id.* at 46:13–17, 47:9–13.[1] Though eligible to participate in the Plan since July 8, 2011, Plaintiff did not begin participating until November 2012. *Id.* at 65:23–66:21.

On January 2, 2014, Plaintiff increased his pre-tax election to 25%. *Id.* at 68:21–69:7. Later, on February 10, 2019, Plaintiff again increased his election, this time to 75%. *Id.* at 70:23–71:6; *see* ECF No. 160-9 (screenshots detailing Plaintiff's deferral elections). Before Plaintiff increased his election to 25%, his paycheck completely covered his deferral elections. ECF No. 160, ¶ 2. Once he increased his election to 25%, however, his payroll checks stopped completely covering his election, causing him to receive a "zero paycheck" from that point forward. *Id.* ¶¶ 12, 13; ECF No. 160-10 at 70:9–14. Plaintiff began receiving quarterly arrears letters on March 31, 2014, informing him of his arrears amount and notifying him that any arrears contributions are considered after-tax contributions. *See* ECF No. 160, ¶¶ 16, 17. Plaintiff has received over 30 arrears letters since 2014. *See id.* ¶¶ 15, 17. Plaintiff acknowledged that he received, read, and understood the Host Associate Handbook, which explained both the Tips Policy and the arrears contribution process. ECF No. 160-10 at 93:7–20, 100:20–25; 101:9–18; ECF No. 159-31 (signed acknowledgement of policies and procedures from 2014 Associate Handbook).

---

[1] As noted *supra*, Plaintiff's union agreed to implement the electronic payment of tips beginning on January 1, 2025, so Plaintiff may no longer be receiving his credit card tips in cash at the end of his shifts.

Plaintiff has been a member of UNITE HERE Local 11 since he began working at Host. ECF No. 160-10 at 28:3–14. In 2013, Plaintiff was a member of the negotiating committee for the first CBA between the union and Host. *Id.* at 104:7–18. Around November 2018, Plaintiff approached his human resources ("HR") manager requesting a change to Host's Tips Policy. *Id.* at 57:16–58:10. The HR manager explained that it was company policy that prevented credit card tips from being paid through paycheck. *Id.* Following that discussion, Plaintiff approached his union representatives to put together a proposal asking Host to include credit card tips on paychecks because the union could pursue that outcome through contract negotiations with Host. *See id.* at 58:14–59:25. Plaintiff participated in these negotiations himself. *Id.* at 106:10–15. During negotiations, Host explained that it could pay credit card tips through paychecks but, due to administrative and technical restrictions, this election would have to be all or nothing for a particular location. In other words, payment of credit card tips through paychecks would have to apply to all tipped employees at a given location, or apply to none of them. *Id.* at 108:3–11; *see also* ECF No. 160-8 at 21:19–22:19. The parties tabled the issue. ECF No. 160-10 at 109:19–21.

Following the unsuccessful effort to change the Tips Policy, Plaintiff increased his deferral election to 75% in 2019. *Id.* at 70:23–71:6; *see* ECF No. 160-9. On February 11, 2019, Plaintiff emailed his HR manager stating that the SPD defines "Compensation" as "W-2 compensation" and further stating: "Before you pay my credit card tips in cash to me you have not been withholding the full 25% of my compensation per my election. From what I can find in the literature this is deemed a Missed Deferral Opportunity." ECF No. 159-32 at 3. The following month, Host's Senior Manager for Defined Contribution Plans responded to Plaintiff via letter, explaining the payroll process. ECF No. 159-33. Specifically, the letter explained that the payroll process involves calculating the total tax due and required deductions for benefits, and then

reducing the taxable earnings accordingly. *Id.* If the remaining Compensation available suffices to fund the elected pretax contribution to the Plan, the full amount is withheld and contributed to the Plan. *Id.* If the remaining Compensation is not sufficient, "whatever is available will be funded as a pretax contribution to the Plan[,]" and the remaining balance is reported to the employee as a "401(k) Arrears" classification. *Id.* Employees can contribute their arrears to the Plan as an after-tax contribution, which are also eligible for matching contributions. *Id.*

That month, Plaintiff formally requested "that deferrals begin as soon as possible from [his] total Compensation including [his] credit card tips prior to those being paid to [him] in cash," arguing that "credit card tips are collected by HMS Host and then paid to [him] as Compensation as defined under the Plan" and "effectively available compensation" includes credit card tips. ECF No. 159-34. On April 10, 2019, Claims Administrator Carol Russell denied Plaintiff's request, explaining that "even though reported tips are included in Compensation for purposes of determining the overall amount of deferrals/contributions to the Plan, 'counting' tips as Compensation does not mean that tip amounts are effectively available to withhold deferrals from." ECF No. 159-35 at 3. Plaintiff appealed the denial on May 20, 2019. ECF No. 159-36. On June 7, 2019, the Retirement Committee upheld the denial. ECF No. 159-37. The letter to Plaintiff reiterated that:

> [A]n Employer *cannot*, under the terms of the Plan and federal tax law, make your elected pre-tax deferrals of tip Compensation out of anything *other than* your regular wages paid through payroll that remain[s] after taking deductions for all required tax withholdings and other authorized deductions from your pay. The remaining amount of wages paid to you through payroll is what the Plan, in Section 5.03 of the basic plan document, refers to as your "effectively available Compensation."

*Id.* at 3.

## B. Procedural Background

On April 28, 2020, ten months after the denial was upheld, Plaintiff filed his Complaint against Defendants for improper denial of benefits under ERISA § 502(a)(1)(B) and breach of fiduciary duty under ERISA § 502(a)(2) and (a)(3). *See generally* ECF No. 1. Plaintiff also alleges that Defendants violated ERISA by discriminating against tipped employees. *Id.* ¶¶ 42, 52, 59. Plaintiff seeks declaratory, injunctive, and monetary relief. *Id.* at 16–17.

On August 20, 2020, Defendants filed a motion to dismiss and a supporting memorandum, ECF Nos. 27 & 28, which Plaintiff opposed, ECF Nos. 32 & 33. After a hearing, the Honorable Peter J. Messitte denied Defendants' motion to dismiss by Memorandum Opinion and Order dated March 3, 2021. ECF Nos. 37, 38. On March 11, 2022, Plaintiff filed a motion to certify the putative class, ECF No. 79, and Defendants filed a response in opposition, ECF No. 84. The parties exchanged further responses regarding Plaintiff's motion to certify the putative class. ECF Nos. 88, 98, 105. After a hearing and supplemental briefing, Judge Messitte denied Plaintiff's motion to certify the class. ECF Nos. 155, 156.[2]

Defendants proceeded to file a motion for summary judgment, ECF No. 159, Plaintiff filed a response in opposition, ECF Nos. 167 & 168, and Defendants filed a reply, ECF No. 171.

## II.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.  Standard of Review

A court may grant a party's summary judgment motion under Rule 56 of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 441 (D. Md. 2015) (citations omitted); *Am. Metal*

---

[2] See Judge Messitte's Memorandum Opinion, ECF No. 155 at 6–10, for a more detailed procedural history of the case before the class certification motion was denied.

*Forming Corp. v. Pittman*, 52 F.3d 504, 507 (4th Cir. 1995) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986)). A fact is "material" if it "might affect the outcome of the suit under the governing law[,]" and a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016) (holding that the lower court's decision to grant defendant-appellee's motion for summary judgment was erroneous because "genuine disputes of material fact underlie[d] both prongs of [plaintiff-appellant's] claim."). A party can establish the absence or presence of a genuinely disputed fact through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court must view all the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmovant," *Spinks v. Maryland*, No. CV MJM-23-3184, 2024 WL 4122222, at *5 (D. Md. Sept. 9, 2024) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)), but the court is not permitted to weigh the evidence, make credibility determinations, or decide the truth of disputed facts, *Anderson*, 477 U.S. at 255.

"The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Med. Mut. Ins. Co. of N. Carolina v. Gnik*, 93 F.4th 192, 200 (4th Cir. 2024) (citing *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003)). The burden then shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial." *Bouchat*, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e)).

**B.  Count I: Recovery of Benefits (29 U.S.C. § 1132(a)(1)(B))**

ERISA § 502(a)(1)(B) provides that a participant in an employee benefit plan may bring a civil suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Here, in Count I of this Complaint, Plaintiff challenges under § 502(a)(1)(B) the Claims Administrator's denial of his request for deferral of his reported credit card tips.

The Fourth Circuit has explained that when "a plan by its terms confers discretion on a fiduciary and the fiduciary acts within the scope of conferred discretion, we defer to the fiduciary in accordance with well-settled principles of trust law[.]" *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 341 (4th Cir. 2000). "Thus, a trustee's discretionary decision will not be disturbed if reasonable, even if the court itself would have reached a different conclusion." *Id.* The Fourth Circuit then laid out a non-exhaustive list of eight factors courts may consider "for determining the reasonableness of a fiduciary's discretionary decision[.]" *Id.* at 342. The *Booth* factors are:

> (1) [T]he language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id.* at 342–43 (footnote omitted).

Here, Plaintiff formally requested "that deferrals begin as soon as possible from [his] total Compensation including [his] credit card tips prior to those being paid to [him] in cash." ECF No.

159-34. His request was denied. To determine the reasonableness of Claims Administrator Russell's denial of Plaintiff's request for deferral of his reported credit card tips, this Court must begin by "examining the language of the Plan to determine whether the provision of benefits is prescriptive or discretionary and, if discretionary, whether the plan administrator acted within its discretion." *Id.* at 343. Here, there is no dispute that the Plan vests discretion in the administrator to interpret the Plan's provisions to make benefit determinations:

> In addition to the powers and authorities expressly conferred upon it in the Plan, the Administrator shall have all such powers and authorities as may be necessary to carry out the provisions of the Plan, including the discretionary power and authority to interpret and construe the provisions of the Plan, such interpretation to be final and conclusive on all persons claiming benefits under the plan; to make benefit determinations . . . ; and to resolve any disputes arising under the Plan.

ECF No. 159-7 (Basic Plan Document § 19.01). In denying Plaintiff's request "to make employer qualified non-elective contributions . . . or any other additional benefit accruals in [his] account," the Claims Administration explained that "even though reported tips are included in Compensation for purposes of determining the overall amount of deferrals/contributions to the Plan, 'counting' tips as Compensation does not mean that tip amounts are effectively available to withhold deferrals from." ECF No. 159-35 at 3. Because the Plan states that the administrator has discretion to make decisions regarding benefit determinations and to resolve disputes arising under the Plan, this Court reviews that determination under an abuse-of-discretion standard and must not disturb the administrator's decision as long as it is a reasonable interpretation. *Booth*, 201 F.3d at 342.

Review of the *Booth* factors confirms that the Claims Administrator's determination denying Plaintiff's request was reasonable.

***Plan Language***: The Plan consists of three documents: the Adoption Agreement, the Basic Plan Document, and the Trust Agreement. ECF No. 160, ¶ 29; ECF No. 159-7 (Basic Plan

11

Document) at 7. Participants may elect to have up to 75% of pre-tax "Compensation" contributed to the Plan, for each payroll period, up to the annual limit set by 26 U.S.C. § 402(g). ECF No. 159-6 (2017 Adoption Agreement) at 11 (§ 1.07(a)); ECF No. 159-7 at 18 (§ 5.03); ECF No. 159-8 at 11. It is not disputed that "Compensation" under the Plan includes credit card tips. The Basic Plan Document explains, however, that deferral contributions are limited to "effectively available Compensation." The full explanation reads as follows:

> Notwithstanding any other provision of this Section or of any Participant's salary reduction agreement, in no event shall a Participant be permitted to make Deferral Contributions in excess of his "effectively available Compensation." A Participant's "effectively available Compensation" is his Compensation remaining after all applicable amounts have been withheld (e.g., tax withholding and withholding of contributions to a cafeteria plan).

ECF No. 159-7 at 20 (§ 5.03 titled "Deferral Contributions"). Because Host can only conduct withholding through its payroll process, it is reasonable to interpret "effectively available Compensation" as limited to compensation paid by Host through the payroll process, which does not include employees' cash or credit card tips. *See* ECF No. 160-2 at 58:5–59:11, 125:22–127:5. Both Host's Tip Policy and the CBA in force at Plaintiff's workplace provide that tips are employees' property. *See* ECF No. 159-18, ¶ 4.5. Accordingly, during the relevant period, an employee's credit card tips were cashed out at the end of their shift, placing them, like cash tips,[3] outside the payroll process and unavailable for withholding. Therefore, the language of the Plan defining "effectively available Compensation" supports the Claims Administrator's determination.

*Purposes and Goals of the Plan*: "The purpose of the Plan is to enable eligible Employees to save for retirement." ECF No. 159-8 (Summary Plan Description) at 6. In pursuit of this purpose, the Plan allows for both pre-tax deferrals and after-tax contributions. ECF No. 159-7 at 18–20 (§§

---

[3] Plaintiff does not argue that cash tips should be available for pre-tax deferral contributions.

5.03, 5.04 of the Basic Plan Document). Limiting pre-tax deferrals to employees' compensation though payroll while also allowing for tips to be contributed on an after-tax basis does not undermine the purpose of the Plan. Both forms of contribution are matched by Host to the same degree. ECF No. 159-8 at 7, 12.

*Adequacy of Materials Considered*: In the April 10, 2019, letter denying Plaintiff's claim, Claims Administrator Russell cites the SPD, federal tax law, and IRS rules and guidance in support of their decision. ECF No. 159-35 at 2–3. On appeal, the Retirement Savings Plan Committee and Plan counsel held a meeting to discuss Plaintiff's claim. ECF No. 160-13 at 2–3. The Committee discussed relevant provisions of the Plan and IRS regulations. In its letter denying Plaintiff's appeal, the Committee cited state labor laws, IRS plan correction procedures, the SPD, and the Plan itself, all in support of its decision. *Id.* at 4–6. The Court finds that the Claims Administrator and the Committee reviewed and considered adequate materials in reaching their decision to deny Plaintiff's claim.[4]

*Consistency with Other Plan Documents*: The Administrator's determination is consistent with the SPD. The SPD is not part of the Plan but is used to explain the Plan to employees. The SPD explains: "Tipped employee contributions to the Plan include all reported gratuities as eligible compensation when determining the eligible contribution amount for the Plan. Consequently, tipped employees may receive a payroll check that is not sufficient for taking a deduction, which may result in an Arrears Contribution (calculated deductions not taken from the payroll check)." ECF No. 159-8 at 12. The SPD notes that "Arrears contributions are treated as After-tax

---

[4] Plaintiff's argument that a Committee member admitted that the Committee did not review any materials in deciding to deny the appeal misconstrues the record. *See* ECF No. 167-31 (Lauterbach Dep.) at 32:20–34:13, 38:16–40:4, 52:22–53:12, 83:13–84:11, 122:17–23. The Committee member testified that he had reviewed the Plan document during the claims process and did not need to review it again before the appeal. ECF No. 171-2 (Lauterbach Dep.) at 67:14–69:3. He also testified that he was not personally aware of what documents other Committee members reviewed, not that they failed to review any materials.

contributions in the Plan" and explains how tipped employees with an arrears balance may submit their arrears contributions to the Plan.

 ***Decision-making Process***: Plaintiff argues that the Committee merely signed off on counsel's prewritten denial letter. *See* ECF No. 167-31 at 32:20–34:13, 38:16–40:4, 52:22–53:12, 83:13–84:11, 122:17–23. After the initial denial, the Committee held a meeting where counsel was present and offered their recommendation. ECF No. 160-13 at 2–3. At that meeting, members of the Committee raised questions and actively exchanged relevant information. A vote was conducted, and the Committee unanimously decided to deny Plaintiff's appeal, agreeing with counsel's recommendation. *Id.* at 2–6; *see also* ECF No. 167-31 at 38:16–40:4, 83:2–84:11, 122:17–23. The process through which the Committee arrived at this decision was reasoned and principled.

 ***Consistency with ERISA Requirements***: Claims Administrator Russell's decision complied with ERISA requirements. ERISA regulations specifically allow employers to restrict elective deferrals "to amounts available after other withholding from the employee's pay (*e.g.*, after deduction of all applicable income and employment taxes)." 26 C.F.R. § 1.414(v)-1(e)(1)(ii)(B). Plaintiff argues that the challenged decision is not consistent with 26 U.S.C. § 401(a)(4), which proscribes "contributions or benefits provided under the plan" from "discriminat[ing] in favor of highly compensated employees (within the meaning of section 414(q))." But Plaintiff cites no record evidence to support the proposition that the challenged decision discriminates in favor of "highly compensated employees." Plaintiff also cites ERISA § 510, codified at 29 U.S.C. § 1140, which prohibits retaliation and discrimination against participants for exercising their rights under the plan. But, as explained in Part II.D *infra*, Plaintiff fails to establish any violation of ERISA § 510.

*External Standards Relevant to Exercise of Discretion*: The determination to deny Plaintiff's request was also consistent with external standards, including employment laws and CBAs that require employers to treat tips as employees' property, as well as provisions in some CBAs that require an employee's credit card tips to be cashed out at the end of the work shift. *See* ECF No. 159-18, ¶ 4.5.

*Fiduciary's Motive and Conflicts of Interest*: Plaintiff argues that there is a structural conflict in any benefits decision made by Defendants because the Plan's fiduciaries and decision-makers as to claims for benefits include Plaintiff's employer, Host, and its officers. Plaintiff argues that this conflict of interest manifested into an improper motive for denying his claim when Defendants based their denial on the practical difficulty and expense of accommodating Plaintiff's request under Host's payroll policy and practices, instead of acting in the best interest of Plan participants. Plaintiff cites *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008), where the Supreme Court held that an employer has an interest conflicting with that of plan beneficiaries when it "both funds the plan and evaluates the claims." The instant case is clearly distinguishable because Host's obligation to match employees' contributions is the same whether or not the employee's contribution is made through a pre-tax deferral. *See* ECF No. 159-8 at 12 ("Your Employer has elected to make matching contributions to all Participants in an amount equal to 100% of the first 3% of your eligible compensation and 50% of the next 3% of your eligible compensation, contributed to the Plan as Pre-tax Deferral Contributions and/or After-tax Contributions."). The only financial incentive Host had to deny Plaintiff's claim would be the administrative expense of altering its payroll processes. The Court does not find this factor to weigh heavily in Plaintiff's favor. Plaintiff cites no evidence that Claims Administrator Russell's denial of Plaintiff's request was motivated by any administrative expense. The letters denying

Plaintiffs' claim and other evidence of the decision-making process make no reference to any administrative cost associated with Plaintiff's request. They only reflect the administrator's understanding of the Plan itself and the legal framework surrounding it. *See* ECF No. 159-35; ECF No. 160-13. What little financial incentive Host had in denying Plaintiff's claim is not sufficient to undermine the deference owed to the Claims Administrator's exercise of discretion in making a benefits determination.

After reviewing the *Booth* factors in light of the undisputed facts, this Court concludes that the Claims Administrator's determination denying Plaintiff's request was reasonable and was not an abuse of discretion. Defendants are entitled to summary judgment on Count I.

### C. Counts II and III: Breach of Fiduciary Duty (29 U.S.C. §§ 1132(a)(2), 1132(a)(3))

ERISA § 502(a)(2) allows a plan participant to file a civil suit "for appropriate relief" against plan fiduciaries who breach their fiduciary duties. 29 U.S.C. § 1132(a)(2) (citing 29 U.S.C. § 1109). In Count II of his Complaint, Plaintiff alleges that Defendants breached two separate fiduciary duties set forth in ERISA § 404(a)(1)(B) and (D), codified at 29 U.S.C. § 1104(a)(1)(B), (D).[5] Under ERISA § 404(a)(1)(D), a fiduciary must act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III." 29 U.S.C. § 1104(a)(1)(D). Under ERISA § 404(a)(1)(B), a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

---

[5] In Plaintiff's response in opposition to Defendants' Motion for Summary Judgment, Plaintiff alleges for the first time that Defendants breached their fiduciary duties under ERISA § 404(a)(1)(A), codified at 29 U.S.C. § 1104(a)(1)(a). ECF No. 167 at 26, 26 n.9. As Defendants point out, this claim must be disregarded because it was not pled in Plaintiff's Complaint. *See generally* ECF No. 1.

matters would use in the conduct of an enterprise of a like character and with like aims[.]" 29 U.S.C. § 1104(a)(1)(B).

Plaintiff's Complaint states that "Defendants have breached ERISA § 404(a)(1)(D) by failing to act in accordance with the documents and instruments governing the Plan." ECF No. 1, ¶ 48. But there is no genuine dispute that, in denying Plaintiff's claim, Defendants complied with the terms of the Plan, as explained in Part II.B *supra*. In addition, the Court notes that "[i]ndividualized claims for breach of fiduciary duty are not authorized where ERISA provides adequate relief for a plaintiff's injury in another part of ERISA's statutory scheme." *Wozniak v. S.T.A. of Baltimore-I.L.A. Container Royalty Fund*, Civ. No. GLR-12-1540, 2012 WL 5388845, at *4 (D. Md. Oct. 31, 2012) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 512, 515 (1996)). ERISA § 502(a)(1)(B) "provides individualized review to plan participants for an allegedly wrongful denial of plan benefits." *Id.* (citing 29 U.S.C. § 1132(a)(1)(B)). "The Fourth Circuit has expressly rejected a denial of benefits claim being 'repackaged' as a breach of fiduciary duty claim." *Id.* (citing *Korotynska v. Metro. Life Ins. Co.*, 474 F.3d 101, 106–07 (4th Cir. 2006)). "[A] claim for breach of fiduciary duty is actually a claim for benefits where the resolution of the claim rests upon an interpretation and application of an *ERISA regulated plan* rather than upon an interpretation and application of *ERISA*." *Smith v. Sydnor*, 184 F.3d 356, 362 (4th Cir. 1999). Here, Plaintiff's claim under ERISA § 404(a)(1)(D) in Count II appears to be a repackaging of his claim for denial of benefits in Count I. Defendants are entitled to summary judgment on this portion of Count II.

Defendants are also entitled to summary judgment on the remainder of Count II because there is no evidence of loss on the part of the Plan. The Fourth Circuit has held, "while certain conduct may be a breach of an ERISA fiduciary's duties under § 1104, that fiduciary can only be held liable upon a finding that the breach actually caused a loss to the plan." *Plasterers' Loc. Union*

*No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 217 (4th Cir. 2011). In a separate case, the Fourth Circuit indicated that the initial burden is on the plaintiff to show both a breach of a fiduciary duty and a loss. *See Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 363 (4th Cir. 2014). It is not until a plaintiff makes that initial showing that the burden on loss causation shifts to the fiduciary.[6] *Id.*

Here, Plaintiff does not present any evidence that the Plan sustained any loss. *See* ECF No. 167 at 27. Plaintiff argues that Defendants draw a false equivalence between pre- and post-tax contributions and that each offers distinct incentives for participation. *Id.* Plaintiff states that "by excluding the primary feature and benefit of the Plan for a significant portion of the compensation of Host's tipped employees, Defendants have reduced the amount of contributions that would have otherwise added to the Plan's assets." *Id.* Plaintiff cites an expert report explaining that tipped employees would have more tip compensation to contribute through pre-tax deferral than on an after-tax basis. ECF No. 167-7 at 16. But Plaintiff does not identify any evidence Plan participants would have actually increased contributions to the Plan if they had the option of making pre-tax deferrals from credit card tips. Defendants, on the other hand, produced evidence that at least one participant reduced his deferral rate to 0% once electronic payment of credit card tips was implemented, making them available for pre-tax deferral, indicating that this participant did not want to make pre-tax deferrals from his credit card tips. ECF No. 160-17, ¶ 44. In sum, there is no evidence that the Plan sustained any loss, and Defendants are entitled to summary judgment on Count II.

---

[6] Plaintiff's reliance on *Pender v. Bank of America Corporation*, 788 F.3d 354 (4th Cir. 2015) is misplaced. At issue in *Pender* was whether the plaintiffs, seeking disgorgement of profits, had demonstrated injury in fact sufficient for Article III standing. 788 F.3d at 365–67. In that posture, the Fourth Circuit held that "for standing purposes, Plaintiffs incurred an injury in fact, i.e., an invasion of a legally protected interest, because they suffered an individual loss, measured as the spread or difference between the profit the Bank earned by investing the retained assets and the amount it paid to them." *Id.* at 367.

Plaintiff's claim in Count III arises under ERISA § 502(a)(3), codified at 29 U.S.C. § 1132(a)(3). ERISA § 502(a)(3) allows a plan participant to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]" 29 U.S.C. § 1132(a)(3). Plaintiff's ERISA § 502(a)(3) claim is premised upon his allegation that Defendants violated ERISA § 510.

The Court believes this claim to be moot because the remedy of plan reformation is now unnecessary. Due to negotiations between Plaintiff's union and Host, Plaintiff has the relief he requested; he can now defer credit card tips pre-tax into the Plan. *See* ECF No. 159-28 at 14–16 (beginning on January 1, 2025, Host and Plaintiff's union have agreed to implement the electronic payment of tips). Further, there does not seem to be a basis for other equitable relief. Plaintiff has not suffered any harm. He could have invested his cash tips through the arrears process, but instead he used his tips to pay for other expenses. ECF No. 160-10 at 128–129. An additional contribution to Plaintiff's Plan would be a windfall, allowing him to both spend and save his cash tips. Therefore, Defendants are entitled to Summary Judgment on Count III.

### D.  Discrimination Under ERISA § 510 (29 U.S.C. § 1140)

ERISA § 510 makes it

> unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140. This statute "relates to discriminatory conduct directed against individuals; it does not forbid discrimination relating to the plan in general." *Duncan v. State Farm Ins.*

*Companies*, 896 F. Supp. 543, 547 (D.S.C. 1995) (citing cases). Courts applying ERISA § 510 "require that the employer engage in conduct affecting the employment relationship." *Gross v. St. Agnes Health Care, Inc.*, Civ. No. ELH-12-2990, 2013 WL 4925374, at *18 (D. Md. Sept. 12, 2013) (citing cases).

The Fourth Circuit has established that "a § 510 plaintiff must prove specific intent by defendants to interfere with his pension rights." *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 238 (4th Cir. 1991). "In seeking to prove specific intent, a claimant in the ERISA context confronts proof problems similar to those encountered by Title VII plaintiffs: employers rarely, if ever, memorialize their specific intent to act unlawfully." *Id.* at 239. Thus, the Fourth Circuit held "that the *McDonnell Douglas* scheme of presumptions and shifting burdens of production is appropriate in the context of discriminatory discharge claims brought under § 510 of ERISA." *Id.*

The burden is therefore on the plaintiff to make out a *prima facie* case of discrimination or retaliation. *Goode v. Am. Veterans, Inc.*, 874 F. Supp. 2d 430, 452 (D. Md. 2012). "To establish a *prima facie* case under ERISA § 510, an employee must demonstrate that (1) the employer performed a prohibited action (2) for the purpose of interfering (3) with the attainment of a right to which the employee is currently, or in the future may become, entitled." *Id.* at 452–53. *See also Obazee v. Wells Fargo Advisor, LLC*, No. 3:10-CV-215, 2010 WL 3522091, at *3 (E.D. Va. Sept. 3, 2010) ("[T]o make a claim of intentional interference under § 510, a plaintiff must typically show 1) that there was an adverse employment action, 2) that such action was taken with the purpose of interference with benefits, 3) and that he was otherwise eligible for the benefit."). "If the plaintiff establishes a *prima facie* case by a preponderance of the evidence, the burden shifts to the employer to state a legitimate, nondiscriminatory explanation for the challenged conduct." *Goode*, 874 F. Supp. 2d at 453. If the employer carries its burden, "the burden then shifts back to

the plaintiff, who is given the opportunity to establish by a preponderance of the evidence that the defendant's explanation is pretextual." *Id.*

Here, Plaintiff fails to carry his burden of showing that Defendants took any adverse employment action against him for the purpose of interfering with his pension rights. Plaintiff argues that "Host instituted and enforced a policy that is designed to preclude him from exercising his rights under the Plan to defer a portion of his pre-tax credit card income . . . ." ECF No. 167 at 29. But record evidence establishes that the challenged policy of paying out credit card tips in cash preceded the adoption of the Plan and of Plaintiff's hiring by more than a decade. ECF No. 160-2 at 47:22–48:6 (tips policy adopted prior to 2000; Plan adopted in 2013). Therefore, the Tips Policy could not have been adopted to discriminate against Plaintiff individually. Moreover, the Tips Policy was adopted at the behest of unions representing Host's employees, who negotiated against implementing electronic payment of credit card tips. *See* ECF No. 159-21 at 48:12–22, 94:8–25; ECF No. 160-3, ¶¶ 18–21; ECF Nos. 160-4, 160-5, 160-6; ECF No. 160-7 at 21:4–21:18. Thus, even if the challenged policy could be considered an adverse employment action, the record reflects legitimate non-discriminatory reasons for the policy, and Plaintiff fails to show that they are a mere pretext for discrimination. In sum, Plaintiff fails to present any evidence that Host took any action to discriminate against him with any discriminatory or retaliatory intent or purpose of interfering with his pension rights.

III.    **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is granted.

A separate Order will follow.

_9/30/25_
Date

_____
Matthew J. Maddox
United States District Judge